# In the United States Court of Appeals for the District of Columbia Circuit

———————————

IGAS HOLDINGS, INC., et al.,
Petitioners,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
Respondent.

----------------------------

AIR-CONDITIONING, HEATING, AND REFRIGERATION INSTITUTE AND
ALLIANCE FOR RESPONSIBLE ATMOSPHERIC POLICY,
Intervenors.

———————————

On Petition for Review from the United States
Environmental Protection Agency

———————————

**INITIAL BRIEF OF PETITIONERS IGAS HOLDINGS, INC.; IGAS USA, INC.; BMP USA, INC.; BMP INTERNATIONAL INC.; L.M. SUPPLY, INC.; COOL MASTER USA, LLC; ASSURED COMFORT A/C, INC.; SCALES N STUFF, INC.; GOLDEN G IMPORTS LLC, RAMJ ENTERPRISES INC.; and JPRP INTERNATIONAL, INC.**

———————————

JOANN T. SANDIFER
HUSCH BLACKWELL LLP
8001 Forsyth Blvd., Suite 1500
St. Louis, MO 63105

JAMIE SHOOKMAN
HUSCH BLACKWELL LLP
511 N. Broadway, Suite 1100
Milwaukee, WI 53202

DANIEL G. SOLOMON
HUSCH BLACKWELL LLP
1801 Penn. Avenue, NW, Suite 1000
Washington, DC 20006

*Counsel for Petitioners IGas Holdings, Inc., et al.*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**Parties**. The parties in No. 23-1261 are Petitioners IGas Holdings, Inc.; IGas USA, Inc.; BMP USA, Inc.; BMP International Inc.; L.M. Supply, Inc.; Cool Master U.S.A., LLC; Assured Comfort A/C, Inc.; Scales N Stuff, Inc.; Golden G Imports LLC; RAMJ Enterprises Inc.; and JPRP International, Inc. (collectively, "IGas Petitioners") and Respondent Environmental Protection Agency.

The parties in No. 23-1263, which has been consolidated with No. 23-1261, are Petitioner RMS of Georgia, LLC d/b/a Choice Refrigerants and Respondents Environmental Protection Agency and Michael S. Regan, in his official capacity as Administrator of the Environmental Protection Agency.

**Rulings Under Review**. The petition for review challenges the Environmental Protective Agency's final rule titled "Phasedown of Hydrofluorocarbons: Allowance Allocation Methodology for 2024 and Later Years," which appears in the Federal Register at 88 Fed. Reg. 46,836 (July 20, 2023) ("2024 Rule") (codified at 40 C.F.R. Part 84) and in the joint appendix at ___ –___.

**Related Cases**. IGas Petitioners are unaware of related cases other than No. 23-1263, which has been consolidated in this appeal.

# CORPORATE DISCLOSURE STATEMENT

Under Federal Rules of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, IGas Petitioners certify as follows:

Petitioner IGas Holdings, Inc. is a Florida corporation operating as a parent company for companies that import and/or distribute refrigerant gases, including hydrofluorocarbons. IGas Holdings has no parent corporation, and no publicly traded corporation owns 10 percent or more of its stock.

Petitioner IGas USA, Inc. is a Florida corporation that distributes refrigerant gases, including hydrofluorocarbons. IGAS USA is owned by IGAS Holdings and Zhejiang Juhua Co., Ltd., a publicly traded corporation.

Petitioners BMP USA, Inc.; BMP International Inc.; L.M. Supply, Inc.; Cool Master USA, LLC; Assured Comfort A/C, Inc.; Scales N Stuff, Inc.; Golden G Imports LLC; RAMJ Enterprises Inc.; and JPRP International, Inc. are Florida corporations, wholly owned by IGas Holdings, that import or distribute refrigerant gases, including hydrofluorocarbons. No publicly traded corporation owns 10 percent or more of their stock.

**TABLE OF CONTENTS**

Page

CERTIFICATE AS TO PARTIES, RULINGS,
AND RELATED CASES ......................................................................... i

CORPORATE DISCLOSURE STATEMENT ........................................ ii

TABLE OF AUTHORITIES................................................................... vi

GLOSSARY ........................................................................................... xiii

INTRODUCTION .................................................................................. 1

STATEMENT OF JURISDICTION ....................................................... 3

STATEMENT OF THE ISSUES ............................................................ 3

STATUTES AND REGULATIONS ....................................................... 4

STATEMENT OF THE CASE................................................................ 4

      A.     HFCs........................................................................................ 4

      B.     The AIM Act.......................................................................... 5

      C.     EPA's Framework Rule........................................................... 6

      D.     EPA's Proposed Rule for the 2024–2028 HFC Allocation.................. 7

      E.     Comments on the Proposed 2024 Rule .................................. 9

      F.     The 2024–2028 HFC Allocation Final Rule ...................... 10

STANDARD OF REVIEW .................................................................... 12

SUMMARY OF ARGUMENT............................................................... 13

STANDING............................................................................................ 16

ARGUMENT ......................................................................................... 17

I.     EPA Arbitrarily And Capriciously Excluded 2020 Consumption Activity Data From The Timeframe Used To Determine HFC Consumption Allowance Allocations ................................................................. 17

    A.    EPA's conclusion that the 2020 data is unrepresentative of HFC market conditions is arbitrary and capricious ..................................... 19

        1.    EPA's speculation that 2020 data was distorted because of stockpiling and COVID-19 has no support in the record ........ 19

        2.    Entities had the opportunity and incentive to stockpile long before Congress showed interest in passing the AIM Act ....... 26

        3.    EPA should have used averaging to resolve its concerns about 2020 was an outlier year ......................................................... 31

    B.    The 2020 data was sufficiently vetted for consideration in the 2024 Rule ...................................................................................................... 35

    C.    Including 2020 in the range of years to determine allowance allocations will not frustrate EPA's goals to minimize market disruptions and provide a seamless transition through the phasedown steps ................................................................................. 37

        1.    Including 2020 will not add more disruption to the market .... 38

        2.    Including 2020 would not interfere with promoting long-term planning or maintaining continuity between the stepdown periods................................................................... 46

CONCLUSION ........................................................................................... 48

CERTIFICATE OF COMPLIANCE ..................................................... 50

CERTIFICATE OF SERVICE .............................................................. 51

STATUTORY AND REGULATORY ADDENDUM

    Table of Contents .................................................................. Add. i

American Innovation and Manufacturing Act of 2020, Pub. L. No. 116-260, Div. S, § 103, 134 Stat. 1182, 2255–71 (2020) .........................Add. 1

*Phasedown of Hydrofluorocarbons: Allowance Allocation Methodology for 2024 and Later Years*, 88 Fed. Reg. 46,836 (July 20, 2023).....Add. 18

*Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 55,116 (Oct. 5, 2021).................Add. 81

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Action for Child.'s Television v. FCC*,
821 F.2d 741 (D.C. Cir. 1987) ..............................................................36

*Airmark Corp. v. FAA*,
758 F.2d 685 (D.C. Cir. 1985) ..............................................................35

*Allied Loc. & Reg'l Mfrs. Caucus v. EPA*,
215 F.3d 61 (D.C. Cir. 2000) ..........................................................22, 29

*Am. Petroleum Inst. v. EPA*,
862 F.3d 50 (D.C. Cir. 2017) ..............................................................41

*Am. Wild Horse Pres. Campaign v. Perdue*,
873 F.3d 914 (D.C. Cir. 2017) ................................................23, 26, 41

*Arkema Inc. v. EPA*,
618 F.3d 1 (D.C. Cir. 2010) ..................................................................4

*Bd. of Cnty. Comm'rs of Weld Cnty., Colo. v. EPA*,
72 F.4th 284 (D.C. Cir. 2023) ..............................................................16

*Catawba Cnty., N.C. v. EPA*,
571 F.3d 20 (D.C. Cir. 2009) ..............................................................34

*Chem. Mfrs. Ass'n v. EPA*,
28 F.3d 1259 (D.C. Cir. 1994) ........................................................22, 43

*Clean Wisc. v. EPA*,
964 F.3d 1145 (D.C. Cir. 2020) ..........................................................25

*Del. Dep't. of Nat. Res. & Envtl. Control v. EPA*,
785 F.3d 1 (D.C. Cir. 2015) ........................................................13, 22, 29

*Dist. Hosp. Partners, L.P. v. Burwell*,
786 F.3d 46 (D.C. Cir. 2015) ..............................................................29

*Eagle Broad. Grp., Ltd. v. FCC*,
    563 F.3d 543 (D.C. Cir. 2009) ..............................................................34

*Encino Motorcars, LLC v. Navarro*,
    579 U.S. 211 (2016) ..............................................................................37

*Fed. Power Comm'n v. Fla. Power & Light Co.*,
    404 U.S. 453 (1972) ..................................................................... 13, 25

*Gas Appliance Mfrs. Ass'n, Inc. v. Dep't of Energy*,
    998 F.2d 1041 (D.C. Cir. 1993) ..........................................................42

*Genuine Parts Co. v. EPA*,
    890 F.3d 304 (D.C. Cir. 2018) ............................................................26

*Grayscale Invs., LLC v. SEC*,
    82 F.4th 1239 (D.C. Cir. 2023) ..........................................................31

*Honeywell Int'l, Inc. v. EPA*,
    705 F.3d 470 (D.C. Cir. 2013) ..................................................... 30, 31

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ..............................................................................16

*Maryland v. EPA*,
    958 F.3d 1185 (D.C. Cir. 2020) ..........................................................12

*Merck & Co. v. U.S. Dep't Health & Hum. Svcs*,
    962 F.3d 531 (D.C. Cir. 2020) ............................................................24

*Mexichem Fluor, Inc. v. EPA*,
    866 F.3d 451 (D.C. Cir. 2017) .........................................................4, 27

*Michigan v. EPA*,
    576 U.S. 743 (2015) ..............................................................................23

*MISO Transmission Owners v. FERC*,
    45 F.4th 248 (D.C. Cir. 2022) ..................................................... 29, 33

*Miss. Comm'n on Envtl. Quality v. EPA*,
    790 F.3d 138 (D.C. Cir. 2015) .............................................. 12, 17, 43

*Mississippi v. EPA*,
  744 F.3d 1334 (D.C. Cir. 2013) .........................................................18

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................... 12, 13, 17, 23, 41

*Nat. Res. Def. Council, Inc. v. Herrington*,
  768 F.2d 1355 (D.C. Cir. 1985) .........................................................42

*Nat'l Shooting Sports Found., Inc. v. Jones*,
  716 F.3d 200 (D.C. Cir. 2013) ................................................... 23, 43

*Nat'l Tel. Coop. Ass'n v. FCC*,
  563 F.3d 536 (D.C. Cir. 2009) ...........................................................45

*New York v. EPA*,
  413 F.3d 3 (D.C. Cir. 2005) ..................................................... 19, 22, 46

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
  472 F.3d 882 (D.C. Cir. 2006) ...........................................................46

*Sierra Club v. EPA*,
  292 F.3d 895 (D.C. Cir. 2002) ...........................................................16

*Sorenson Commc'ns Inc. v. FCC*,
  755 F.3d 702 (D.C. Cir. 2014) ................................................... 34, 47

*Steger v. Def. Investigative Serv. Dep't of Def.*,
  717 F.2d 1402 (D.C. Cir. 1983) .........................................................36

*Transactive Corp. v. United States*,
  91 F.3d 232 (D.C. Cir. 1996) ............................................................29

*U.S. Sugar Corp. v. EPA*,
  830 F.3d 579 (D.C. Cir. 2016) ...........................................................13

*United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*,
  839 F.3d 242 (3d Cir. 2016) ..............................................................42

*Verizon v. FCC*,
  740 F.3d 623 (D.C. Cir. 2014) ................................................. 21, 44, 46

*West Virginia v. EPA*,
    362 F.3d 861 (D.C. Cir. 2004) ..............................................................47

## Statutes

42 U.S.C.
    § 7607.............................................................................................................3
    § 7607(d)(9)(A)..........................................................................................12
    § 7671a..........................................................................................................4
    § 7671c..........................................................................................................4
    § 7675.......................................................................................................3, 5
    § 7675(e)(2)(A)............................................................................................5
    § 7675(e)(2)(B)............................................................................................5
    § 7675(e)(2)(C).......................................................................................5, 44
    § 7675(e)(2)(D)............................................................................................5
    § 7675(e)(2)(D)(i)......................................................................................48
    § 7675(e)(3)..................................................................................................5
    § 7675(k)......................................................................................................3

American Innovation and Manufacturing Act of 2020, Pub. L. No. 116-260,
    Div. S, § 103, 134 Stat. 1182, 2255–71 (2020) ....................................5

## Regulations

40 C.F.R. § 84.11(b)(2) ......................................................................................3

40 C.F.R. Part 84 ................................................................................................6

*Phasedown of Hydrofluorocarbons: Allowance Allocation Methodology for*
    *2024 and Later Years*, 87 Fed. Reg. 66,372 (Nov. 3, 2022)....................7

*Phasedown of Hydrofluorocarbons: Allowance Allocation Methodology for*
    *2024 and Later Years*, 88 Fed. Reg. 46,836 (July 20, 2023)
    .........................................................1-3, 7-11, 13-14, 16-17, 19-30, 32-36, 38-48

*Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation*
    *and Trading Program Under the American Innovation and Manufacturing*
    *Act*, 86 Fed. Reg. 27,150 (May 19, 2021) ......................6, 28-30, 32, 39

*Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 55,116 (October 5, 2021) ......................................................1, 5-7, 16, 19-20, 25, 27, 30, 32-35, 39-40, 42

Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2021) ..............................24

*Protection of Stratospheric Ozone: Change of Listing Status for Certain Substitutes Under the Significant New Alternatives Policy Program*, 80 Fed. Reg. 42,870 (July 20, 2015) ........................................................11, 27, 42

## Other Authorities

Amendment to the Montreal Protocol on Substances that Deplete the Ozone Layer, Oct. 15, 2016, U.N. Doc. C.N.872.2016.TREATIES-XXVII.2.f ..............5

Comments of the American HFC Coalition, EPA-HQ-OAR-2021-0044-0160 (July 6, 2021) ...................................................................................... 40

Comments of Arkema, EPA-HQ-OAR-2021-0044-0135 (July 6, 2021) ...............30

Comments of Arkema Inc., EPA-HQ-OAR-2022-0430-0044 (Dec. 19, 2022) ......43

Comments of Daikin U.S. Corporation, EPA-HQ-OAR-2022-0430-0096 (Dec. 19, 2022) .......................................................................................... 44

Comments of FluoroFusion Specialty Chemicals, Inc., EPA-HQ-OAR-2022-0430-0015 (Dec. 19, 2022) ........................................................................40, 44

Comments of Honeywell International, Inc., EPA-HQ-OAR-2021-0044-0197 (July 6, 2021) ............................................................................................28, 40

Comments of Honeywell International, Inc., EPA-HQ-OAR-2022-0430-0039 (Dec. 19, 2022)...........................................................................................43

Comments of IGas Holdings, Inc., EPA-HQ-OAR-2022-0430-0070 (Dec. 19, 2022)............................................................................... 9, 22, 29, 31, 34, 36, 44

Comments of Koura, EPA-HQ-OAR-2021-0044-0143 (July 6, 2021) ...... 28, 31, 40

Comments of Mexichem Fluor, Inc. d/b/a Koura, EPA-HQ-OAR-2022-0430-0043 (Dec. 19, 2022)......................................................................... 43

Comments of National Refrigerants, Inc., EPA-HQ-OAR-2022-0430-0046 (Dec. 19, 2022)...............................................................................43

Comments of Nature Gas Import and Expert, Inc., EPA-HQ-OAR-2022-0430-0029 (Dec. 19, 2022)........................................................ 22,34, 36, 44

Comments of RGAS, LLC, EPA-HQ-OAR-2022-0430-0095 (Dec. 19, 2022) ............................................................... 9, 10, 22, 29, 31, 34, 36, 44

Comments of Semiconductor Industry Association, EPA-HQ-OAR-2022-0430-0036 (Dec. 19, 2022)...............................................................45

Comments of The Chemours Company, EPA-HQ-OAR-2021-0044-0216 (July 6, 2021) .............................................................................. 40

Comments of The Chemours Company, EPA-HQ-OAR-2022-0430-0047 (Dec. 19, 2022) ..............................................................................31, 40, 43

Dr. Tedros Adhanom Ghebreyesus, Director-General, World Health Organization, Opening Remarks at the Media Briefing on COVID-19 (Mar. 11, 2020), *available at* https://bit.ly/3Mvelm9......................................24

Executive Office of the President, The President's Climate Action Plan (June 2013).......................................................................................27

*GHGRP Data Relevant to the AIM Act*, U.S. Envtl. Prot. Agency, https://www.epa.gov/ghgreporting/ghgrp-data-relevant-aim-act ..................10, 11

*HFC Allowances*, U.S. Envtl. Prot. Agency, https://www.epa.gov/climate-hfcs-reduction/hfc-allowances (last updated on Oct. 19, 2023) ................................43

Kigali Amendment, U.N. Doc. C.N.872.2016.TREATIES-XXVII.2.f. ..................28

Montreal Protocol on Substances That Deplete the Ozone Layer, Sept. 16, 1987, S. Treaty Doc. No. 100-10, 1522 U.N.T.S. 29 .............................................4

Montreal Protocol art. 2F ...........................................................................4

Peter S. Goodman, *A Normal Supply Chain? It's 'Unlikely' in 2022*, N.Y. Times (Feb. 6, 2022), https://nyti.ms/3siNe77 ....................................................24

Press Release, Office of the Spokesperson, Bureau of Global Public Affairs, United States, Canada, and Mexico Submit North American HFC Phase Down Amendment to the Montreal Protocol (April 15, 2015), https://bit.ly/3SDQMvv ...................................................................................27

S. 2448, 115th Cong. (2018) ..................................................................................28

S. 2448, 115th Cong. § 2(a) (2018) .......................................................................31

# GLOSSARY

| | |
|---|---|
| AIM Act | American Innovation and Manufacturing Act of 2020 |
| CFC | Chlorofluorocarbon |
| EPA or Agency | U.S. Environmental Protection Agency |
| GHGRP | Greenhouse Gas Reporting Program |
| HCFC | Hydrochlorofluorocarbon |
| HFC | Hydrofluorocarbon |
| JA | Joint Appendix |
| OEM | Original Equipment Manufacturers |
| ODS | Ozone-Depleting Substances |

## INTRODUCTION

The American Innovation and Manufacturing Act ("AIM Act") established a comprehensive statutory regime to reduce the production and consumption of hydrofluorocarbons ("HFCs") through a phased stepdown between 2022 and 2036. To implement the program, the Environmental Protection Agency ("EPA") administers an allowance allocation program, granting regulated entities allowances to produce or consume specified HFC quantities. This program is designed to "mirror[] the AIM Act's phasedown provisions by distributing allowances to those entities that historically conducted the same activities now prohibited absent the expenditure of allowances." 2024 Rule at 46,848 (JA__).

EPA has allocated HFC allowances under the program twice. In 2021, the Agency issued a final rule establishing a methodology for allocating allowances for 2022–2023. In that rule, the Framework Rule, EPA based allocations on an entity's market share derived from averaging the three highest years of production and consumption between 2011 and 2019, the most recent, verified data available at the time. The Agency concluded that this methodology is the most "accurate, equitable, and inclusive" because it "incorporates consideration of both industry history and ongoing growth and market change." 86 Fed. Reg. 55,116, 55,145–46 (October 5, 2021).

Two years later, EPA promulgated another final rule, the 2024 Rule, establishing the methodology for allocating allowances for 2024–2028. The 2024 Rule, the subject of these consolidated petitions for review, used the same methodology as the Framework Rule, basing allocations on market data from 2011

to 2019. The 2024 Rule omitted 2020 and 2021 data from consideration despite EPA's recognition that more recent data generally represents the most accurate information on the current market.

EPA concluded that the 2020–2021 data did not represent the market and cited reasons for disregarding this data—reasons that ostensibly applied to both years. But EPA failed even to consider whether adding either year, standing alone, was similarly justified. Whatever support EPA may have had for excluding the 2021 data, excluding the 2020 data as unrepresentative rests on unsupported assumptions and rank speculation. The record lacks any facts supporting EPA's decision that 2020 was an "atypical" year. Similarly, EPA's stated concerns about market disruptions collapse when the 2020 data is considered alone.

EPA's decision to disregard available data for 2020, with no valid reason, flouted EPA's stated goal in implementing the AIM Act: allocating allowances based on the most accurate, equitable, and inclusive information about historical market activity. Rather than prioritize more recent data, EPA emphasized its desire to maintain the status quo and minimize market disruption caused by changing the methodology used to allocate the 2022–2023 allowances. But with no evidence that 2020 is not representative of the market, including more recent market data must trump EPA's desire to maintain the status quo.

The current allocations continue through 2028. So, under the 2024 Rule, the 2028 allocations will be based on data that is then nine to seventeen years old. Given EPA's admitted desire to maintain the status quo, does EPA plan to use the same methodology until the phasedown ends in 2036? Periodic changes to allocation

allowances during the AIM Act phasedown based on updated market data would better serve EPA's stated goals of considering industry history and market change while also smoothing transitions during the phasedown.

In short, EPA's decision to exclude 2020 market data from the 2024 Rule's methodology for calculating the 2024–2028 consumption allowances was arbitrary and capricious. The IGas Petitioners request that this Court vacate 40 C.F.R. § 84.11(b)(2) and remand for EPA to revise the 2024 Rule to calculate 2024–2028 consumption allowances by averaging each entity's three highest years between calendar years 2011 and 2020.

## STATEMENT OF JURISDICTION

EPA issued its final rule, *Phasedown of Hydrofluorocarbons: Allowance Allocation Methodology for 2024 and Later Years*, 88 Fed. Reg. 46,836, on July 20, 2023 under the American Innovation and Manufacturing Act ("AIM Act"), 42 U.S.C. § 7675. The IGas Petitioners timely petitioned this Court for review on September 14, 2023. This Court has jurisdiction under Subsection (k) of the AIM Act, 42 U.S.C. § 7675(k), and Section 307 of the Clean Air Act, 42 U.S.C. § 7607.

## STATEMENT OF ISSUES

1.    Did EPA arbitrarily and capriciously exclude 2020 consumption activity data from the methodology for allocating hydrofluorocarbon consumption allowances for calendar years 2024 through 2028, when EPA's stated reasons for excluding the 2020 and 2021 data do not apply to 2020 and excluding available data

from 2020 contravenes EPA's goal of equitably distributing allowances based on industry history and ongoing growth and market change?

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the Addendum.

## STATEMENT OF THE CASE

### A.    HFCs.

In the mid-1980s, the United States and other nations agreed to the Montreal Protocol, requiring signatories to regulate certain ozone-depleting substances. Montreal Protocol on Substances That Deplete the Ozone Layer, Sept. 16, 1987, S. Treaty Doc. No. 100-10, 1522 U.N.T.S. 29 ("Montreal Protocol" or "Protocol"); *see also Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 456 (D.C. Cir. 2017). As amended, the Protocol required ozone-depleting chlorofluorocarbons ("CFCs") production and consumption to end in developed countries by 1996.[1] Montreal Protocol art. 2A. Fulfilling its commitment, Congress started to phase them out in 1990. 42 U.S.C. §§ 7671a, 7671c.

CFCs have several uses, including as coolants in refrigeration technology. When CFCs were phased out, HFCs became an approved substitute. With HFCs in widespread use in the 2010s, concerns grew about their environmental and global warming impact. *Phasedown of Hydrofluorocarbons: Establishing the Allowance*

---

[1] The parties to the Protocol eventually agreed to also phase out the initial substitute for CFCs, hydrochlorofluorocarbons ("HCFCs"), which could be used as substitutes for CFCs. Montreal Protocol art. 2F; *see generally Arkema Inc. v. EPA*, 618 F.3d 1, 2–3 (D.C. Cir. 2010).

*Allocation and Trading Program Under the American Innovation and Manufacturing Act*, 86 Fed. Reg. 55,116, 55,123–24 (Oct. 5, 2021) ("Framework Rule"). To this end, more than 120 countries joined together to develop the Kigali Amendment to the Montreal Protocol in 2016, which required a "global phasedown of the production and consumption of HFCs." *Id.* at 55,123–24, 55,139; *see* Amendment to the Montreal Protocol on Substances that Deplete the Ozone Layer, Oct. 15, 2016, U.N. Doc. C.N.872.2016.TREATIES-XXVII.2.f.

## B.    The AIM Act.

In keeping with this international commitment to phase down HFCs, Congress enacted the AIM Act on December 21, 2020. Pub. L. No. 116-260, Div. S, § 103, 134 Stat. 1182, 2255–71 (2020) (codified at 42 U.S.C. § 7675). The AIM Act required phasing down HFC production and consumption to 15 percent of baseline levels by 2036 and directed EPA to accomplish this target "through an allowance allocation and trading program." 42 U.S.C. §§ 7675(e)(2), (3).

Under the AIM Act, EPA calculates the HFC production and consumption baseline. *Id.* § 7675(e)(1)(C). The Agency then caps maximum annual HFC production and consumption at a percentage of those baselines—for example, 90 percent by 2023. *Id.* § 7675(e)(2)(B), (C). Over time, the caps come down, reaching 15 percent in 2036. *Id.* To make sure production and consumption stay under the caps, the AIM Act created a system of "allowances." *Id.* § 7675(e)(2)(D). An allowance is like a license; without one, "no person shall . . . produce" or "consume" HFCs. *Id.* § 7675(e)(2)(A). EPA distributes these allowances to HFC producers and

importers, who can then buy and sell allowances from one another to adjust their production or consumption capacity. *Id.* § 7675(g). Providing this framework, the AIM Act left EPA to fill in the details.

## C. EPA's Framework Rule.

In May 2021, EPA issued a notice of proposed rulemaking, "Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the American Innovation and Manufacturing Act," 86 Fed. Reg. 27,150 (May 19, 2021) ("Proposed Framework Rule"). Under the AIM Act's mandate, EPA proposed to "[e]stablish the HFC production and consumption baselines based on historical data [and] establish the allowance allocation program to phase down HFC production and consumption." Proposed Framework Rule at 27,157. To allocate allowances, the Agency proposed basing allowances on market share derived from a company's best year of production and consumption between 2017 and 2019. *Id.* at 27,170. EPA requested comment on using production and consumption data from a different range of years, including, for example, from 2011–2013 or 2011–2019. *Id*.

In October 2021, EPA issued the final Framework Rule, implementing the allowance allocation program for 2022 and 2023. Framework Rule at 55,118; 40 C.F.R. Part 84. After receiving comments, EPA pivoted from its original proposal of basing allocations on a company's highest year between 2017 and 2019 and instead based allowance allocations on an average of the three highest years from 2011 to 2019. Framework Rule at 55,145. EPA reasoned that averaging the three highest

years over a longer period was "more accurate, equitable, and inclusive" because it "incorporates consideration of both industry history and ongoing growth and market change" and "allows for more evening out of fluctuations in the market." *Id.* at 55,145–46. EPA also determined that using this full range of years "allows a balancing of using the most current data, which generally provide *the most accurate information* on the current market to provide for less market disruption," with incorporating older data to account for changes in market behavior after the Kigali Amendment in 2016. *Id.* at 55,145–46 (emphasis added).

EPA excluded the 2020 data from its analysis for the sole reason that the Agency did not have enough time to verify the 2020 data reported to EPA's Greenhouse Gas Reporting Program ("GHGRP") before issuing the Framework Rule in October 2021. *Id.* at 55,146. Though the world was in the throes of COVID-19 in October 2021, EPA did not mention the pandemic's potential effect on HFC supply or consumption data as a reason to exclude using the 2020 data.

### D. EPA's Proposed Rule for the 2024–2028 HFC Allocation.

EPA always intended to develop another rule before allocating allowances for 2024 and later years. Framework Rule at 55,129. To that end, EPA issued a notice of proposed rulemaking, *Phasedown of Hydrofluorocarbons: Allowance Allocation Methodology for 2024 and Later Years*, 87 Fed. Reg. 66,372 (Nov. 3, 2022) ("Proposed 2024 Rule") (JA__–__). The Proposed 2024 Rule recommended using the same methodology for allocating allowances for 2024–2028 as it used for the 2022–2023 allocations. *Id.* at 66,377 (JA__). Aside from "the reasons described in

the Framework Rule (86 FR 55145–55147)," EPA cited two other reasons to continue using the 2011–2019 data for allowance allocations: using the same methodology through the next phasedown step would reduce market disruption, and this data, having been through several reviews, was "well-understood." *Id.* at 66,377–78 (JA__–__). EPA thus identified no "reasons that merit[ed] significantly changing course." *Id.* at 66,378 (JA__).

EPA considered "whether to include more recent data in determining allocation levels given that more recent data may be a more accurate reflection of the current state of the HFC production and import market." *Id.* To this end, EPA requested comment "on whether to expand the range of years to use to develop each allowance holder's high three-year average to include 2020 and 2021." *Id.*; *see also id.* (requesting comment "on whether there are advantages and disadvantages of including 2020 and 2021 data, and if so, what those would be"). EPA stated that it excluded these years in the Proposed 2024 Rule because the 2020–2021 import data was "likely influenced by external factors such as the COVID–19 pandemic, and supply chain disruptions." *Id.* EPA also stated that the 2020–2021 data "could be distorted due to an entity's awareness that the AIM Act may be, or had been, passed." *Id.* In addition, EPA speculated that including the 2020–2021 data "could also significantly change each entity's market share," disrupting the market and frustrating ongoing adjustments to the HFC allowance allocation program. *Id.* Finally, EPA noted that the 2011–2019 dataset is "well understood and has received more review than any other set of years." *Id.*

### E. Comments on the Proposed 2024 Rule.

IGas and other commenters submitted detailed comments in response to the 2024 Proposed Rule, identifying flaws in EPA's approach. First, commenters challenged EPA's assumption that entities stockpiled HFCs in 2020 and 2021. Comments of IGas Holdings, Inc., EPA-HQ-OAR-2022-0430-0070 at 6–9 (Dec. 19, 2022) ("IGas Comments") (JA__–__); Comments of RGAS, LLC, EPA-HQ-OAR-2022-0430-0095 at 5 (Dec. 19, 2022) ("RGAS Comments") (JA__). IGas commented that, for 2020 in particular, EPA's data shows the opposite of stockpiling—HFC imports and net supply *decreased* from 2019 to 2020. IGas Comments at 6–7 (JA__–__). Commenters also reminded EPA of its acknowledgment that stockpiling likely occurred long before Congress showed interest in passing the AIM Act and that EPA addressed the concern that an entity might receive a large allocation based on a single high year through averaging each entity's three highest years. *Id.* at 6, 9 (JA__, __). RGAS Comments at 5, 7 (JA__).

Commenters also explained that *excluding*, rather than including, the 2020–2021 data will disrupt the HFC market. IGas Comments at 1–4 (JA__–__); RGAS Comments at 2–3 (JA__–__). The original equipment manufacturers ("OEMs") began using HFCs in new air conditioning equipment between 2011 and 2013. IGas Comments at 1 (JA__). To service this maturing equipment, the "aftermarket" HFC needs increase every year. *Id.* Excluding the 2020–2021 data—when aftermarket HFC suppliers had their best import years to service the growing aftermarket—deprives these suppliers of needed supply and hands it to the OEMs who have little to no interest in servicing this aftermarket. *Id.* at 2 (JA__). Finally, commenters

disputed that the 2020–2021 data is less reliable, pointing out that it would have been triple-checked by the time the Final Rule was published. *Id.* at 5 (JA__); RGAS Comments at 4 (JA__).

### F. The 2024–2028 HFC Allocation Final Rule.

The comments had no effect. Section 84.11(b)(2) of the 2024 Rule kept the same allocation methodology as the Framework Rule, excluding 2020 and 2021 from the timeframe used to determine consumption allowance allocations. *See* 2024 Rule at 46,843 (JA__). EPA acknowledged that in making this choice, "the Agency is fundamentally excluding the most recent years to date." *Id.* EPA still reasoned that the 2020–2021 data does not "accurately reflect companies' market share" because, due to several important global and market factors, "the market *could have* been so significantly skewed in those years that depending on them would lead to an unrepresentative and ill-suited data set." *Id.* (emphasis added). In particular, EPA dismissed the 2020–2021 data as unrepresentative because entities may have stockpiled HFCs once they heard about Congressional interest and activity to pass the AIM Act and because COVID-19 caused supply chain disruptions, "*potentially* including shortages of key materials necessary for the production of HFCs." *Id.* at 46,843, 46,845–46. (JA__, __–__) (emphasis added).

EPA cited no evidence establishing COVID-19's impact on the HFC market. As for stockpiling, the Agency cited GHGRP data showing that the net supply of HFCs in 2021 was about 150 percent that of the 2020 level and HFC imports increased by 215 percent between 2020 and 2021. *Id.* at 46,843 (JA__); *see GHGRP*

*Data Relevant to the AIM Act*, U.S. Envtl. Prot. Agency, https://www.epa.gov/ghgreporting/ghgrp-data-relevant-aim-act ("GHGRP Data"). At the individual company level, EPA pointed to the "stark, unprecedented, and otherwise inexplicable (aside from stockpiling) increase in import activity in 2021 from a limited number of entities." 2024 Rule at 46,843 (JA__). Five companies were responsible for 97 percent of the net increase in import activity between 2020 and 2021, and fourteen companies doubled their import activity from 2020 to 2021. *Id.* EPA also highlighted that "import activity in 2021 was atypical" because "several entities with extremely limited or no bulk HFC import history" imported or tried to import HFCs for the first time in 2021. *Id*. All in all, EPA found that this data "strongly suggests that the increased imports in 2021 may well have been due to stockpiling . . . rather than due to use or demand." *Id.*

EPA cited no similar data for 2020 because that data did not exist. EPA simply labeled 2020 import activity—which *decreased* from 2019—as "atypical" because it was "almost equal to 2019 import activity, even with the various effects of COVID–19." *Id.* at 46,846 (JA__); *see also* GHGRP Data, *supra*.

EPA also stated that the 2011–2019 data is "better understood and more thoroughly vetted" than the 2020–2021 data, and that commenters' arguments about EPA's ability to validate and verify data from 2020 and 2021 "do not outweigh the concerns about the non-representative nature of that data . . . ." 2024 Rule at 46,846 (JA__); *see also id.* at 46,842, 46,845 (JA__, __).

Ultimately, EPA expressed concern that "[e]xpanding the range of years considered to determine entities' market share could significantly change each

entity's market share from the allocation levels determined for calendar years 2022 and 2023," which "would likely disrupt the market and negatively affect ongoing adjustments to the HFC Allocation program that have taken place in 2022 and 2023." *Id*. at 46,844 (JA\_\_). The Agency also noted that keeping the same allocation framework would provide continuity between the two stepdown periods and a longer planning horizon for HFC producers and importers. *See id.* at 46,844, 46,846 (JA\_\_, \_\_). In sum, "EPA is finalizing a continued use of the same set of years because the Agency has determined that this has the best means for reducing (though not eliminating) disruption in the market." *Id*.

This timely appeal follows.

## STANDARD OF REVIEW

EPA's "basic obligation [is] to conduct reasoned decisionmaking." *Miss. Comm'n on Envtl. Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015) (cleaned up). Under the Clean Air Act, the Court will set aside any EPA action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A); *see also Maryland v. EPA*, 958 F.3d 1185, 1196 (D.C. Cir. 2020) (applying "the same standard of review under the Clean Air Act as . . . under the Administrative Procedure Act").

Without substituting its judgment for that of the agency, the Court must determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*MVMA*") (citation omitted).

Agency action is arbitrary and capricious if, for example, the agency "offer[s] an explanation . . . that runs counter to the evidence before the agency," *id*.; makes decisions "without substantial basis in fact," *Fed. Power Comm'n v. Fla. Power & Light Co.*, 404 U.S. 453, 463 (1972); or fails to articulate "a rational connection between the facts found and the choice made," *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 606 (D.C. Cir. 2016) (citations omitted). An agency also acts arbitrarily and capriciously when, as here, it fails to "respond to serious objections." *Del. Dep't. of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 11 15 (D.C. Cir. 2015) (citations omitted).

In reviewing agency action, the Court must look to the agency's explanation for its action; the Court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *MVMA*, 463 U.S. at 43 (citation omitted).

## SUMMARY OF ARGUMENT

EPA disregarded basic principles of rational, non-arbitrary administrative decision-making in concluding that there are "many advantages to using data from the 2011 to 2019 timeframe and reasons for excluding data from 2020 and 2021." 2024 Rule at 46,843 (JA__). In so doing, EPA lumped 2020 and 2021 together, failing to consider whether its reasons for excluding those two years together applied if either year was considered independently. When 2020 is evaluated independently, the record shows that EPA's stated reasons for keeping the same methodology do not support excluding the 2020 data standing alone.

*First*, 2020 import levels were hardly atypical. Unlike the 2021 import data, which reflected a significant spike in imports, the 2020 data reflects *fewer* imports than in 2019. The Agency's conclusion that stockpiling may have occurred in 2020 or that COVID-19 may have influenced HFC imports in 2020 is pure speculation with no support in the record. Speculating when faced with conflicting evidence is classic arbitrary and capricious action.

Moreover, even if EPA had evidence that entities stockpiled in 2020, the Agency admitted that other years are just as unrepresentative of market conditions because entities started stockpiling many years before Congress showed interest in passing the AIM Act. To resolve this identical concern, EPA averaged entities' three best years between 2011 and 2019, softening the effect of any outlier years. The Agency should have resolved its concerns about the 2020 data in the same way. This inconsistent treatment also makes the 2024 Rule arbitrary and capricious.

*Second*, the 2020 data was sufficiently vetted. EPA excluded the 2020 data in the Framework Rule because the Agency did not have enough time to complete its regular quality assurance review. By July 2023 when EPA issued the 2024 Rule, the Agency had more than sufficient time to review the 2020 data—nine months longer than the Agency had to review the 2019 data before promulgating the Framework Rule. And EPA gave entities, who had every incentive to ensure accuracy, three opportunities to verify and correct it. The Agency cannot arbitrarily move the bar to require higher and higher levels of accuracy.

*Third*, incorporating the 2020 data would not exacerbate market disruptions because it would allocate allowances to entities meeting near-term needs. EPA's

claim that it would do the opposite is valid only if entities stockpiled in 2020, which the data does not support. By excluding 2020, EPA effectively reset the market to 2011–2013, allocating the most allowances for 2024–2028 to the OEMs who had their best years over ten years ago.

Nor would adding 2020 to the methodology's timeframe necessarily reshape entities' allowance allocations. Rather than speculating that including 2020 could significantly change allowance holders' allocations, EPA should have analyzed whether that result would occur. The more likely outcome is that adding 2020 would affect minimal change because the companies whose allowances would increase if 2020 were included represented less than a third of the total market share. Changes to allowances for entities who oppose adding 2020—over two-thirds of the total market share—would thus be incremental, at best. These changes would be justified because they would incorporate recent data that accurately reflects current market conditions, providing a smoother transition to allocations in future phasedown steps.

Finally, excluding the 2020 data is inconsistent with EPA's decision to base eligibility for consumption allowances for 2023–2024 on market participation in 2020. EPA had no concern that basing eligibility solely on 2020 data might exclude normal market participants or include others who jumped into the market during an atypical year.

In short, EPA offered speculative explanations that conflicted with the evidence, made decisions unsupported by substantial evidence, and treated similar situations inconsistently. When considered independently, including 2020 provides a more accurate, equitable, and inclusive basis for allocating the 2024–2028

consumption allowances. This error can be remedied by an order from this Court vacating Section 84.11(b)(2) in the 2024 Rule, which omitted the 2020 data from the methodology for setting 2024–2028 consumption allocations, and remanding to EPA to revise this portion of the rule. *Bd. of Cnty. Comm'rs of Weld Cnty., Colo. v. EPA*, 72 F.4th 284, 296 (D.C. Cir. 2023) (noting the presumptive severability of agency regulations: "[W]e set aside only the invalid parts unless the remaining ones cannot operate by themselves or unless the agency manifests an intent for the entire package to rise or fall together").

## STANDING

The IGas Petitioners have standing to challenge the 2024 Rule as an "object of the action . . . at issue." *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). IGas Petitioners import HFCs regulated by the 2024 Rule and thus must comply with it. Because this compliance has serious economic consequences for IGas Petitioners, the 2024 Rule aggrieves them, and these injuries can be redressed by a decision vacating Section 84.11(b)(2) of the 2024 Rule.

# ARGUMENT

## I. EPA Arbitrarily And Capriciously Excluded 2020 Consumption Activity Data From The Timeframe Used To Determine HFC Consumption Allowance Allocations.

Excluding the 2020 data from the range of years used to develop each consumption allowance holder's high three-year average is arbitrary and capricious. In reaching this conclusion, EPA failed its "basic obligation" to engage in "reasoned decisionmaking." *Miss. Comm'n*, 790 F.3d at 150. EPA proffered several "advantages to using data from the 2011 to 2019 timeframe and reasons for excluding data from 2020 and 2021." 2024 Rule at 46,843 (JA__). Neither hold up if only 2020 is added: The same "advantages" for using the 2011–2019 data favor adding another recent year to the data, and the "reasons" for excluding the 2020 and 2021 data together do not support excluding just 2020. *Id.*

The Agency failed in the first instance by lumping 2020 and 2021 together and pretending to have given the issue "careful consideration." *Id.* at 46,486 (JA__). The Supreme Court's decision in *MVMA* is instructive. There, the Court held that the National Highway Traffic Safety Administration acted arbitrarily and capriciously in revoking a motor vehicle safety standard requiring new cars to be equipped with passive restraints. The agency's decision was based, in part, on its finding that because the industry planned to install readily detachable passive belts, the agency could not reliably predict expected usage increases. *MVMA*, 463 U.S. at 39.

Among other reasons, the Court struck down the agency action because the agency failed to articulate a basis for not requiring nondetachable belts in its safety standards, such as a continuous passive belt. *Id.* at 55. The Court observed that "[t]he

agency did not separately consider the continuous belt option, but treated it together with the ignition interlock device in a category it titled 'option of use-compelling features.'" *Id*. The Court held that the agency offered no explanation why a continuous passive belt would engender the same adverse reaction as the interlock device and noted that the record evidence did not support this conclusion. *Id*. at 56. The Court found no basis for equating the two devices and stated that "more importantly, it is the agency's responsibility not this Court's, to explain its decision." *Id*. at 57. The Court thus concluded: "By failing to analyze the continuous seatbelts in its own right, the agency has failed to offer the rational connection between facts and judgment required to pass muster under the arbitrary and capricious standard." *Id*. at 56.

The same logic dooms EPA's action here. EPA failed to independently consider whether 2020 data should be included and to offer any rational basis for excluding it. When examining the 2020 data on its own, EPA's reasons for excluding the data from those two years do not support excluding 2020. These failures render EPA's decision arbitrary and capricious.

This Court need not take EPA at its word; it must perform its own "searching and careful inquiry into the underlying facts." *Mississippi v. EPA*, 744 F.3d 1334, 1342 (D.C. Cir. 2013) (citation omitted). And when this Court does, it will find that excluding the 2020 data is textbook arbitrary and capricious agency action.

**A.  EPA's conclusion that the 2020 data is unrepresentative of HFC market conditions is arbitrary and capricious.**

Recent data on HFC imports "generally provide[s] the most accurate information on the current market." Framework Rule at 55,145. Allocating allowances using accurate information, in turn, reduces market disruption during the phasedown, a "key goal" for the Agency. 2024 Rule at 46,844 (JA__). To avoid including 2020, the Agency discarded the 2020 data as "unrepresentative" of "existing market conditions" and "distorted," speculating that entities stockpiled when they learned about Congressional activity to pass the AIM Act and that COVID-19 had a "substantial and unprecedented" impact on global supply chains. 2024 Rule at 46,843, 46,845 (JA__, __). That may be a plausible theory—if EPA had evidence to support it. Because the Agency "reached a conclusion unsupported by substantial evidence," its action is arbitrary and capricious. *New York v. EPA*, 413 F.3d 3, 18 (D.C. Cir. 2005).

Even if EPA could do more than speculate that the 2020 data is unrepresentative, that would still not justify excluding 2020. The Agency had the *same* concern about earlier years and mitigated it through averaging. EPA should have also resolved its concerns about 2020 through averaging. Inconsistent treatment, like speculation, constitutes arbitrary and capricious agency action.

**1.  EPA's speculation that 2020 data was distorted because of stockpiling and COVID-19 has no support in the record.**

The Agency's unsupported, speculative conclusion that 2020 data did not represent current market conditions makes the 2024 Rule arbitrary and capricious. In assessing the HFC market, EPA relied on GHGRP data on HFC import and export

activity from 2011 to 2021 as detailed in the chart reproduced below. 2024 Rule at 46,843 (JA__); *see also* Framework Rule at 55,146.

**Net Supply of AIM-Listed HFCs Reported to GHGRP in Years 2011–2021 (million metric tons per year of $CO_2e$)**

| Aggregation Type | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Production minus destruction minus transformation | 331 | 328 | 356 | 341 | 277 | 255 | 263 | 234 | 234 | 228 | 188 |
| Exports | 135 | 140 | 138 | 138 | 95.3 | 118 | 101 | 76.1 | 68.3 | 62.6 | 36.0 |
| Imports | 54.0 | 54.0 | 72.2 | 65.9 | 110 | 106 | 127 | 148 | 148 | 144 | 309 |
| Net Supply | 250 | 242 | 290 | 269 | 292 | 243 | 290 | 306 | 314 | 309 | 461 |

GHGRP Data, *supra*. Although EPA purportedly relied on this data to reach several conclusions about stockpiling in 2020 and 2021, the data does not support EPA's conclusions as to 2020.

As "evidence that there was significant stockpiling," EPA pointed to the 150 percent increase in net supply of HFCs and 215 percent increase in HFC imports between 2020 and 2021. 2024 Rule at 46,483 (JA__); *see also id.* at 46,845 (JA__) ("[B]oth the net supply of AIM-listed HFCs and the imports of AIM-listed HFCs, increased [in 2021] at rates that are unlikely to be explained as changing business models to meet increased aftermarket consumer demand."). These increases stood out because the next highest year-over-year import increase between 2011 and 2021 was 167 percent in 2015. 2024 Rule at 46,483 (JA__). And in more recent years (2016–2019), the highest import increase topped out at 120 percent in 2017. *Id.* Altogether, as EPA pinpointed in the Proposed 2024 Rule, "[d]ata from 2021, *in*

*particular*, may be skewed given the likelihood of stockpiling." Proposed 2024 Rule at 66,378 (JA__) (emphasis added).

EPA also looked at "individual company import activity in 2021" to provide "further evidence of stockpiling." 2024 Rule at 46,483 (JA__). Five companies were responsible for about 97 percent of the net increase in import activity in 2021, and fourteen companies doubled their 2020 import activity in 2021. *Id.* The Agency called this "increase in import activity *in 2021* from a limited number of entities" "stark, unprecedented, and otherwise inexplicable (aside from stockpiling)." *Id.* (emphasis added).

EPA also highlighted that several entities with extremely limited or no bulk HFC import history imported (or tried to import) HFCs for the first time in 2021, and other entities began importing HFCs again in 2021 after previously exiting the market. *Id.* at 46,846 (JA__). This data bolstered EPA's "concerns that import activity **in 2021** was atypical based on the then-imminent restrictions on production and consumption." *Id.* (emphasis added). To sum up, the Agency concluded that import data "strongly suggests that the increased imports **in 2021** may well have been due to stockpiling . . . rather than due to use or demand."[2] *Id.* (emphasis added); *see also id.* at 46,845–46 (JA__–__) ("[T]he Agency maintains that [2021] was not

---

[2] Even as to 2021, EPA had to speculate that imports increased dramatically in 2021 due to stockpiling. *Compare* 2024 Rule at 46,846 (JA__) ("increased imports in 2021 may well have been due to stockpiling"), *with Verizon v. FCC,* 740 F.3d 623, 663 (D.C. Cir. 2014) (Silberman, J., concurring in part and dissenting in part) (criticizing agency for "litter[ing]" its conclusions with "'may,' 'if,' and 'might'").

representative of any normal or changing business model, nor would it account for any unmet lingering needs from 2020.").

EPA did not provide similar—or rather, any—support for stockpiling in 2020. Commenters pointed out that EPA's data does not support the finding that entities stockpiled in 2020. IGas Comments at 6 (JA__); RGAS Comments at 5 (JA__); *see also* Comments of Nature Gas Import and Expert, Inc., EPA-HQ-OAR-2022-0430-0029 at 9 (Dec. 19, 2022) (JA__) ("Nature Gas Comments") (criticizing "EPA's proposal to ignore import data after 2019"). Just the opposite: HFC imports *decreased* in 2020 from 2019. GHGRP Data, *supra*. Lacking evidence—let alone "substantial evidence," *New York*, 413 F.3d at 18—to discredit the 2020 data, EPA mustered this unadorned assumption: "The Agency also maintains that 2020 import activity was also atypical, i.e., import levels were almost equal to 2019 import activity, even with the various effects of COVID–19." 2024 Rule at 46,846 (JA__). This rhetorical sleight of hand is precisely the sort of "high-handed and conclusory" response that this Court has found "insufficient." *Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265–66 (D.C. Cir. 1994).

At its root, the Agency failed to "engage the argument[] raised before it," *Del. Dep't*, 785 F.3d at 11—a prerequisite to "rational" rulemaking, *Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 80 (D.C. Cir. 2000). When looking at the data "holistically," 2024 Rule at 46,845 (JA__)—as EPA is wont to do, *see supra* Section I.B—2020 import activity was far from "atypical." 2024 Rule at 46,846 (JA__).

After imports increased in 2017 and 2018, imports leveled off in 2019, with entities importing almost the same amount as in 2018. *See* GHGRP Data, *supra*.

Import activity in 2020, less than 3 percent lower than in 2019, followed this trend, continuing the leveling off that started the year before. *Id.* Nor was 2020 atypical because import levels decreased from the year before. From 2011 to 2021, year-to-year decreases happened twice before: between 2013 and 2014 and between 2015 and 2016. *Id.* And when looking at the narrower, more recent 2014–2020 range, year-to-year import activity decreases happened thrice in seven years. *Id.* EPA cannot "brush[] aside [these] critical facts" to square-peg-round-hole a conclusion on the 2020 data. *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017).

At best, entities did not stockpile in 2020; at worst, EPA had no evidence of stockpiling in 2020. Either way, Section 84.11(b)(2) of the 2024 Rule should be vacated—this Court "may not uphold agency action based on speculation," *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (citation omitted), or that "runs counter to the evidence before" it, *MVMA*, 463 U.S. at 43.

Because EPA offered no support for its stockpiling assumptions in the data, the Agency's process for excluding 2020 was not "logical and rational." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (citation omitted). Confronted with the data, EPA tried to look behind the numbers—something it did not do for any other year—to reverse-engineer the data to suit its conclusion, speculating that 2020 imports were artificially *high* because of stockpiling **and** artificially *low* because of COVID-19. *See* 2024 Rule at 46,846 (JA__) ("The Agency also maintains that 2020 import activity was also atypical, *i.e.*, import levels were almost equal to 2019 import activity, even with the various effects of COVID–19."). Through these unsupported

machinations, EPA tried to transform normal import activity into "atypical" activity. *Id.* This reasoning is, at best, fatally "attenuated." *Merck & Co. v. U.S. Dep't Health & Hum. Svcs.*, 962 F.3d 531, 539 (D.C. Cir. 2020).

EPA cannot have it both ways. If COVID-19 caused "unprecedented supply chain disruptions," 2024 Rule at 46,845 (JA__), stockpiling would have been challenging, if not impossible, not only because shipping HFCs to the United States would have been harder but also because supply disruptions supposedly caused "shortages of key materials necessary for the production of HFCs." *Id.* at 46,843 (JA__). Stockpiling cannot happen when there is no stock to pile.

On the other hand, if entities successfully stockpiled in 2020, the import data should have reflected it just like in 2021. EPA discounted the 2020–2021 data together because "external factors such as the COVID–19 pandemic and supply chain disruptions . . . created well-documented market distortions."[3] 2024 Rule at 46,843 (JA__); *see also id.* at 46,886 (JA__) ("Anecdotal feedback indicates that HFC prices increased in 2021 and 2022 based on a number of factors, including supply chain disruptions, a global pandemic . . . ."); *see generally* Peter S. Goodman, *A Normal Supply Chain? It's 'Unlikely' in 2022*, N.Y. Times (Feb. 6, 2022), https://nyti.ms/3siNe77 (describing the ongoing Great Supply Chain Disruption).

---

[3] EPA also overlooked that COVID-19 did not affect a sizable part of 2020. The World Health Organization did not declare COVID-19 a pandemic until March 11, 2020—seventy days into the year. Dr. Tedros Adhanom Ghebreyesus, Director-General, World Health Organization, Opening Remarks at the Media Briefing on COVID-19 (Mar. 11, 2020), *available at* https://bit.ly/3Mvelm9; *see also* Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 13, 2021) (declaring a national emergency over COVID-19). The ensuing supply chain disruptions took time to develop after that.

Although supply chain disruptions were not unique to 2020, EPA had no issue concluding that companies transcended them to stockpile in 2021 when import levels doubled from the year before. 2024 Rule at 46,483, 46,845 (JA__, __). Yet if the 2021 import activity reflected stockpiling despite these problems, the 2020 import activity should have, too, if stockpiling occurred. EPA cannot use stockpiling to discount both high *and* normal import levels at the same time.

EPA's decision to exclude the 2020 data as "atypical" also contravenes its decision to base eligibility for consumption allowances *solely* on 2020 market activity. *See* Framework Rule at 55,144 (using market participation in 2020 as the sole eligibility criteria for allocating consumption allowances "to ensure that allowance holders are active in the HFC market"). If EPA had valid concerns that 2020 was not a representative year, limiting eligibility to entities that participated in the market in 2020 could have wrongfully excluded or included entities based on the allegedly unique circumstances in 2020. EPA's lack of any such concern is inconsistent, at best.

In the end, "EPA's explanation falls short." *Clean Wisc. v. EPA*, 964 F.3d 1145, 1172 (D.C. Cir. 2020). If the Agency wanted to discredit 2020 as "so significantly skewed," it needed more. 2024 Rule at 46,843 (JA__); *but see* Proposed 2024 Rule at 66,378 (JA__) ("Data from 2021, *in particular*, may be skewed.") (emphasis added). EPA had no "substantial basis in fact" to conclude that stockpiling or COVID-19 affected 2020's normal import levels. *Fla. Power & Light*, 404 U.S. at 463. And "[c]onclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict" do not suffice. *Genuine Parts Co.*

*v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018). To be sure, "[f]acts are stubborn things. But record facts are the grist of reasoned agency decisionmaking." *Perdue*, 873 F.3d at 932 (cleaned up). Because EPA "ignore[d] evidence contradicting its position," *Genuine Parts*, 890 F.3d at 346 (citation omitted), excluding the 2020 data as unrepresentative is arbitrary and capricious.

### 2. Entities had the opportunity and incentive to stockpile long before Congress showed interest in passing the AIM Act.

Even if Congressional activity to pass the AIM Act "could reasonably have affected business decisions" in 2020, 2024 Rule at 46,846 (JA__), EPA understood that entities had already been stockpiling for many years yet still included those years in the dataset. The Agency overlooked stockpiling in previous years because averaging minimized its effects on allowance allocations. Yet when faced with the same ostensible problem for 2020, EPA arbitrarily and capriciously refused to resolve the concern through averaging.

"HFCs are not perishable goods," so entities could stockpile them when it became clear that HFCs would be phased down. 2024 Rule at 46,843 (JA__). Any entity paying attention—and EPA thinks they were, *see id.* at 46,845 (JA__) (rejecting comments that entities would not have had time to stockpile in 2020 because "producers and importers of regulated HFCs were well aware of the phasedown of HFCs prior to the AIM Act's enactment")—need not have hired a seer to know that, in time, HFCs, like CFCs and HCFCs before them, would be regulated. For this reason, EPA readily admitted that "[t]here is no year in which a forward-looking entity may not have been stockpiling in preparation for a restriction on HFCs

or new duties that were imposed by the Department of Commerce." Proposed 2024 Rule at 66,378 (JA__). Indeed, the writing was on the wall long before Congress took interest in passing the AIM Act.

In the 1990s and 2000s, HFCs were considered a safe substitute for replacing ozone-depleting substances. *Mexichem Fluor*, 866 F.3d at 454–55. At some point, scientists discovered that HFCs were also environmental hazards. So, in 2013, President Obama announced that EPA would seek to reduce HFC emissions. Executive Office of the President, The President's Climate Action Plan 10 (June 2013). EPA accordingly moved many HFCs from the list of safe substitutes to the list of prohibited substitutes in 2015. *See Protection of Stratospheric Ozone: Change of Listing Status for Certain Substitutes Under the Significant New Alternatives Policy Program*, 80 Fed. Reg. 42,870 (July 20, 2015); *see also Mexichem Fluor*, 866 F.3d at 463–64 (upholding EPA's decision to remove HFCs from the safe substitutes list). These events were early signs that HFCs were on their way out.

The next year, the United States and more than 120 countries signed the Kigali Amendment to the Montreal Protocol, committing to a "global phasedown of the production and consumption of HFCs." Framework Rule at 55,123–24, 55,139. Though countries agreed to the Kigali Amendment in 2016, it was hardly sudden— "efforts to amend the Montreal Protocol took the better part of a decade." Proposed 2024 Rule at 66,378 (JA__); *see, e.g.*, Press Release, Office of the Spokesperson, Bureau of Global Public Affairs, United States, Canada, and Mexico Submit North American HFC Phase Down Amendment to the Montreal Protocol (April 15, 2015), https://bit.ly/3SDQMvv (announcing that the United States, Canada, and Mexico

submitted an amendment to the Montreal protocol in April 2015 "to phase down the production and consumption of hydrofluorocarbons"). Once agreed to, the Kigali Amendment required signatories to start phasing down HFC use in January 2019. *See* Kigali Amendment, U.N. Doc. C.N.872.2016.TREATIES-XXVII.2.f. Then, in February 2018, a bipartisan Senate group introduced the AIM Act of 2018, requiring an HFC phasedown consistent with the Kigali Amendment. S. 2448, 115th Cong. (2018).

With these signposts, entities could plan for the inevitable HFC phasedown long before the AIM Act began working its way through the legislative process in 2020. *See* Proposed Framework Rule at 27,170 ("Reasonably, companies would have been aware that the United States may be taking action to phase down HFCs as of October 15, 2016, which is when countries agreed to the Kigali Amendment."). EPA took this into account, including data from as far back as 2011, to balance out its "concerns that data from more recent years, particularly 2017–2021, could reflect attempts at market manipulation, stockpiling, or other system gaming by some entities" that knew about the Kigali Amendment or the AIM Act. Proposed 2024 Rule at 66,378 (JA__); *see also* Comments of Koura, EPA-HQ-OAR-2021-0044-0143 at 2 (July 6, 2021) (commenting that the 2017–2019 data is distorted because the Kigali Amendment "placed the industry on notice that reductions in HFC usage were on the immediate horizon"); Comments of Honeywell International, Inc., EPA-HQ-OAR-2021-0044-0197 at 13–14 (July 6, 2021) (same).

Though stockpiling and market manipulation also may have inflated import data in 2017, 2018, and 2019, if not earlier, EPA had no reservations about including

these years in the timeframe.[4] *See MISO Transmission Owners v. FERC*, 45 F.4th 248, 264 (D.C. Cir. 2022) ("An agency ignoring its own qualms is not reasoned decisionmaking.").

EPA never reconciled this inconsistent treatment, much less offered an "insufficient reason[] for treating similar situations differently." *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996). "For an agency's decisionmaking to be rational, it must respond to significant points raised during the public comment period." *Allied Loc.*, 215 F.3d at 80. Commenters raised this significant point— stockpiling occurred every year—but EPA never addressed it. *Compare* IGas Comments at 6 (JA__), *and* RGAS Comments at 5 (JA__), *with* 2024 Rule at 46,845–46 (JA__–__).

At most, the Agency acknowledged its previous statement that no year is immune from stockpiling before repeating statistics to prove that stockpiling occurred in 2021. 2024 Rule at 46,845–46 (JA__–__). But "merely hearing [commenters' concerns] is not good enough[;] EPA must respond to serious objections." *Del. Dep't*, 785 F.3d at 16. Even if stockpiling occurred in 2020, that does not come close to explaining EPA's arbitrary choice to care about stockpiling here but not there. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 59 (D.C. Cir. 2015) (collecting cases when this Court "declined to affirm an agency decision [with] unexplained inconsistencies in the final rule").

---

[4] In fact, EPA originally proposed basing allowance allocations on each entity's single high year between 2017 and 2019 despite these concerns. Proposed Framework Rule at 27,170.

EPA's caprice goes further. The Agency singled out 2020 as a year when some companies "likely" increased their imports, "gambling that EPA would set up an allocation system similar to the [ozone-depleting substances] phaseout and look at company-specific historic data." 2024 Rule at 46,843 (JA__). Even if this were true, this gamble also applies to earlier years.

"EPA's well-established regulatory program at 40 CFR part 82, subpart A," setting up allowance allocation systems for phasing out ozone-depleting substances like CFCs and HCFCs was known long before the movement to phase out HFCs started. Framework Rule at 55,123 n.9; *see id.* at 55,142 ("EPA's practice from the ODS phaseout . . . is familiar to many producers and importers of HFCs."); Proposed Framework Rule at 27,166 (proposing to use the same "mechanism EPA has used to implement the ODS phaseout" because it "would meet the expectations of, and be understood by, producers and importers of HFCs"); *Honeywell Int'l, Inc. v. EPA*, 705 F.3d 470, 471 (D.C. Cir. 2013) ("EPA has always set baseline allowances by considering historical usage of HCFCs by participating companies."); Comments of Arkema, EPA-HQ-OAR-2021-0044-0135 at 2 (July 6, 2021) ("All the stakeholders understand how [the ODS] system works . . . ."). Combined with EPA's conclusion that stockpiling occurred as early as 2016, once the Agency imputed knowledge of the ozone-depleting substance allocation systems to industry participants, it could not limit potential distorting effects from "gambling" to 2020 alone. 2024 Rule at 46,843 (JA__).

In any event, by February 2018, making business decisions based on potential allocation systems was hardly a gamble. The proposed AIM Act of 2018 ended any

"informational vacuum," *see* Comments of The Chemours Company, EPA-HQ-OAR-2022-0430-0047 at 9 (Dec. 19, 2022) ("Chemours Comments") (JA___), by directing EPA to issue rules "to phasedown hydrofluorocarbons through an allowance allocation and trading program." S. 2448, 115th Cong. § 2(a) (2018). If they could not already, interested parties could then reasonably project that the HFC allocation program would rely on historical data like the HCFC "cap-and-trade program" that had been around for many years. *Honeywell*, 705 F.3d at 471; *see also* Koura Comments, EPA-HQ-OAR-2021-0044-0143 at 2 (pointing out that entities could also look to the "experience of the European market where the EU introduced a quota system for HFC rights in the F-Gas Regulation"). Armed with this obvious telegraph, entities had as much opportunity and incentive to stockpile in 2018 and 2019 as in 2020. Still, EPA included 2018 and 2019 but not 2020.

At bottom, the Agency cannot place false significance on stockpiling in 2020 while ignoring it as a genuine concern in other years. Treating 2020 differently on this basis is "the quintessence of arbitrariness and caprice." *Grayscale Invs., LLC v. SEC*, 82 F.4th 1239, 1245 (D.C. Cir. 2023).

### 3. EPA should have used averaging to resolve its concerns about 2020 was an outlier year.

At the least, commenters noted that any stockpiling or atypicality concerns in 2020 could be resolved through averaging—the technique EPA used to resolve the same concerns for other years. IGas Comments at 6, 9 (JA___, ___); RGAS Comments at 5, 7 (JA___, ___). Recognizing the need to account for stockpiling after the Kigali Amendment, EPA determined allowance allocations in the Framework Rule by

averaging each entity's three highest years between 2011 and 2019 rather than basing allowances on these entities' single highest years between 2017 and 2019. *Compare* Proposed Framework Rule at 27,150, *with* Framework Rule at 55,145.

The Agency chose an averaging approach because it "minimizes the effect of market fluctuations and mitigates the possibility of an entity receiving a large share of allocations based on a single very high year." Proposed 2024 Rule at 66,378 (JA__); *see also* Framework Rule at 55,146 (same). Put another way, averaging "softens the effects of outlier years where a company may have imported extra to avoid duties, to build stockpile, or to address a one-off large order or series of orders from customers." Framework Rule at 55,146. In effect, averaging levels the playing field. Because "no single year is 'better' for all market participants," averaging "a wider range of years is more equitable" for everyone. Proposed Rule 2024 at 66,378 (JA__). "Each entity receives its 'best' years regardless of actions taken by other entities." *Id.*

This principle does not hold true for entities that had their best years after 2019. Though EPA's averaging approach would counsel including both 2020 and 2021, EPA "disagree[d] that stockpiling concerns [in 2020 and 2021] can be simply resolved by averaging" for two reasons. 2024 Rule at 46,846 (JA__). Like EPA's concerns about stockpiling generally, these reasons apply only if the Agency included 2020 *and* 2021.

*First*, EPA stated that averaging would "fail to mitigate concerns about entities that began importing in 2021, or reimporting after apparent exit from the market, ahead of the HFC phasedown." *Id*. Naturally, this concern would disappear if the

Agency included only 2020, a year when no entities began importing for the first time.

*Second*, EPA claimed that if 2020 and 2021 were "two of the three high years used in considering allocations, averaging exacerbates, rather than mitigates, the Agency's concerns that an entity may receive a disproportionately large amount of allowances." *Id.* If averaging mitigates outlier years when only one year is high but exacerbates when two years are high, excluding 2021 avoids this problem. Even if the 2020 data were unusually high such that it could distort the allowance allocations—it's not—averaging would soften its effect. *See* Framework Rule at 55,146.

Aside from this easy fix, EPA ignored this exacerbating concern elsewhere. For entities with less than three years of import data, the Agency took "the average of the years between 2011 and 2019 for which each company imported HFCs." 2024 Rule at 46,648 (JA__). This calculation threatens to allocate "a disproportionately large amount of allowances" even more than if 2020 and 2021 were "two of the three high years used in considering allocations." *Id.* at 46,846 (JA__). For example, if an entity's three best years included 2020, the other years would bring down the average. But an entity with only two years of data—or worse, just one—has no other year(s) to soften the average if those years are unusually high. That entity could receive a disproportionately high share based on one or two anomalous years.[5] EPA allowed this distortion anyway. *See MISO Transmission*, 45 F.4th at 264.

---

[5] If given this choice, every entity would jump at the chance to use their best one or two years for determining allowance allocations.

Stripped of the concerns that averaging would not allegedly fix, EPA had no reason not to include 2020. For one, using a wider range of years is more "equitable[] and inclusive." Framework Rule at 55,145. But more than that, equity demands that "[e]ach entity receives its 'best' years regardless of actions taken by other entities." Proposed Rule 2024 at 66,378 (JA__); *see* Framework Rule at 55,147 (listing "promoting equity" as one of the "considerations for determining who should receive allowances"). IGas and other aftermarket distributors saw growth year-over-year before 2020, which would have continued pandemic or not. IGas Comments at 1–2, 8 (JA__); RGAS Comments at 1–2 (JA__); *see also* Nature Gas Comments at 1 (JA__) (citing year-over-year growth from 2019 through 2021). EPA cannot penalize these companies based on the conclusory "belie[f]" that their "growth"— or other companies' "contraction"—in 2020 was "likely due to factors that are atypical of the pre-2020 market." 2024 Rule at 46,845 (JA__); *see Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (reversing rule that relied on "one unsubstantiated conclusion heaped on top of another").

The Agency used averaging to "soften[] the effects of outlier years" between 2011 and 2019, Framework Rule at 55,146, and it "may not treat [2020] differently." *Eagle Broad. Grp., Ltd. v. FCC*, 563 F.3d 543, 551 (D.C. Cir. 2009). "Such inconsistent treatment is the hallmark of arbitrary agency action." *Catawba Cnty., N.C. v. EPA*, 571 F.3d 20, 51 (D.C. Cir. 2009).

**B.    The 2020 data was sufficiently vetted for consideration in the 2024 Rule.**

Excluding the 2020 data as insufficiently vetted is arbitrary and capricious. In the Framework Rule, EPA excluded the 2020 data from the range of years used to determine allowance allocations because the Agency "had not completed its regular quality assurance review of 2020 data reported to the GHGRP early enough in the process for consideration in this final rule." Framework Rule at 55,146. Although EPA had ample time to review the 2020 data before promulgating the 2024 Rule close to two years later, the Agency still excluded it. To justify sidelining the 2020 data, EPA claimed to prioritize using "robust, verified, and well-understood" data. 2024 Rule at 46,842 (JA__). Yet EPA had longer to validate and verify the 2020 data before issuing the 2024 Rule than it did for the 2019 data before issuing the Framework Rule.

EPA included 2019 in the range of years to determine allowance allocations for 2022 and 2023 when it issued the Framework Rule in October 2021. Framework Rule at 55,118. The Agency typically releases GHGRP data in October for the previous year, *id.* at 55,146, so EPA had no more than one year to verify the 2019 data. At the time, the Agency had no qualms about using this data despite the short validation window. By contrast, when EPA issued the Final Rule in July 2023, the Agency had *nine* extra months to review the 2020 data, published in October 2021, yet still excluded it.[6] EPA offered "no coherent explanation for this disparate treatment." *Airmark Corp. v. FAA*, 758 F.2d 685, 695 (D.C. Cir. 1985); *see also*

---

[6] To be fair, EPA had less time to verify the 2021 data for the 2024 Rule (nine months) than it did to verify the 2019 data for the Framework Rules.

*Steger v. Def. Investigative Serv. Dep't of Def.*, 717 F.2d 1402, 1406 (D.C. Cir. 1983) (stating that agencies are at their "most arbitrary" when "treat[ing] similar situations dissimilarly").

When confronted with comments pointing out its inconsistency, *see, e.g.*, IGas Comments at 5 (JA__); RGAS Comments at 4 (JA__); Nature Gas Comments at 4 (JA__), EPA responded with a "barebones incantation of [an] abbreviated rationale[]." *Action for Child.'s Television v. FCC*, 821 F.2d 741, 746 (D.C. Cir. 1987). Now that EPA could not maintain that it had insufficient time to review the 2020 data, the Agency pivoted, claiming that the 2020 data should be given less weight because, "when holistically compared," the 2011–2019 data is "better understood and more thoroughly vetted." 2024 Rule at 46,845 (JA__). Even if that were true—EPA had slightly longer to verify it—that apples-to-oranges comparison makes the 2020 data no less robust. EPA gave entities—who have every incentive to provide accurate data to increase their allowances—*three* opportunities to verify and correct the 2020 data. *Id.* at 46,855 (JA__).

At any rate, no data set is perfect. EPA acknowledged that even today, "there will be some entity specific revisions due to corrected historic data." *Id.* at 46,844 (JA__). In fact, the Agency is still revising the 2011–2013 consumption baseline *two years* after the Framework Rule. After issuing the Framework Rule, one company informed EPA that its reported data was "significantly more than its actual import quantities." *Id.* at 46,858 (JA__). EPA revised the baseline to correct this "error." *Id.* at 46,859 (JA__).

In short, any perceived concern about the accuracy of the 2020 data does not support excluding it from the timeframe. EPA acknowledged as much, conceding that commenters' argument that the Agency can "validate and verify" the 2020 data has merit; it just does not "outweigh the concerns about the non-representative nature" discussed—and refuted—above. *Id.* at 46,845 (JA___). To be sure, the ability to verify the 2020 data was "not a primary reason" underlying EPA's decision. *Id.* But secondary reasons, like primary ones, must not be arbitrary and capricious either. EPA failed "the basic procedural requirement[] of administrative rulemaking" to "give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

**C. Including 2020 in the range of years to determine allowance allocations will not frustrate EPA's goals to minimize market disruptions and provide a seamless transition through the phasedown steps.**

EPA's rejection of the 2020 data was largely premised on the purported "advantages" of providing "a smooth transition from HFCs through the next phasedown step" and "continuity between two stepdown periods." *Id.* at 46,843, 46,846 (JA___, ___). EPA expressed concern that expanding the range of years considered "could significantly change each entity's market share," requiring changes to the 2022–2023 allocations. *Id.* at 46,844. EPA considered this undesirable, noting that entities had restructured their businesses and made long-term plans based on the 2022–2023 allocations. *Id.*

Under these circumstances, EPA's misplaced emphasis on maintaining the status quo defies the stated purpose of EPA's allocation program—to develop a

methodology that accurately reflects the current market and equitably distributes allocations based on the best available information. Because there is no basis for EPA's decision that 2020 data is unrepresentative, adding 2020 to the methodology will more accurately reflect the current market while smoothing the transition through the next phase.

### 1. Including 2020 will not add more disruption to the market.

"Changes in the market are inherent during a phasedown." 2024 Rule at 46,844 (JA__). To "minimize disruption . . . to the market in 2024," EPA used the same timeframe as the Framework Rule. *Id.* Including 2020 and 2021 would allegedly "add significant additional disruption to the market at a time when allowances are decreasing significantly." *Id.* at 46,845 (JA__). That conclusion, however, relies on two incorrect premises. Once undermined, the conclusion unravels with them.

*First*, EPA reasoned that allocating HFCs to entities using them "to meet near-term needs is an important way to reduce disruption to the market." *Id.* at 46,843 (JA__). "[A]llocating based on stockpiling," on the other hand, "would directly reduce allowance allocations for those entities who are meeting near-term need." *Id.* And so, EPA kept the same range of years and excluded 2020 and 2021, which, in the Agency's view, were tainted by stockpiling. *Id.*

If EPA's assumption is correct, allocating HFCs based on stockpiling reduces allowances for those entities meeting near-term needs, thus disrupting the market. That theory, however, would support excluding 2021, the only year that the Agency

has any data (even without formal proof) suggesting that stockpiling occurred. 2020 is a different story. No evidence suggests that stockpiling occurred in 2020. *See supra,* Section I.A.1; *see also* 2024 Rule at 46,844 (JA__) (criticizing commenter for "provid[ing] no evidence" to support theory). To state the converse, without evidence that stockpiling occurred in 2020, HFC imports went to meet near-term needs, so allocating allowances using 2020 data would too. That some companies grew during the pandemic while others struggled only reinforces this point. 2024 Rule at 46,845 (JA__). The companies that grew were the ones that met current needs. Put slightly differently, without stockpiling evidence to discredit the 2020 data, this data constitutes "the most current data, which generally provide the most accurate information on the current market to provide for *less* market disruption." Framework Rule at 55,145 (emphasis added).

EPA's chosen methodology also contradicts the Agency's desire to reduce market disruption by allocating to meet near-term needs. In the Framework Rule, EPA declined to allocate allowances only to market participants in 2011–2013 because it "would exclude current market participants and not be reflective of current market conditions." Framework Rule at 55,147; *see also* Proposed Framework Rule at 27,170 (taking comment on "issuing allowances only to those companies that produced or imported HFCs in 2011–2013"). "An attempt to reset the market to 2013 would also disrupt all existing market relationships for HFCs from the importer down the supply chain." Framework Rule at 55,147. EPA, however, managed to do just that in promulgating the 2024 Rule.

The big OEMs had their best years in 2011–2013. *See* Comments of The Chemours Company, EPA-HQ-OAR-2021-0044-0216 at 24–25 (July 6, 2021) (noting that the OEMs "suffered declining sales" and that their market share was "seized" after 2013); Comments of the American HFC Coalition, EPA-HQ-OAR-2021-0044-0160 at 2, 7 (July 6, 2021) (same). For example, Honeywell, who received a whopping 29.3 percent of consumption allowances for 2024—almost as much as the next three allowance holders combined, *see HFC Allowances*, *supra*—initially supported allocating allowances for the Framework Rule based on each entity's average annual production and consumption between 2011 and 2013. Honeywell Comments, EPA-HQ-OAR-2021-0044-0197 at 5; *see also* Koura Comments, EPA-HQ-OAR-2021-0044-0143 at 3 (proposing that EPA should look at only 2011–2016 to determine allocations).

The OEMs had their best years in 2011–2013, in part because they "change[d their] market behavior," transitioning away from HFCs and "actively commercializing alternatives to high-GWP [(global warming potential)] HFCs." Proposed 2024 Rule at 66,377 (JA__); *see* Chemours Comments, EPA-HQ-OAR-2021-0044-0216 at 8–9; Honeywell Comments, EPA-HQ-OAR-2021-0044-0197 at 12, 14. As the OEMs decrease their HFC production to move towards products with lower global warming potential, they need fewer HFC consumption allowances, which are also expended when an entity produces HFCs. Framework Rule at 55,142; *see also* Comments of FluoroFusion Specialty Chemicals, Inc., EPA-HQ-OAR-2022-0430-0015 at 5 (Dec. 19, 2022) ("FluoroFusion Comments") (JA__) ("Many

companies that had a large footprint in the early periods of the phasedown do not have an outlet for all of their allowances.").

Even though the OEMs need fewer HFC allowances, the big four OEMs—Honeywell, Chemours, Koura, and Arkema—received 61.6 percent of the 2024 consumption allowances. *See HFC Allowances*, *supra*. By allocating this huge proportion of allowances to the OEMs who had their best years in 2011–2013 before they started transitioning away from HFCs, EPA reset the market to that period—what the Agency sought to avoid. *See Perdue*, 873 F.3d at 932 (critiquing an agency for not "adequately analyz[ing]" the consequences of a decision). In other words, EPA set out to allocate allowances "for those entities who are meeting near-term need" and managed to do the opposite.[7] 2024 Rule at 46,843 (JA__).

*Second*, EPA concluded that including the 2020–2021 data would "likely disrupt the market" because it "could significantly change" each entity's market share, which, in turn, "would mean a significant change in allocation levels" from the 2022 and 2023 allowances. *Id.* at 46,844 (JA__); *see also id.* at 46,845 (JA__) (rejecting choosing an approach "at the risk" of distorting allowances for other companies). EPA "must offer more than timorous assertions" on what "could" happen. *Am. Petroleum Inst. v. EPA*, 862 F.3d 50, 63 (D.C. Cir. 2017).

For such a key issue, the Agency should have "examine[d] the relevant data" and figured out what *would* happen. *MVMA*, 463 U.S. at 43. After all, an agency "may not tolerate needless uncertainties in its central assumptions when the evidence

---

[7] This misallocation will be even more pronounced in 2028 when allocations will be based on data up to seventeen years old.

fairly allows investigation and solution of those uncertainties." *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1391 (D.C. Cir. 1985); *see also Gas Appliance Mfrs. Ass'n, Inc. v. Dep't of Energy*, 998 F.2d 1041, 1047 (D.C. Cir. 1993) ("An important, easily testable hypothesis should not remain untested."). Even if adding two extra years to the range could affect more than a minimal change to each entity's allocation, adding just one extra year would not have such an effect.

This analysis—gaining insight into whether adding 2020 to the timeframe would affect entities' allocations—would not have been hard. A sophisticated agency like EPA, which often invokes its "technical expertise," 2024 Rule at 46,844 (JA__), is no neophyte to such data analysis.[8] Not to mention, we live "[i]n an era when Microsoft Excel or, indeed, any data management software can [manipulate] data based on complex queries" with ease. *United States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co.*, 839 F.3d 242, 262 (3d Cir. 2016). EPA need only have "identif[ied] entities' high three years of historic data [from 2011 to 2020], averaged those, and calculated respective market shares." Proposed 2024 Rule at 66,377 (JA__).

To understand how allocations could change if 2020 were included, EPA could have calculated, for example, the average percentage change across entities or the percentage of entities that would experience less than a five percent decrease in allocations if 2020 were included. This information would have provided tangible,

---

[8] Nor was EPA working on a time crunch. The Agency had seven months from when the notice and comment period ended until it issued the 2024 Rule to investigate this. *See* Proposed 2024 Rule at 66,381 (JA__); 2024 Rule at 46,836 (JA__).

rather than speculative, information on how including 2020 would affect allocations. *See, e.g.*, *Chem. Mfrs.*, 28 F.3d at 1266 (rejecting EPA's "speculative factual assertion" (cleaned up)). Had EPA wanted deference, it should have conducted an analysis warranting it. *See Jones*, 716 F.3d at 214 ("We do not defer to an agency's 'conclusory or unsupported suppositions.'") (citation omitted).

If EPA performed the analysis, fulfilling its "basic obligation" to engage in "reasoned decisionmaking." *Miss. Comm'n*, 790 F.3d at 150, the more likely outcome would be that adding 2020, a year in which import data did not spike, would not significantly change allowance allocations. Five of the six largest HFC consumption allowance allocations for 2024, representing 68.6 percent of total allocated allowances, were allocated to entities that opposed including 2020 in the dataset.[9] *See HFC Allowances*, U.S. Envtl. Prot. Agency, https://www.epa.gov/climate-hfcs-reduction/hfc-allowances (last updated on Oct. 19, 2023) ("HFC Allowances"); *see also* 2024 Rule at 46,842 (JA__) ("Most allowance holders . . . supported EPA's proposal to use 2011 to 2019 production and consumption activity as the years to evaluate for allocations."). Assuming entities take positions favoring their economic self-interest, the odds are that 2020 was not in their top three years. *See supra,* Section I.C.1 (explaining that the OEMs had their

---

[9] *See* Comments of Honeywell International, Inc., EPA-HQ-OAR-2022-0430-0039 at 3 (Dec. 19, 2022) (JA__); Chemours Comments at 9 (JA__); Comments of Arkema Inc., EPA-HQ-OAR-2022-0430-0044 at 5 (Dec. 19, 2022) (JA__); Comments of Mexichem Fluor, Inc. d/b/a Koura, EPA-HQ-OAR-2022-0430-0043 at 1 (Dec. 19, 2022) (JA__); Comments of National Refrigerants, Inc., EPA-HQ-OAR-2022-0430-0046 at 2 (Dec. 19, 2022) (JA__).

best years in 2011–2013). That leaves companies representing less than a third of the total market share who would receive more allowances if 2020 were included.

As a result, if EPA recalculated three-year averages using 2011–2020, after applying the phasedown step to the baseline (90 percent to 60 percent), *see* 42 U.S.C. § 7675(e)(2)(C), and spreading out the effect over more than two-thirds of the market, changes to allowances for entities who opposed adding 2020 would be incremental. In fact, EPA applied the same logic when defending revisions to the consumption baseline. *See* 2024 Rule at 46,859 (JA__) ("Once EPA applies the relevant phasedown step to the baseline and then allocates the resulting allowances among eligible recipients, the change in the consumption baseline is expected to have a small effect on individual entities' allocations.").

Although including 2020 would not change allocations for most companies, at the same time, it would not result in choosing "an approach with benefits that might accrue to an individual entity at the risk of distorting allowance share" for everyone else.[10] *Id*. at 46,845 (JA__). EPA recognized that "[s]everal allowance holders and a number of importers and their customers" supported including 2020 as part of the years to be considered in the allocation methodology. *Id*. at 46,842 (JA__); *see* IGas Comments at 2 (JA__); RGAS Comments at 1 (JA__); Nature Gas Comments at 1 (JA__); FluoroFusion Comments at 5 (JA__); Comments of Daikin U.S. Corporation, EPA-HQ-OAR-2022-0430-0096 at 6 (Dec. 19, 2022) (JA__); *see*

---

[10] Again, EPA could only speculate that benefits "might" accrue to an individual entity. 2024 Rule at 46,845 (JA__); *see Verizon,* 740 F.3d at 663.

*also* Comments of Semiconductor Industry Association, EPA-HQ-OAR-2022-0430-0036 at 6 (Dec. 19, 2022) (JA___).

At its core, EPA's "concerns" that changing the timeframe now "would contribute to further market pressures leading to price spikes and lack of availability of HFCs in sectors that are not yet prepared to transition into different chemicals" are unfounded. 2024 Rule at 46,844 (JA___). As "EPA fully expects," "prices will increase" during the HFC phasedown regardless of its chosen methodology. *Id.*[11] And this is even more likely to occur in 2024, one of the two "most acute" stepdown periods. *Id.* at 46,841 (JA___).

EPA rejected commenters' concerns that excluding later years will cause "scarcity of needed products, increased pricing, and supply chain issues to the aftermarket" because commenters did not explain "how or why this is attributable to EPA's choice of allocation methodology as opposed to market pressures inherent in the AIM Act." *Id.* at 46,844 (JA___). In the same way, the Agency did not explain— much less consider—"how or why" pricing problems would be attributable to making a minor change to its "choice of allocation methodology as opposed to market pressures inherent in the AIM Act." *Id.* To be sure, an "agency's predictive judgments about the likely economic effects of a rule" are entitled to deference. *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009). But "deference to such

---

[11] *But see* 2024 Rule at 46,886 (JA___) ("[T]ransitioning to substitutes, increased recovery, reclamation, leak reduction, and prior inventory in combination support the assumption that sufficient domestic supply of HFCs will be available for entities to meet demand without significant price increases."), *and id.* ("[T]he Agency's past experience phasing out ODS did not show a clear correlation between reduction in allocations and price in these markets . . . .").

. . . judgment[s] must be based on some logic *and evidence*, not sheer speculation."
*Verizon*, 740 F.3d at 663 (Silberman, J., concurring in part and dissenting in part)
(emphasis added); *New York*, 413 F.3d at 30 (extending deference "[t]o the extent
that EPA's predictive judgment is supported by substantial evidence in the record").
And here it is not.

2.     **Including 2020 would not interfere with promoting long-term planning or maintaining continuity between the stepdown periods.**

EPA's other two stated "advantages" for excluding the 2020 data do not
support using the same methodology. 2024 Rule at 46,843 (JA__). *First*, revising the
methodology for the 2024–2028 period will not frustrate entities' "long[]-term
planning horizon." *Id.* at 46,844 (JA__). Even agencies are not beneath placing
"emphasis on . . . a red herring." *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d
882, 904 (D.C. Cir. 2006). Before July 2023 when EPA issued the 2024 Rule, "no
entities should have had a reasonable expectation of allowance allocation levels"
because "there was no prior allocation methodology that would apply to calendar
year 2024 allowances and beyond." 2024 Rule at 46,859 (JA__). In other words,
"long[]-term planning" could not start until July 2023 whether EPA kept the same
methodology or not. *Id.* at 46,844 (JA__). And starting in July 2023, entities could,
in fact, plan for the long term because the Agency allocated allowances for a five-
year horizon rather than a shorter period.

What's more, EPA discounted entities' reliance on the rulemaking process for
business planning: "[I]ndependent of this rulemaking or any other methodology

rulemaking, entities can run scenarios and anticipate various business, technology, or supply chain models on their own." *Id.* at 46,841 (JA__). Put another way, "entities know the phasedown schedule," so even without "knowing their individual allocations for every year," they can plan. *Id.* Had EPA truly prioritized continuity and long-term planning, the Agency would have set one methodology through the final phasedown step in 2036. *See id.* at 46,840–41 (JA__–__).

*Second*, EPA's conclusion that using the same methodology will provide continuity between the two stepdown periods is arbitrary and capricious because it was "left completely unexplained." *West Virginia v. EPA*, 362 F.3d 861, 866 (D.C. Cir. 2004). The Agency twice menti

oned this rationale but did not explain why keeping the same methodology would provide such continuity. 2024 Rule at 46,844, 46,846 (JA__, __). An agency "may hoist the standard of common sense, of course, but the wisdom of agency action is rarely so self-evident that no other explanation is required." *Sorenson*, 755 F.3d at 708.

Perhaps, like long-term planning, EPA meant that using the same methodology will provide continuity because allowance recipients can "estimate on an earlier timeframe their anticipated allocation and plan accordingly."[12] 2024 Rule at 46,846 (JA__); *see also id.* at 46,844 (JA__) (same). This "earlier timeline," however, has little to no significance—the ten-week leg up between when the 2024

---

[12] The better read is that the Agency cited this consideration as an independent reason rather than elaborating on why keeping the same methodology would provide continuity. *See* 2024 Rule at 46,846 (JA__) ("Using the same time period will *also* enable ….") (emphasis added); *see also id.* at 46,844 (JA__) (similar).

Rule was issued and October 1, 2023, when EPA is statutorily required to allocate allowances for 2024, does not outweigh the inequities of excluding 2020. *See id.* at 46,837 (JA__); 42 U.S.C. § 7675(e)(2)(D)(i). And again, entities can plan "independent" of the Agency's rulemaking. 2024 Rule at 46,841 (JA__). Moreover, because adding 2020 would likely have a minimal effect on most entities' allowances, effective planning would likewise be minimally comprised. *See supra,* Section I.C.1.

In sum, the professed need to promote long-term planning and maintain continuity between the stepdown periods are not advantages to keeping the same methodology. EPA's shortsighted approach threatens to exacerbate market disruption in the coming years. If the Agency categorically refuses to update the methodology using current data that accurately reflects the market, allocations in later years will be based on a dataset that grows more dated every year. Markets change, and consumption allocations should change with them.

Because EPA has valid data for 2020, the Agency had the responsibility to make accurate and equitable changes to the methodology for the 2024–2028 allocations. Making these changes now furthers EPA's goal of minimizing market disruptions during the <u>entire</u> phasedown process. EPA's misguided decision to elevate the status quo over including the 2020 data is arbitrary and capricious.

## CONCLUSION

For all the reasons above, this Court should grant the Petition for Review, vacate Section 84.11(b)(2), and remand for EPA to revise the 2024 rule to calculate

2024–2028 consumption allowances by averaging each entity's three highest years between calendar years 2011 through 2020.

Respectfully submitted,

*/s/ JoAnn T. Sandifer*

JOANN T. SANDIFER
HUSCH BLACKWELL LLP
8001 Forsyth Blvd., Suite 1500
St. Louis, MO 63105
314.480.1833
joann.sandifer@huschblackwell.com

JAMIE SHOOKMAN
HUSCH BLACKWELL LLP
511 N. Broadway, Suite 1100
Milwaukee, WI 53202-5502
414.978.5356
jamie.shookman@huschblackwell.com

DANIEL G. SOLOMON
HUSCH BLACKWELL LLP
1801 Pennsylvania Avenue, NW
Suite 1000
Washington, D.C. 20006
202.378.2391
danny.solomon@huschblackwell.com

*Counsel for Petitioners*
*IGas Holdings, Inc., et al.*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because it has been prepared in 14-point Equity font.

I further certify that this brief complies with the requirements of Federal Rule of Appellate Procedure 32(a)(7) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), it contains 12,713 words according to the word-count feature of Microsoft Word.

*/s/ JoAnn T. Sandifer*

**CERTIFICATE OF SERVICE**

I certify that on January 5, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ JoAnn T. Sandifer*