NOT YET SCHEDULED FOR ORAL ARGUMENT

Nos. 23-1261, 23-1263

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

IGAS HOLDINGS, INC., et al.,
*Petitioners*,

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent*.

Petition for Review of Action(s) of the U.S. Environmental Protection Agency

**PUBLIC COPY – SEALED MATERIAL REDACTED**

**INITIAL BRIEF FOR U.S. ENVIRONMENTAL PROTECTION AGENCY**

Of Counsel:

KAREN BIANCO
*Attorney*
U.S. Environmental Protection Agency

TODD KIM
*Assistant Attorney General*
SARAH A. BUCKLEY
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7411
Washington, D.C. 20044
(202) 616-7554
sarah.buckley@usdoj.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Except for the following, all parties, intervenors, and amici appearing in this court are listed in the Brief for Petitioner RMS of Georgia, LLC:

- Natural Resources Defense Council, Amicus Curiae in Support of Respondents

### B.    Rulings Under Review

References to the rulings at issue appear in the Brief for Petitioner RMS of Georgia, LLC.

### C.    Related Cases

There are no related cases within the meaning of Circuit Rule 28(a)(1)(C).

*/s/ Sarah A. Buckley*
SARAH A. BUCKLEY

Counsel for Respondent(s)

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ...................................................................................................i

TABLE OF AUTHORITIES ...................................................................iv

GLOSSARY ...........................................................................................xi

INTRODUCTION ....................................................................................1

STATEMENT OF JURISDICTION........................................................2

STATEMENT OF THE ISSUES.............................................................3

STATEMENT OF THE CASE................................................................3

    A.    Statutory and regulatory background ...................................3

    B.    The Framework Rule............................................................6

    C.    The Allowance Allocation Methodology for 2024 and Later Years ........................................................................10

SUMMARY OF ARGUMENT ..............................................................12

STANDARD OF REVIEW ...................................................................13

ARGUMENT .........................................................................................15

I.    The AIM Act Does Not Delegate Legislative Power.....................15

    A.    Congress declared the legislative policy in the AIM Act, leaving EPA a narrow area to "fill up" details....................21

    B.    The AIM Act's structure, context, and purpose delineate and guide EPA's discretion. ..................................26

    C.    Congress may provide the Executive discretion in implementing the law without crossing constitutional lines..................................................................................34

II.   EPA reasonably excluded 2020 data from the 2024–2028
      allowance allocation calculation....................................................39

      A.    IGas forfeited its argument that EPA should have added
            only 2020 import data by failing to raise it in comments. ..................41

      B.    EPA reasonably excluded 2020 data given concerns
            about market stability, distortions, and data quality. .........................44

            1.    EPA reasonably prioritized continuity and
                  minimizing market disruption..................................................45

            2.    EPA reasonably determined that 2020 data did not
                  accurately represent the hydrofluorocarbon market. ...............50

            3.    The 2011–2019 data was more thoroughly vetted
                  than 2020.................................................................................58

      C.    If iGas prevails, remand without vacatur is the
            appropriate remedy..............................................................................59

CONCLUSION ....................................................................................................61

CERTIFICATE OF COMPLIANCE ....................................................................63

# TABLE OF AUTHORITIES*

## Cases

**Cases**

*A.L.A. Schecter Poultry Corp. v. United States,*
  295 U.S. 495 (1935) .................................................................. 19, 25

*Allied-Signal, Inc. v. Nuclear Regul. Comm'n,*
  988 F.2d 146 (D.C. Cir. 1993) ............................................................60

*Am. Clinical Lab'y Ass'n v. Becerra,*
  40 F.4th 616 (D.C. Cir. 2022) ...........................................................15

*Am. Great Lakes Ports Ass'n v. Schultz,*
  962 F.3d 510 (D.C. Cir. 2020) ...........................................................60

*\*Am. Power & Light Co. v. SEC,*
  329 U.S. 90 (1946) ............................................... 17, 18, 21, 35, 36

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
  462 U.S. 87 (1983) ..........................................................................44

*Bluewater Network v. EPA,*
  370 F.3d 1 (D.C. Cir. 2004) ..............................................................15

*Bowsher v. Synar,*
  478 U.S. 714 (1986) ........................................................................22

*Calcutt v. Fed. Deposit Ins. Corp.,*
  598 U.S. 623 (2023) ........................................................................59

*Dep't of Com. v. New York,*
  139 S. Ct. 2551 (2019) ............................................... 40, 41, 44, 59

*Env't Def. Fund, Inc. v. Costle,*
  657 F.2d 275 (D.C. Cir. 1981) ...........................................................50

---

* Authorities upon which we chiefly rely are marked with asterisks.

*EPA v. EME Homer City Generation, L.P.*,
572 U.S. 489 (2014) ................................................................41

*Ethyl Corp. v. EPA*,
541 F.2d 1 (D.C. Cir. 1976) ....................................................52

*Fahey v. Mallonee*,
332 U.S. 245 (1947) ................................................................18

*Fed. Power Comm'n v. Hope Nat. Gas Co.*,
320 U.S. 591 (1944) ................................................................18

*Gundy v. United States*,
139 S. Ct. 2116 (2019) ................. 17, 18, 19, 22, 25, 26, 27, 28, 38, 39

*Heartland Reg'l Med. Ctr. v. Sebelius*,
566 F.3d 193 (D.C. Cir. 2009) ................................................60

*Heating, Air Conditioning & Refrigeration Distributors Int'l v. EPA*,
71 F.4th 59 (D.C. Cir. 2023) ................................................4, 9

*Herron v. Fannie Mae*,
861 F.3d 160 (D.C. Cir. 2017) ................................................24

*J.W. Hampton Jr., & Co. v. United States*,
276 U.S. 394 (1928) ................................................... 16, 17, 18

*Lead Indus. Ass'n, Inc. v. EPA*,
647 F.2d 1130 (D.C. Cir. 1980) ..............................................57

*Lichter v. United States*,
334 U.S. 742 (1948) ................................................... 18, 31, 37

*Loving v. United States*,
517 U.S. 748 (1996) ................................................................18

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) ............................................................. 44,

*Marshall Field & Co. v. Clark*,
143 U.S. 649 (1892) ................................................... 17, 18

v

*Maryland v. EPA*,
    958 F.3d 1185 (D.C. Cir. 2020) ................................................................ 14, 43

*\*Mistretta v. United States*,
    488 U.S. 361 (1989) ................................... 12, 16, 17, 18, 19, 32, 33, 36, 37, 38

*Motor & Equip. Mfrs. Ass'n v. Nichols*,
    142 F.3d 449 (D.C. Cir. 1998) ................................................................ 43, 44

*\*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) .......................................................................... 15, 40, 57

*Nat'l Broad. Co. v. United States*,
    319 U.S. 190 (1943) ...................................................................... 18, 27, 28

*Nat. Res. Def. Council v. EPA*,
    571 F.3d 1245 (D.C. Cir. 2009) ......................................................................41

*Panama Refin. Co. v. Ryan*,
    293 U.S. 388 (1935) ...................................................................... 19, 25, 35

*S. Coast Air Quality Mgmt. Dist. v. EPA*,
    472 F.3d 882 (D.C. Cir. 2006) ......................................................................41

*Sanchez v. Off. of State Superintendent of Educ.*,
    45 F.4th 388 (D.C. Cir. 2022) ......................................................................26

*Small Refin. Lead Phase-Down Task Force v. EPA*,
    705 F.2d 506 (D.C. Cir. 1983) ......................................................................57

*State of N. Y. v. Reilly*,
    969 F.2d 1147 (D.C. Cir. 1992) ......................................................................44

*The Cargo of the Brig Aurora v. United States*,
    11 U.S. 382 (1813) ............................................................................ 17, 18

*Touby v. United States*,
    500 U.S. 160 (1991) ......................................................................................18

*U.S. Air Tour Ass'n v. FAA*,
    298 F.3d 997 (D.C. Cir. 2002) ................................................................ 52, 53

*United States v. Grimaud*,
  220 U.S. 506 (1911)............................................................ 17, 31, 36

*Universal Camera Corp. v. NLRB*,
  340 U.S. 474, (1951).............................................................57

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)..............................................................28

*Wayman v. Southard*,
  23 U.S. 1 (1825)............................................................. 22, 37

*West Virginia v. EPA*,
  597 U.S. 697 (2022)..............................................................24

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001).................................. 16, 18, 19, 26, 27, 31, 35, 36

*Yakus v. United States*,
  321 U.S. 414 (1944)......................................................... 16, 18

## Constitution

U.S. Const. art. I § 1.................................................................15

U.S. Const. art. II § 3 ..............................................................32

## Statutes

5 U.S.C. § 706(2)(A).................................................................36

5 U.S.C. § 706(2)(C).................................................................36

42 U.S.C. § 7607......................................................................13

42 U.S.C. § 7607(b) ..................................................................2

42 U.S.C. § 7607(d)(1)(I)............................................................14

42 U.S.C. § 7607(d)(7)(B) ...................................................... 14, 41

42 U.S.C. § 7607(d)(9)(A) ...................................................... 14, 36

42 U.S.C. § 7607(d)(9)(C) ...................................................36

42 U.S.C. § 7671 .............................................................4

42 U.S.C. § 7675(b)(2) ................................................. 27, 28

42 U.S.C. § 7675(b)(3) ....................................................5, 28

42 U.S.C. § 7675(b)(7) ................................................. 28, 29

42 U.S.C. § 7675(b)(7)(A) ..............................................4, 5

42 U.S.C. § 7675(b)(11) ...................................................4

42 U.S.C. § 7675(c)(1) .....................................................4

42 U.S.C. § 7675(c)(3)(A) ................................................4

42 U.S.C. § 7675(e) .......................................................12

42 U.S.C. § 7675(e)(1) ........................................ 11, 25, 29, 42

42 U.S.C. § 7675(e)(1)(B) ................................................4

42 U.S.C. § 7675(e)(1)(C) ..............................................4, 47

42 U.S.C. § 7675(e)(2) ...................................... 4, 5, 19, 20, 28, 29

42 U.S.C. § 7675(e)(2)(A) ................................. 21, 25, 28, 38

42 U.S.C. § 7675(e)(2)(B) ..............................................5, 29

42 U.S.C. § 7675(e)(2)(C) ................................. 1, 5, 8, 11, 47

42 U.S.C. § 7675(e)(2)(D) ...............................................38

42 U.S.C. § 7675(e)(2)(D)(i) ..........................................6, 21

42 U.S.C. § 7675(e)(2)(D)(ii) ..................................... 5, 21, 28

42 U.S.C. § 7675(e)(2)(D)(ii)(I)(aa) ...................................5

42 U.S.C. § 7675(e)(3)............................................... 5, 6, 20, 25, 31

42 U.S.C. § 7675(e)(3)(A) ........................................... 21, 22, 32

42 U.S.C. § 7675(e)(3)(B) ............................................... 21, 32

42 U.S.C. § 7675(e)(4)......................................................25

42 U.S.C. § 7675(e)(4)(B)(i)........................................ 6, 20, 22

42 U.S.C. § 7675(e)(4)(B)(ii) ......................................... 22, 28

42 U.S.C. § 7675(e)(4)(B)(iv)........................... 6, 20, 22, 27, 38

42 U.S.C. § 7675(e)(4)(B)(iv)(I).........................................28

42 U.S.C. § 7675(e)(4)(B)(v)...............................................22

42 U.S.C. § 7675(k)(1)(C) ........................................ 2, 13, 14

42 U.S.C. § 7675(g)(1).....................................................5, 6

**Rules**

Fed. R. App. P. 32(a)(5) ....................................................62

Fed. R. App. P. 32(a)(6) ....................................................62

Fed. R. App. P. 32(a)(7)(B) ...............................................62

Fed. R. App. P. 32(f) ........................................................62

**Code of Federal Regulations**

40 C.F.R. § 84.11(b)(2) .....................................................59

40 C.F.R. § 84.13(a) ...........................................................7

40 C.F.R. § 84.19 .............................................................5, 6

**Federal Registers**

86 Fed. Reg. 9059 (Feb. 11, 2021) ...........................................................58

86 Fed. Reg. 27,150 (May 19, 2021) ................................................... 30, 31

86 Fed. Reg. 55,116 (Oct. 5, 2021)................................... 6, 7, 8, 10, 53

86 Fed. Reg. 55,841 (Oct. 7, 2021)...........................................................8

87 Fed. Reg. 61,314 (Oct. 11, 2022)......................................................8, 9

87 Fed. Reg. 66,372 (Nov. 3, 2022)........................... 10, 11, 32, 45, 50, 58

88 Fed. Reg. 46,836 (July 20, 2023) ... 2, 3, 4, 10, 11, 12, 14, 23, 24, 29, 39, 45, 46, 47, 50, 52, 53, 54, 56, 58

88 Fed. Reg. 72,060 (Oct. 19, 2023)........................................ 24, 49, 60

**Other Authorities**

Phillip Hamburger, Nondelegation Blues,
    91 Geo. Wash. L. Rev. 1083 (2023) ...................................................34

## GLOSSARY

| | |
|---|---|
| AIM Act | American Innovation and Manufacturing Act |
| APA | Administrative Procedure Act |
| EPA | Environmental Protection Agency |
| RTC | Response to Comments |

**INTRODUCTION**

In the 2020 American Innovation and Manufacturing Act ("AIM Act"), Congress directed the U.S. Environmental Protection Agency to create an allowance allocation and trading program to phase down the production and importation of certain hydrofluorocarbons, potent greenhouse gases used in various applications. Beginning in 2022, the Act prohibits any person from producing or importing regulated hydrofluorocarbons without an allowance issued for use in a particular calendar year. The number of allowances available each year is determined by a statutory formula. *See* 42 U.S.C. § 7675(e)(2)(C).

Petitioners seek review of EPA's rule establishing a methodology for allocating calendar year allowances in calendar years 2024 through 2028. They raise two unrelated arguments. Petitioner RMS of Georgia, LLC, which goes by its trade name, "Choice," contends that Congress's decision to give EPA limited discretion to allocate some of the AIM Act allowances is an unconstitutional delegation of legislative power to the Agency. But by making the AIM Act's many relevant policy decisions, big and small, and providing in the statutory structure and context bounds and guidelines for EPA's allowance allocation, Congress set forth a more than sufficient "intelligible principle." The narrow slice of discretion afforded to EPA falls well within constitutional bounds.

Petitioners led by iGas Holdings, Inc. ("iGas") contend that EPA arbitrarily or capriciously excluded 2020 hydrofluorocarbon import data from EPA's methodology for calculating allowance allocations for 2024 through 2028. IGas argues that, even if EPA's explanation that 2021 import data was distorted by stockpiling and other market gamesmanship in anticipation of regulation is valid, that explanation does not hold true for the 2020 data. As an initial matter, that argument is forfeited because iGas and other public commenters only ever advocated that EPA consider *both* 2020 and 2021 data; they did not argue, as iGas does here, that the COVID-19 pandemic and market gamesmanship did not affect the 2020 data to same degree as they affected 2021 data. iGas's current claim that EPA had to analyze the 2020 data on its own is thus not properly presented.

Even if the Court reaches the merits, EPA reasonably weighed the need for stability in the allowance allocation against concerns that the 2020 data are not representative because of the COVID-19 pandemic's supply chain disruptions and stockpiling, and the fact that 2020 data is less well-vetted than the 2011–2019 dataset. EPA's choice was not arbitrary or capricious and must therefore be upheld.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under 42 U.S.C. § 7607(b), as made applicable to the AIM Act by 42 U.S.C. § 7675(k)(1)(C). The petitions for review were timely filed because the final rule at issue, *Phasedown of Hydrofluorocarbons: Allowance*

2

*Allocation Methodology for 2024 and Later Years*, 88 Fed. Reg. 46,836 (July 20, 2023), was published in the Federal Register on July 20, 2023, and the petitions for review were filed on September 14, 2023. Case No. 23-1261 (Doc. 2017175); Case No. 23-1263 (Doc. 2017301).

## STATEMENT OF THE ISSUES

1.      Whether Congress constitutionally exercised its legislative authority to mandate a hydrofluorocarbon phasedown using an allocation and trading program while giving EPA discretion reasonably to allocate certain allowances for individual program years among entities that have historically produced and imported hydrofluorocarbons.

2.      Whether EPA reasonably continued to base the 2024–2028 allowance allocation on production and importation data from 2011 through 2019 and declined to include 2020 data that were distorted by the COVID-19 pandemic and market gamesmanship in anticipation of regulation.

## STATEMENT OF THE CASE

### A.      Statutory and regulatory background

Hydrofluorocarbons are fluorinated chemicals used in various applications like refrigeration and air conditioning. 88 Fed. Reg. at 46,839. In recent decades, hydrofluorocarbons have come into greater use as replacements for certain ozone-depleting substances that are being phased out under the Montreal Protocol on

Substances that Deplete the Ozone Layer, which the United States implements under Title VI of the Clean Air Act, 42 U.S.C. § 7671 *et seq*. *Id*.

Unfortunately, hydrofluorocarbons present their own problem: They are potent greenhouse gases, hundreds of times more so than carbon dioxide. *See id*.; *see also Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59, 62 (D.C. Cir. 2023). In response to the growing threat from hydrofluorocarbons, in 2016, countries, including the United States, adopted what is known as the Kigali Amendment to the Montreal Protocol. The Kigali Amendment provides for a global phasedown of the production and consumption (which includes importation) of hydrofluorocarbons. Congress in 2020 enacted a program to implement that phasedown: the AIM Act.[2]

Congress's program takes the form of stepwise percentage reductions in the production and consumption of hydrofluorocarbons from baseline levels down to fifteen percent of baseline levels by 2036. 42 U.S.C. § 7675(e)(2). Thus, to begin, the AIM Act directs EPA to determine the baselines, which includes specific historic levels of production and consumption of hydrofluorocarbons in the United States. *Id*. § 7675(e)(1)(B), (C). Production is the amount of hydrofluorocarbons

---

[2] The AIM Act identifies eighteen hydrofluorocarbons, along with their isomers, as "regulated substances." 42 U.S.C. § 7675(b)(11), (c)(1). The statute also provides EPA with authority to designate additional substances that meet certain criteria as regulated substances, *id*. § 7675(c)(3)(A), though it has not done so at this time.

manufactured from a raw material or feedstock chemical. *Id*. § 7675(b)(7)(A).

Consumption includes both production and importation of hydrofluorocarbons into

the United States, subtracting the amount exported. *Id*. § 7675(b)(3).

Congress next provided a schedule for a gradual phasedown of production

and consumption relative to those baselines. *Id*. § 7675(e)(2). *See* Table 1, *infra*.

The statute directs EPA to "ensure that the annual quantity of all regulated

substances produced or consumed in the United States does not exceed" the

quantity permitted by the statutory phasedown schedule. *Id*. § 7675(e)(2)(B).

**Table 1 – 42 U.S.C. § 7675(e)(2)(C) Phasedown Schedule**

| Date | Percentage of Production Baseline | Percentage of Consumption Baseline |
|------|-----------------------------------|------------------------------------|
| 2020–2023 | 90 percent | 90 percent |
| 2024–2028 | 60 percent | 60 percent |
| 2029–2033 | 30 percent | 30 percent |
| 2034–2035 | 20 percent | 20 percent |
| 2036 and thereafter | 15 percent | 15 percent |

Congress instructed EPA to establish, by rule, "an allowance allocation and

trading program" to achieve that phasedown. *Id*. § 7675(e)(3). The statute provides

that an allowance is a limited authorization for the production or consumption of

regulated hydrofluorocarbons. *Id*. § 7675(e)(2)(D)(ii). An allowance is not a

property right, *id*. § 7675(e)(2)(D)(ii)(I)(aa), but is transferrable in accordance with

regulations that must be (and were) promulgated by the same deadline as the

allocation and trading program, *id*. § 7675(g)(1); *see* 40 C.F.R. § 84.19. As production and consumption levels decrease per the statutory schedule, *see* Table 1, *supra*, the number of available allowances in the trading program decreases accordingly, 42 U.S.C. § 7675(e)(2)(D)(i).

The AIM Act mandates that, for the first five years of the trading program, EPA must allocate "the full quantity of allowances necessary, based on projected, current, and historical trends, for the production or consumption" of hydrofluorocarbons for six specific applications, which include certain semiconductor uses, defense sprays, and mission-critical military uses, among others. *Id*. § 7675(e)(4)(B)(iv). The Act provides that EPA may identify other applications that meet certain criteria to receive priority allowance access also. *Id*. § 7675(e)(4)(B)(i).

## B. The Framework Rule

As Congress directed, *see id*. § 7675(e)(3), on September 23, 2021, EPA promulgated its Framework Rule for the AIM Act allowance allocation and trading program. *Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the [AIM Act]*, 86 Fed. Reg. 55,116 (Oct. 5, 2021). Among other things, the Framework Rule applied the statutory formulas to establish the production and consumption baselines against which the hydrofluorocarbon phasedown would be measured. *Id*. at 55,118. It then applied

the percentage in the statutory phasedown schedule (90% for 2022 and 2023) to those baselines to determine the quantity of allowances that would be available for each calendar year. *Id.*

The Framework Rule then established an allowance allocation and trading program as the AIM Act requires. EPA established three types of allowances: application-specific allowances, consumption allowances, and production allowances. *Id.* at 55,142. The application-specific allowances can be expended only for producing or consuming hydrofluorocarbons for use in the six specific applications identified in the statute. *Id.*; 40 C.F.R. § 84.13(a). Importing hydrofluorocarbons requires expending consumption allowances. 86 Fed. Reg. at 55,142. And because the AIM Act defines consumption to include production, producing hydrofluorocarbons requires expending both production and consumption allowances. *Id.*

EPA also established a methodology for allocating the allowances for calendar years 2022 and 2023. *Id.* at 55,118. First, end users in the six statutorily specified applications would receive application-specific allowances. *Id.* at 55,147. Then, EPA set aside a small number of allowances for which a limited set of users that would not otherwise qualify for allowances could apply. *Id.*; *see also id.* at 55,155. The remaining allowances are called the general allowance pool. *Id.* at 55,147.

EPA determined it would issue production and consumption allowances from the general allowance pool to entities that produced or imported regulated hydrofluorocarbons between 2011 and 2019 and continued to do so in 2020. *Id*. at 55,144.[3] Specifically, historic market participants would receive allowances in amounts based on the average of their three (not necessarily consecutive) highest years of production or consumption between 2011 and 2019. *Id*. at 55,145. That high-three average would then be divided by the sum of all entities' averages to determine each entity's share of the general allowance pool. *Id*. at 55,147. An entity's ultimate allocation is the product of their share (high-three average divided by sum of all high-three averages) times the total number of allowances in the general pool (the baseline multiplied by the percentage reduction reflected in 42 U.S.C. § 7675(e)(2)(C), *see* Table 1, *supra*).

In separate actions, EPA issued calendar year allowances for 2022 and 2023. *See* Notice, *Phasedown of Hydrofluorocarbons: Notice of 2022 Allowance Allocations for Production and Consumption of Regulated Substances Under the [AIM Act]*, 86 Fed. Reg. 55,841, 55,842 (Oct. 7, 2021); Notice, *Phasedown of Hydrofluorocarbons: Notice of 2023 Allowance Allocations for Production and*

_____

[3] The Framework Rule stated that EPA would give individualized consideration, if requested, to circumstances of historical importers that were not active in 2020, such as if the inactivity in 2020 was due to the COVID-19 pandemic. 86 Fed. Reg. at 55,144.

*Consumption of Regulated Substances Under the [AIM Act]*, 87 Fed. Reg. 61,314, 61,316–17 (Oct. 11, 2022).

Save for certain provisions pertaining to the use of disposable cylinders and tracking of cylinders for transporting hydrofluorocarbons, in 2023 this Court upheld EPA's Framework Rule against two petitions for review. *Heating, Air Conditioning & Refrigeration Distribs. Int'l v. EPA*, 71 F.4th 59 (D.C. Cir. 2023). Petitioner Choice filed a petition for review in that case, too, arguing that EPA unlawfully regulated hydrofluorocarbon blends and that the AIM Act violated the nondelegation doctrine. The Court rejected both challenges, the latter on the ground that Choice failed to exhaust the issue by not raising it in comments to EPA. No petitioner challenged the allocation methodology for 2022 and 2023 in that case.[4]

---

[4] Choice petitioned for review of the 2022 and 2023 Allocation Acts but moved to voluntarily dismiss those petitions on August 23, 2023. *RMS of Georgia, LLC v. EPA*, Case No. 22-1025 (and consolidated cases). Another party, Peter Williams, also petitioned for review of the 2023 Allocation Action, *Williams v. EPA*, Case No. 22-1314, and filed a subsequent related mandamus petition, *In re: Peter Williams*, Case No. 23-1269, both of which have been dismissed. Mr. Williams has also filed a petition for review of EPA's 2024 Allocation Action, and a motion to dismiss that petition remains pending. *Williams v. EPA*, Case No. 23-1340. The issues raised in Mr. Williams' petitions are unrelated to those raised here.

### C.    The Allowance Allocation Methodology for 2024 and Later Years

EPA's Framework Rule governed allocations only for the first two years of the phasedown, 2022 and 2023. EPA stated in the Framework Rule that it intended "to undertake a subsequent rulemaking to govern allocations for calendar years 2024 and beyond." 86 Fed. Reg. at 55,118. That subsequent rulemaking is challenged here.

Before beginning that rulemaking, EPA took advance comment on potential methodologies for issuing allowances in 2024 and beyond. 88 Fed. Reg. at 46,840. EPA considered those comments in developing the Proposed Rule, in which EPA proposed to base the allocation of production and consumption allowances on the average of each entity's highest three years of production or consumption activity between 2011 and 2019—the same years used in the 2022 and 2023 allocations. *Phasedown of Hydrofluorocarbons: Allowance Allocation Methodology for 2024 and Later Years*, 87 Fed. Reg. 66,372, 66,377 (Nov. 3, 2022). EPA explained that retaining the same timeframe as finalized in the Framework Rule "would minimize disruption to the market in 2024." *Id*.

EPA also solicited comment on whether to expand the range of years used to develop each allowance-holder's high-three average to include 2020 and 2021. *Id*. EPA explained that its primary proposal excluded those years because 2020 and 2021 production and importation may have been influenced by external factors like

the COVID-19 pandemic, supply chain disruptions, and stockpiling hydrofluorocarbons in expectation of the phasedown. *Id*.

After considering public comments, EPA published its final rule on July 20, 2023. 88 Fed. Reg. 46,836 ("2024–2028 Allocation Methodology Rule"). As relevant here, the 2024–2028 Allocation Methodology Rule retains the reliance on production and consumption data between 2011–2019. *Id*. at 46,843. As in the Framework Rule, entities receiving allowances from the production or consumption general pools are allocated a share of the pool based on the average of their three highest years of relevant activity between 2011 and 2019, divided by the sum of all entities' high-three average. That share is multiplied by the number of available allowances, which is determined by multiplying the production and consumption baseline, *see* 42 U.S.C. § 7675(e)(1); 88 Fed. Reg. at 46,857–58 (revising baseline), by the phasedown provision for the year set out at 42 U.S.C. § 7675(e)(2)(C). For 2024 through 2028, the allowable production and consumption are at 60% of baseline.

While a majority of commenters supported EPA's approach, *see* 88 Fed. Reg. at 46,842, others, like iGas, advocated for including both 2020 and 2021 production and consumption data in the 2024–2028 methodology. EPA explained that it declined to add 2020 and 2021 data because altering the years of data used to make the allocation could disrupt the market just as allowance-holders and their

supply chains are adjusting to the phasedown, and because 2020 and 2021 data were artificially skewed by the COVID-19 pandemic disruptions and stockpiling. *Id*. at 46,844. EPA also noted that the 2011–2019 dataset was better understood and more thoroughly vetted than the 2020 and 2021 data because of many iterations of review, comment, and updates through the initial regulatory implementation of the AIM Act. *Id*. at 46,845. No commenter differentiated between 2020 and 2021 or advocated alternatively for including only 2020 data.

No one sought reconsideration of EPA's allowance allocation.

## SUMMARY OF ARGUMENT

1.      Choice's petition should be denied. In the AIM Act, Congress "clearly delineate[d] the general policy, the public agency which is to apply it, and the boundaries of the delegated authority." *Mistretta v. United States*, 488 U.S. 361, 372–73 (1989) (internal quotation omitted). Congress mandated that specified hydrofluorocarbons be phased down from a specified baseline according to a detailed schedule; that hydrofluorocarbon production and import be prohibited without an allowance; and that EPA must, through notice-and-comment rulemaking, establish an allowance allocation and trading program and ensure that allowances are allocated to further the statutory scheme. *See* 42 U.S.C. § 7675(e). By setting forth Congress's policy and by providing guardrails for EPA's discretion in the statutory structure and context, the AIM Act provides a sufficient

"intelligible principle" and thus is not an unconstitutional delegation of legislative authority.

2.      The Court should also deny iGas's petition. Because neither iGas nor anyone else raised in comments to EPA the argument that 2020 import data were unlike 2021 import data and thus not distorted by COVID-19 supply chain impacts or stockpiling in anticipating of regulation, that argument is not properly before the Court now.

In any event, iGas fails to show that EPA acted arbitrarily or capriciously in excluding 2020 import data. EPA reasonably prioritized stability in the allowance allocation methodology in deciding to retain the 2011–2019 timeframe for calculating entities' allowance shares. EPA also reasonably concluded—and adequately explained—that 2020 data was impacted by market distortions, and that 2020 data was not as thoroughly vetted as that from 2011 through 2019.

Finally, if iGas prevails, remand of the 2024–2028 allocation methodology without vacatur is the appropriate remedy because the widespread and substantial consequences of vacatur outweigh the seriousness of the error iGas alleges in its petition.

## STANDARD OF REVIEW

The AIM Act provides that section 307 of the Clean Air Act, 42 U.S.C. § 7607, applies to any rulemaking under the AIM Act as though the AIM Act

"were expressly included in title VI" of the Clean Air Act. 42 U.S.C.

§ 7675(k)(1)(C). Section 307(d) of the Clean Air Act sets out various provisions

that apply to the "promulgation . . . of regulations under subchapter VI." *Id.*

§ 7607(d)(1)(I).[5] Clean Air Act section 307(d) therefore applies to the 2024–2028

Allocation Framework Rule. *See* 88 Fed. Reg. at 46,890.

Section 307(d)(7)(B) of the Clean Air Act establishes a mandatory

exhaustion requirement also applicable here: judicial review is limited to "an

objection to a rule or procedure which was raised with reasonable specificity"

during the public comment period, or on reconsideration if "it was impracticable to

raise such objection within such time . . . and if such objection is of central

relevance to the outcome of the rule." 42 U.S.C. § 7607(d)(7)(B).

Under Section 307(d)(9)(A) of the Clean Air Act, the Court may "reverse

any . . . action found to be . . . arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A). To determine

whether an action is arbitrary and capricious under that Clean Air Act provision,

this Court applies the same standard as under the Administrative Procedure Act.

*Maryland v. EPA*, 958 F.3d 1185, 1196 (D.C. Cir. 2020). Under that highly

---

[5] The AIM Act refers to "title VI," not "subchapter VI," of the Clean Air Act. But the AIM Act's parenthetical citation to "42 U.S.C. 7671 et seq." clarifies that the AIM Act is referring to subchapter VI of the Clean Air Act. *See* 42 U.S.C. § 7675(k)(1)(C).

deferential standard, the Court cannot substitute its policy judgment for EPA's. *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004). Where EPA has considered the relevant factors and articulated a rational connection between the facts found and the choices made, its decision must be upheld. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 624 (D.C. Cir. 2022) (cleaned up).

## ARGUMENT

### I. The AIM Act Does Not Delegate Legislative Power.

The AIM Act embodies Congress's policy choice to phase down hydrofluorocarbons, as well as its choices about how to do so. As Choice concedes, Choice Br. at 4, the Act reflects a highly detailed scheme that addresses big and small policy issues alike. Choice, however, attacks one narrowly circumscribed slice of discretion that Congress left for EPA: how to distribute the allowances that Congress mandates must be made available each program year. But establishing—at Congress's direction—a methodology for allocating AIM Act allowances among specified parties is not an unconstitutional exercise of legislative power; rather, it is a traditional executive exercise in implementing Congress's will.

The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const. Art. I, § 1. The Supreme

Court has explained that this "text permits no delegation of those powers." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). It has recognized, however, that neither separation of powers nor the non-delegation doctrine "prevent[s] Congress from obtaining the assistance of its coordinate Branches." *Mistretta*, 488 U.S. at 372. In other words, the Constitution does not "deny[] to the Congress the necessary resources of flexibility and practicality . . . to perform its function." *Yakus v. United States*, 321 U.S. 414, 425 (1944) (citation omitted).

The Supreme Court "ha[s] 'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Am. Trucking*, 531 U.S. at 474–75 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)). It has recognized that "Congress is not confined to that method of executing its policy which involves the least possible delegation of discretion to administrative officers." *Yakus*, 321 U.S. at 425–26. Instead, the "extent and character of [the] assistance" Congress may seek in a particular context "must be fixed according to common sense and the inherent necessities of the governmental coordination" at issue. *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928). Those questions of common sense and necessity are ones that Congress is typically best positioned to assess. *See Mistretta*, 488 U.S. at 372; *see also id.* at 416 (Scalia, J., dissenting).

Accordingly, the Supreme Court has held that Congress may confer discretion on the Executive to implement the laws so long as it supplies an "intelligible principle" defining the limits of that discretion. *Mistretta*, 488 U.S. at 372 (quoting *J.W. Hampton*, 276 U.S. at 409). The Court has clarified that the vesting of authority in an Executive Branch official is "constitutionally sufficient" under that standard "if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of th[e] delegated authority." *Id*. at 372–73 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)); *see also Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (plurality opinion) (reiterating that "a delegation is permissible if Congress has made clear to the delegee the general policy he must pursue and the boundaries of his authority" (cleaned up)).

Consistent with those principles, the Supreme Court has upheld against a nondelegation challenge nearly every statutory provision it has confronted. "From the beginning of the government," Congress has enacted, and the Court has upheld, statutes "conferring upon executive officers power to make rules and regulations— not for the government of their departments, but for administering the laws which did govern." *United States v. Grimaud*, 220 U.S. 506, 517 (1911). For example, early Congresses enacted—and the Supreme Court upheld—a series of statutes that conferred on the President the power to impose or lift trade sanctions and tariffs.

*Marshall Field & Co. v. Clark*, 143 U.S. 649, 683–89 (1892); *The Cargo of the Brig Aurora v. United States*, 11 U.S. 382, 388 (1813).

In the last century, the Supreme Court has upheld statutes authorizing the Secretary of War to determine and recover "excessive profits" from military contractors, *Lichter v. United States*, 334 U.S. 742, 785–86 (1948); authorizing the Price Administrator to fix "fair and equitable" commodities prices, *Yakus*, 321 U.S. at 420; authorizing the Federal Communications Commission to regulate broadcast licensing as "public interest, convenience, or necessity" requires, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–26 (1943); authorizing the Securities and Exchange Commission to ensure that a holding company's structure does not "unfairly or inequitably distribute voting power among security holders," *Am. Power & Light Co.*, 329 U.S. at 104–05; and directing the Sentencing Commission to promulgate binding Sentencing Guidelines for federal crimes, *Mistretta*, 488 U.S. at 374–77.[6]

---

[6] *See also Gundy*, 139 S. Ct. at 2128–30 (plurality opinion) (authority to specify how sex-offender registration statute applies to individuals who committed sex offenses before the statute's enactment); *id.* at 2130–31 (Alito, J., concurring in the judgment); *Am. Trucking*, 531 U.S. at 472–76 (authority to set nationwide air-quality standards limiting pollution); *Loving v. United States*, 517 U.S. 748, 771–74 (1996) (aggravating factors for death penalty in courts martial); *Touby v. United States*, 500 U.S. 160, 165–67 (1991) (temporary designation of controlled substances); *Fahey v. Mallonee*, 332 U.S. 245, 247 (1947) (rules for reorganization, etc., of savings-and-loan associations); *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944) (natural-gas wholesale prices); *J.W. Hampton*, 276 U.S. at 407–11 (tariffs).

Indeed, in the Nation's history, the Supreme Court has only twice found a delegation unconstitutional. In 1935, the Court concluded that two provisions of the National Industrial Recovery Act, ch. 90, 48 Stat. 195—enacted in response to the Great Depression—contained "excessive delegations" because Congress "failed to articulate *any* policy or standard that would serve to confine the discretion of the authorities to whom Congress had delegated power." *Mistretta*, 488 U.S. at 373 & n.7 (emphasis added). The Supreme Court held those provisions invalid because one "provided literally no guidance for the exercise of discretion," and the other "conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Am. Trucking*, 531 U.S. at 474 (discussing *Panama Refin. Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495 (1935)). Since 1935, the Court has "upheld, again without deviation, Congress' ability to delegate power under broad standards." *Mistretta*, 488 U.S. at 373; *see also Gundy*, 139 S. Ct. at 2129 (plurality opinion) (noting the Court has "over and over upheld even very broad delegations").

The delegation at issue here is narrower than many statutes that have passed constitutional muster. In the AIM Act, Congress made the key policy choices, both with respect to the *end* it seeks to achieve (phasing down hydrofluorocarbons), and the *means* for achieving that end (an allowance allocation and trading program), on

a specific timeframe (stepwise reductions through 2036). *See* 42 U.S.C. § 7675(e)(2) (prohibiting production or consumption of hydrofluorocarbons without an allowance); *id*. § 7675(e)(3) (directing EPA to use an allowance allocation and trading program to accomplish the phasedown). Congress also provided detailed guidance on mandatory allocations to specific applications. *See id.* § 7675(e)(4)(B)(iv) (mandatory allocations); *see also id.* § 7675(e)(4)(B)(i) (essential uses). The AIM Act's detailed framework for the phasedown program gives a narrow slice of discretion to EPA to allocate allowances not reserved for those application-specific uses—discretion that is guided by the Act's purpose, structure, and context.

To argue the contrary, Choice makes three arguments adrift from both the statute and the Constitution. First, Choice hyperbolically inflates the scope and significance of EPA's discretion to allocate allowances, when it is Congress's choices that govern private conduct and engender the complained-of effects. Second, Choice contends that the AIM Act provides no constitutionally sufficient "intelligible principle" only by ignoring how the statutory text, context, and structure provide more than sufficient guardrails to guide EPA's action. And third, Choice's argument that granting any policymaking discretion to the Agency necessarily delegates legislative power is unmoored from the Supreme Court's consistent, longstanding understanding of legislative power.

### A. Congress declared the legislative policy in the AIM Act, leaving EPA a narrow area to "fill up" details.

The AIM Act's specific, detailed scheme shows that Congress appropriately exercised the legislative authority here. Congress's delineation of "the general policy, the public agency which is to apply it, and the boundaries of this delegated authority" puts this case comfortably within the bounds of a constitutional delegation of administrative discretion to implement Congress's will. *Am. Power & Light Co.*, 329 U.S. at 105.

Congress did not broadly delegate authority to EPA to regulate hydrofluorocarbons and leave it at that. Nor did it define the statutory phasedown schedule and simply leave it to EPA to achieve that phasedown. Instead, Congress specifically directed EPA to establish "an allowance allocation and trading program," 42 U.S.C. § 7675(e)(3)(A)–(B), and further bounded that direction by specifying that EPA was to do so "in accordance with this section" and "in accordance with the schedule under paragraph (2)(C)[.]" *Id*. Congress prescribed the method for determining the number of available allowances each year. *Id*. § 7675(e)(2)(D)(i). It defined the nature of the allowances. *Id*. § 7675(e)(2)(D)(ii). And it imposed a prohibition on the production or consumption of regulated substances without allowances. *Id*. § 7675(e)(2)(A).

Waving this away, Choice argues that Congress impermissibly delegated the decision of *who* will receive allowances. But even there, Choice overlooks

subsection (e)(4)(B)(iv). There, Congress identified six specific uses of hydrofluorocarbons and required EPA to allocate "the full quantity of allowances necessary" toward those uses "based on projected, current, and historical trends" for at least the first five years. *Id*. § 7675(e)(4)(B)(iv). It also provided a process for extending that period. *Id*. § 7675(e)(4)(B)(v). And it set forth specific criteria and a petition process for EPA to identify other essential uses that should be provided priority access to allowances. *Id*. § 7675(e)(4)(B)(i), (ii).

In sum, Congress made the policy decision of which users *must* receive allowances, leaving EPA to allocate remaining allowances "in accordance with this section." *Id*. § 7675(e)(3)(A). That last, narrowly cast decision is not inherently *legislative*. Rather, determining how to apportion remaining allowances—in service of Congress's overall scheme—is a classically executive act of *implementing* the law. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 733 (1986) ("Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law."). Put differently, the allowance allocation methodology is precisely the sort of "detail[]" that Congress may constitutionally leave to EPA to "fill up." *Wayman v. Southard*, 23 U.S. 1, 43 (1825); *see also Gundy*, 139 S. Ct. at 2136 (Gorsuch, J., dissenting).

To distort that narrow slice of executive discretion into an unconstitutional delegation, Choice artificially inflates the scope and consequences of EPA's

authority. Choice contends that setting a methodology for allocating allowances—which are created and capped by Congress itself—amounts to a "profound re-ordering of this multi-billion-dollar industry sector." Choice Br. at 1.

As an initial matter, Choice's apocalyptic characterization of the consequences of EPA's allocation methodology does not stand up to scrutiny. The AIM Act's phasedown concerns one group of chemicals supplied by an extremely narrow sector of the economy, for which there are substitutes already in the market. *See* Regulatory Impact Analysis Addendum 2.3.2, EPA-HQ-OAR_2022-0430-0112 (discussing the supply and cost of "abatement options" to replace hydrofluorocarbon use in different applications), JA__–__; *see also id.* Appx. C (listing substitutes for different hydrofluorocarbon applications), JA__–__. Many of the same producers and importers of hydrofluorocarbons also supply the substitute chemicals. *See* Economic Impact Screening Analysis, EPA-HQ-OAR-2022-0430-0111 att. 4, at 11–15. JA__; *see also* RIA Addendum, EPA-HQ-OAR-2022-0430-0111 att. 3, JA__ (explaining that assessing environmental justice impacts is difficult because facilities that produce regulated hydrofluorocarbons may also produce substitutes). Furthermore, the suggestion that the allocation of allowances amounts to a "re-ordering" of the industry ignores that EPA's allocation methodology is based on historic production and import levels of entities

in the industry. *See* 88 Fed. Reg. at 46,842.[7] Indeed, because of Choice's historic import activity, in 2024 it was allocated 1,063,455 allowances. 2024 Allocation Action, 88 Fed. Reg. 72,060, 72,063 (Oct. 19, 2023).

More importantly, the market effects Choice complains of—increasingly limited ability to produce or import hydrofluorocarbons, the need to have allowances to engage in those activities, driving users of hydrofluorocarbons to find substitutes—flow from *Congress's* policy choices, not EPA's. Congress determined that hydrofluorocarbons must be significantly phased down in accordance with a provided schedule. Congress chose to achieve its ends through an allowance allocation and trading program,[8] and it set detailed rules for how

---

[7] Choice tosses out some (meritless) quibbles with how EPA determined which entities actually historically took part in the relevant market activity, *see* Choice Br. at 32–34, but conspicuously declines to bring a claim about it. EPA explained in response to Choice's comments on this subject that it allocated to the entities that actually imported the hydrofluorocarbons at issue—that is, who landed on, brought into, or introduced into the United States those hydrofluorocarbons, considering imports reported to U.S. Customs and Border Protection and to the Greenhouse Gas Reporting Program. Response to Comments at 85, JA__. At any rate, Choice has forfeited this argument by failing to raise it directly in Choice's opening brief. *See Herron v. Fannie Mae*, 861 F.3d 160, 165 (D.C. Cir. 2017).

[8] That Congress itself chose such a program scuttles Choice's claim that legislative delegations are somehow more suspect when they involve "cap-and-trade schemes," Choice Br. at 23–24, citing *West Virginia v. EPA*, 597 U.S. 697 (2022). *West Virginia* identified no general concern with Congress electing to adopt "trading systems as a means of complying with an already established emissions limit." 597 U.S. at 733. And unlike the situation in *West Virginia*, Congress here

many allowances would be available each year, what activities would require allowances, and which hydrofluorocarbon uses would be prioritized during the initial phasedown. *See* 42 U.S.C. §§ 7675(e)(1), 7675(e)(4). Choice concedes that a delegation of discretion is constitutional so long as Congress sets the "policy and plan," Choice Br. at 29—and that is precisely what Congress did here.

For those reasons, the AIM Act is unlike the statute at issue in *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495 (1935), where the Supreme Court lamented that Congress had failed to "prescribe rules of conduct," 295 U.S. at 541. Not so here. Congress itself enacted the statutory prohibition that "no person shall" produce or consume regulated substances without an allowance. 42 U.S.C. § 7675(e)(2)(A); *accord Gundy*, 139 S. Ct. at 2143 (Gorsuch, J., dissenting) (recognizing that the Executive may appropriately "resolve even highly consequential details so long as Congress prescribes the rule governing private conduct").

This is not a case in which Congress has punted a decision on which it "could not achieve the consensus necessary to resolve the hard problems." *Gundy*, 139 S. Ct. at 2144 (Gorsuch, J., dissenting); *see* Amicus Brief of Americans for

---

set the applicable limits and explicitly directed the implementation of an "allowance allocation and trading program." 42 U.S.C. § 7675(e)(3).

Prosperity Foundation at 12 (expressing concern about Congress "shirk[ing]" its duty to make "politically difficult and important" policy choices). Nor is it a case in which Congress gave the Executive "free-floating power" to "dismantle an entire industry," *see id.* at 11, aggrandizing the Executive at the Legislature's expense. *See Gundy*, 139 S. Ct. at 2144 (Gorsuch, J., dissenting). Congress directed EPA to issue tradeable allowances to achieve its detailed statutory scheme to phase down hydrofluorocarbons. This is not roving Executive power; this is a narrowly circumscribed piece of a larger statutory scheme. The discretion granted falls "well within the outer limits of [the Supreme Court's] nondelegation precedents," *Am. Trucking*, 531 U.S. at 475, and even within those limits articulated by Justices "willing to reconsider the approach [to the nondelegation doctrine that the Court] ha[s] taken for the past 8[9] years," *Gundy*, 139 S. Ct. 2116, 2131 (Alito, J., concurring in the judgment).

**B.      The AIM Act's structure, context, and purpose delineate and guide EPA's discretion.**

Along with setting forth the broad goals and picayune details of the AIM Act's legislative policy, the statute also provides a constitutionally sufficient "intelligible principle" to guide EPA's action. *Gundy*, 139 S. Ct. at 2123; *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 401 (D.C. Cir. 2022), *cert. denied*, 143 S. Ct. 579 (2023). Choice concedes that the AIM Act provides detailed direction on the design and implementation of the phasedown, including how to

calculate the baseline and standards and dates for phase down milestones. *See*

Choice Br. at 4, 5. The question that Choice contends remains unanswered is "who

should and should not be issued allowances, why, or in what proportion to others

in the U.S. Market." Choice Br. at 6. But Choice's own framing of this issue

betrays the narrow scope of and ample guardrails that apply to EPA's action.

First, it is worth reiterating that the scope of discretion conferred here is

limited. It pertains to one aspect of a detailed statutory scheme: the allocation of

allowances. Neither the concept of an "allowance" (which Congress defined, *see*

42 U.S.C. § 7675(b)(2)) nor the consequence of its "allocation" would have any

effect or meaning without the broader scheme Congress set forth in the AIM Act.

Moreover, Congress gave explicit instruction to provide sufficient allowances from

the pool to certain specified applications, *id*. § 7675(e)(4)(B)(iv), further narrowing

the scope of EPA's discretion. And because Congress specified that the allowances

are tradeable, the initial allocation is not determinative of who is ultimately

allowed to produce or consume hydrofluorocarbons. Given the limited nature of

the discretion granted, the amount of guidance the Constitution requires Congress

must provide is likewise limited. *See Am. Trucking*, 531 U.S. at 475.

Second, the AIM Act's structure, context, and purpose provide guideposts

for EPA's discretion. *Gundy*, 139 S. Ct. at 2126 (plurality opinion) ("To define the

scope of delegated authority, we have looked to the text in 'context' and in light of

the statutory 'purpose.'" (quoting *Nat'l Broad. Co.*, 319 U.S. at 214)). As already explained, Congress mandated that EPA "shall allocate the full quantity of allowances necessary, based on projected, current, and historical trends, for the production and consumption" of hydrofluorocarbons for specifically listed purposes. 42 U.S.C. § 7675(e)(4)(B)(iv)(I). It also required EPA to consider petitions to designate other hydrofluorocarbon applications as entitled to priority allowance access, applying specific factors. *Id*. § 7675(e)(4)(B)(ii).

Beyond the explicit prioritization of certain uses, the broader statutory context provides more direction. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) ("[R]easonable statutory interpretation must account for both the specific context in which . . . language is used and the broader context of the statute as a whole.") (cleaned up). Congress defined allowances as limited authorizations required to produce or import regulated substances beginning in 2022. 42 U.S.C. § 7675(b)(2), (e)(2)(A), (e)(2)(D)(ii). Congress prohibited production (manufacturing hydrofluorocarbons from raw material or feedstock chemicals) and consumption (production and importation) of hydrofluorocarbons without allowances. 42 U.S.C. § 7675(e)(2); *see id*. § 7675(b)(3) (defining consumption),

(b)(7) (defining "produce").[9] Congress provided detailed instructions for calculating how many allowances will be made available. *Id*. § 7675(e)(1). And Congress directed that EPA, in deciding how and to whom to allocate allowances, "ensure that the annual quantity of all regulated substances produced or consumed in the United States does not exceed" the stepped-down baseline. *Id.* § 7675(e)(2)(B).

In other words, EPA was directed to allocate remaining allowances among persons that have produced or imported hydrofluorocarbons or intend to do so— entities engaged in activities that would be prohibited "without a corresponding quantity" of applicable allowances, after the phasedown took effect. 42 U.S.C. § 7675(e)(2).

---

[9] It is worth clarifying that the only regulated activity that Choice has historically engaged in is *importing* or, in AIM Act parlance, *consuming* hydrofluorocarbons. Although Choice creates hydrofluorocarbon blends—in essence, mixing certain hydrofluorocarbons with other chemical substances—it does not "produce" hydrofluorocarbons within the meaning of the AIM Act. *See* 42 U.S.C. § 7675(b)(7); *see* 88 Fed. Reg. at 46,848 ("Allowances are required for the act of importing, not subsequent transport, blending, or sale of regulated substances that have already been produced in or imported into the United States."). Choice is therefore incorrect in saying that its products "cannot be produced . . . without EPA-issued allowances." Choice Br. at 3. To create its product, Choice must either (1) purchase hydrofluorocarbons from a producer or importer, which does *not* require Choice to hold allowances; or (2) import hydrofluorocarbons itself, which does.

Consistent with this statutory context, every one of EPA's proposals to allocate general pool allowances in the Framework Rule and the 2024–2028 Allocation Rule focused on the best way to allocate allowances among entities that have historically produced or consumed hydrofluorocarbons and who are likely to do so again. *See, e.g.*, 86 Fed. Reg. 27,150, 27,169 (May 19, 2021). In the Framework Rule proposal, EPA initially proposed to issue allowances to companies that produced or imported hydrofluorocarbons in 2017, 2018, and 2019, and were still active in the market in 2020. *Id*. In the alternative, EPA took comment on issuing allowances tied to production or import in 2011–2013, or "some other combination of years, including all years, between 2011 and 2019," again, so long as the company was still active as of 2020. *Id*. at 27,170. EPA further sought "advance input" on potential approaches for allocating allowances in 2024 and beyond, including different variations on what years of past market activity to consider, incorporating a fee system alongside an allocation based on past market activity, establishing an auction for allowances, or a combination of approaches. *Id*. at 27,203.

Consistent with the AIM Act's structure, EPA's driving concern in selecting among these options was how best to reflect the market and ensure allowance holders would be those that could and would use allowances to meet near-term needs, while considering distortions like stockpiling or other gamesmanship in

anticipation of regulation. *See id*. at 27,169 (stating the Agency sought to ensure "allowances are allocated to companies that are active in the [hydrofluorocarbon] market" and "to avoid issuing production allowances to entities that are unable to use them").

Choice contends that the fact that EPA could consider multiple implementation options at all is an indication that Congress "failed to speak to the issue." Choice Br. at 17. But a statute need not provide a "determinate criterion" for an agency's action to avoid delegating legislative authority. *Am. Trucking*, 531 U.S. at 475. Holding otherwise would wipe out centuries of legislative practice and judicial precedent. *See, e.g.*, *Grimaud*, 220 U.S. at 517 ("From the beginning of the government, various acts have been passed conferring upon executive officers power to make rules and regulations,—not for the government of their departments, but for administering the laws which did govern."); *Lichter v. United States*, 334 U.S. 742, 785–86 (1948) (explaining that Congress need not "supply administrative officials with a specific formula for their guidance," and collecting cases).

Choice also ignores that Congress specifically directed EPA to establish the phasedown program and its allocation methodology through a "final rule" issued after "a period of notice and opportunity for public comment." 42 U.S.C. § 7675(e)(3). Thus, even as Congress did not provide express direction on how to

weigh various considerations under the statute, it prescribed a robust public process where stakeholders can weigh in as EPA works through the nitty-gritty details of how to distribute transferrable (non-application-specific) allowances.

In all its arguments, Choice ignores the AIM Act's overall structure and context in favor of myopically focusing on Section 7675(e)(3) in isolation. *See* Choice Br. at 24. But even that subparagraph tells Choice—and EPA and the Court—to widen its lens: it states that EPA must issue a rule phasing down hydrofluorocarbons "through an allowance allocation and trading program *in accordance with this section*" and "*in accordance with the schedule* under paragraph (2)(C)." 42 U.S.C. § 7675(e)(3)(A), (B) (emphasis added).

Considering "this section"—the AIM Act—as a whole, EPA's considerations for how to allocate allowances derive from the Act itself. EPA considered factors including "ease of implementation," "consistency with the AIM Act," "facilitating an efficient market," "transparency and certainty for regulated entities and the public," "responsiveness to changing market conditions," "small business implications," and "minimizing the opportunity for fraud." 87 Fed. Reg. at 66,379. Choice derides this as EPA "invent[ing] its own standards," Choice Br. at 8, but each of those considerations is better understood as an Executive agency "tak[ing] care" to ensure Congress's program is realized. U.S. Const. Art. II, § 3. "A certain degree of discretion, and thus of lawmaking, inheres in most executive

or judicial action." *Mistretta*, at 417 (Scalia, J., dissenting). That discretion does not convert a duly authorized Executive action into a Legislative one. *See infra*, Part I.C.

Without pressing any challenges to the merits of EPA's decision in this proceeding, Choice contends it should have received additional allowances. *See* Choice Br. at 14–15, 32–34 (claiming injury because EPA allegedly "took it upon itself to invent standards for its determination to give allowances to these other companies rather than to Choice.").[10] But Choice's dissatisfaction with the number of allowances it received does not reveal any defect with the AIM Act's design. It just reflects Choice's dissatisfaction with how EPA performed its assigned task of allocating allowances. Choice's self-interested desire to have more allowances, and its belief that EPA should have given it credit for importing more

---

[10] In particular, Choice complains, in a convoluted argument, that EPA allegedly did not properly credit Choice as the true "importer" of certain hydrofluorocarbons that were actually imported by a different company. *See* Choice Br. at 14, 32–34; *see* RTC at 85, JA__. But as Choice acknowledges, it is neither advancing in this suit any claim that EPA's selected methodology is arbitrary or capricious, nor advancing any claim that EPA acted arbitrarily or capriciously in applying that methodology to allocate allowances. Moreover, Choice elected to voluntarily dismiss a prior suit contesting the 2022 Allocation Action in which Choice did raise these sorts of arbitrary-and-capricious arguments. *See* Petitioner's Brief, *RMS of Georgia, LLC v. EPA*, Case No. 21-14213 (11th Cir.); Opinion, *RMS of Georgia, LLC v. EPA*, Case No. 21-14213 (11th Cir.); Motion, *RMS of Georgia, LLC v. EPA*, Case No. 22-1025 (D.C. Cir.) (Doc. 2013880).

hydrofluorocarbons, does not make the AIM Act an unconstitutional delegation of legislative power.

In sum, the AIM Act provides sufficient direction in its structure, purpose, and context to guide EPA's narrow discretion to allocate non-application-specific or essential use allowances.

### C. Congress may provide the Executive discretion in implementing the law without crossing constitutional lines.

In the end, Choice's arguments miss the mark because it is aiming at a target of its own invention. Eschewing binding precedent, Choice proposes its own nondelegation standard to bar administrative agencies from making "general, prospective, binding rules that limit liberty." Choice Br. at 19–20 (citing Philip Hamburger, *Is Administrative Law Unlawful?* (2014); Philip Hamburger, *Nondelegation Blues*, 91 Geo. Wash. L. Rev. 1083, 1113 (2023)).[11] Using this self-selected definition, Choice claims that "EPA does not deny that it is legislating," Choice Br. at 22, because EPA explained that "Congress left it to the discretion of the EPA to allocate the [general] . . . allowances in a manner both reasonable and reasonably explained," *id*. at 22–23 (quoting Response to Comments at 91–92 (alteration in original)).

---

[11] Philip Hamburger is a professor at Columbia University School of Law and the founder and CEO of the New Civil Liberties Alliance, which represents Choice in this suit. *See* https://nclalegal.org/philip-hamburger/.

But the suggestion that the very existence of agency discretion is per se an unconstitutional delegation of legislative power is far afield from longstanding, consistent Supreme Court precedent on the separation of powers. The recitation of cases at the beginning of Part I, *supra*, definitively refutes Choice's argument. Even in *Panama Refining*, one of two cases ever finding an unconstitutional delegation, the Supreme Court recognized that "from the beginning of the government, the Congress has conferred upon executive officers the power to make regulations—'not for the government of their departments, but for administering the laws which did govern.'" 293 U.S. at 428–29 (citation omitted). The Court recognized that such regulations can and do become "binding rules of conduct," even as they are "valid only as subordinate rules and when found to be within the framework of the policy which the Legislature has sufficiently defined." *Id*.

It is undisputed that Article I "permits no delegation of [legislative] powers." *Am. Trucking*, 531 U.S. at 472; *see* Choice Br. at 21 (emphasizing that "legislative power belongs exclusively to Congress"). The question is whether the discretion that Congress grants, by statute, to the Executive so blurs the lines of separation of powers that it amounts to a delegation of legislative powers. The Supreme Court has consistently explained that to assess whether that line has been crossed, courts must look to whether Congress has provided an intelligible principle, setting forth

its policy and guidelines for the agency's action. *See, e.g., Am. Power & Light Co.*, 329 U.S. at 105. When it has done that, there is no unconstitutional delegation of *legislative* authority, even where there *is* some delegation of policy discretion. *See, e.g., Grimaud*, 220 U.S. at 516 (holding that, in giving power to the Secretary of Agriculture to establish certain regulations, "Congress was merely conferring administrative functions upon an agent, and not delegating . . . legislative power"). Indeed, the APA and Clean Air Act presume that agencies can exercise "discretion," *see* 5 U.S.C. § 706(2)(A); 42 U.S.C. § 7607(d)(9)(A), within the confines of statutory "limitations," 5 U.S.C. § 706(2)(C); 42 U.S.C. § 7607(d)(9)(C).

Put differently, *because* Congress articulated the policy and *because* there are sufficient guardrails, the discretion that EPA wielded here is *not* legislative. It is not the selection of *any* "standards" that is "an exercise of the forbidden legislative authority," as Choice contends with an out-of-context quotation from *American Trucking*, 531 U.S. at 473. Choice Br. at 21. Rather, the Supreme Court in *American Trucking* explained that *if* there has been a delegation of legislative authority, an agency's narrow construction or application of the unlawful statute cannot save it. 531 U.S. at 473. In contrast, when a delegation of authority is adequately bounded by an intelligible principle, the executive policymaking within and consistent with the statutory framework is constitutional. *See, e.g., Mistretta*,

488 U.S. at 372 (recognizing that Congress may constitutionally "delegate power under broad general directives").

That Congress *could* have expressed a policy and laid down more precise rules for allocating any non-application-specific allowances does not make the Executive's action, through EPA, an exercise of legislative power. Chief Justice Marshall wrote in *Wayman v. Southard*, 23 U.S. at 43, that "Congress may certainly delegate to others, powers which the legislature may rightfully exercise itself." Congress's choice about what decisions to delegate or not is itself a manifestation of its legislative power—which undoubtedly contributes to the Justice Scalia's caution that the Supreme Court "almost never [feels] qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting); *see also Lichter*, 334 U.S. at 784 (deferring to Congress's "well-considered judgment as to the degree of administrative authority which it was necessary to grant in order to effectuate its policy").

Take for example a sandwich order. At your local deli, you order a ham and cheese sandwich. As the cook turns to make it, the neighboring hotdog cart vendor says, "Wait! She can't have a sandwich. She didn't say whether she wanted white or wheat bread, swiss or cheddar cheese, or to have it cut vertically or diagonally."

"I don't want to spell out every detail of how to make a sandwich," you might think. "Whether it is cheddar or swiss, I just want a sandwich."

So too Congress. Congress wants, and has directed, a phasedown of hydrofluorocarbons, accomplished through an allowance allocation and trading program, under which no one can produce or import regulated substances without an allowance. 42 U.S.C. § 7675(e)(2)(A). It wants, and has directed, allowances issued for use in specific calendar years. *Id*. § 7675(e)(2)(D). It wants, and has directed, that specific uses are guaranteed sufficient access, at least for the first five years of the program. *Id*. § 7675(e)(4)(B)(iv). In these and many more respects, Congress has expressed legislative direction. It then has authorized EPA to fill in certain details, through notice-and-comment rulemaking, in accordance with its overall statutory scheme. *See Mistretta*, 321 U.S. at 372 ("Congress simply cannot do its job absent an ability to delegate power under broad general directives."); *see also Gundy*, 139 S. Ct. at 2145 (Gorsuch, J., dissenting) (Congress "may always authorize executive branch officials to fill in even a large number of details[.]").

To conclude that Congress can accomplish none of its objectives unless it articulates a policy preference about the allocation of transferrable, non-application-specific allowances turns the constitutional separation of powers on its head. Endorsing Choice's argument here would frustrate Congress's specifically stated and legitimately exercised legislative prerogative, not protect it.

Policing constitutional boundaries and defining concepts like "legislative power" is at bottom a line-drawing exercise, and one which the Supreme Court has consistently held is "not demanding." *Gundy*, 139 S. Ct. 2129. The discretion Congress afforded EPA here falls well on the constitutional side of that line. Choice's petition should be denied.

## II.    EPA reasonably excluded 2020 data from the 2024–2028 allowance allocation calculation.

On the merits, EPA reasonably decided to continue calculating the general pool allowance allocation from the average of market participants' three highest years of production and import activity between 2011 and 2019. EPA did so for three main reasons. First, and most importantly, retaining the same range of years used to calculate allocations in 2022 and 2023 would provide continuity to promote "as smooth a transition as possible" as the hydrofluorocarbon phasedown continues. *See* 88 Fed. Reg. at 46,842. Second, 2011–2019 best reflects the hydrofluorocarbon market over a broad range of years before disruptions from the COVID-19 pandemic and stockpiling and attempted gamesmanship of the imminent phasedown in the United States potentially skewed the market. *See id*. at 46,844–45. Third, EPA explained that the 2011–2019 data was better understood and vetted than data in later years. *Id*. at 46,845.

Before this Court, iGas disagrees. Having had some of its "best years" in 2020 and 2021, it urged EPA in comments to include both these more recent years

in the 2024–2028 allocation methodology. *See* iGas Comments, EPA-HQ-OAR-2022-0430-0070 att. 1, JA__. Now in litigation, iGas contends that even if the evidence of stockpiling and other market manipulation was starkly apparent in *2021*, it was not so in 2020. Declining to include 2020 data was, according to iGas, arbitrary or capricious because 2020 is a more recent and purportedly more accurate representation of the hydrofluorocarbon import market. *See i*Gas Br. at 16.

The Court should reject iGas's arguments. First, iGas's argument that EPA should have included *only* 2020 data is forfeited because neither iGas nor any other commenter raised the issue in comments. Second, iGas ignores EPA's independent concern that changing the range of years used to calculate allowance allocations could destabilize the market. Third, iGas's argument that 2020 import data were not impacted by market gamesmanship and pandemic-driven supply chain disruptions contradicts the record evidence, iGas's own comments, and common sense. Finally, even if another choice could also be reasonable, the question for the Court is whether EPA's explanation makes a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. It did, and given that, the Court must defer to EPA's reasonable exercise of judgment here. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2570 (2019) (explaining that

"the choice between reasonable policy alternatives in the face of uncertainty" is the agency's to make).

### A. IGas forfeited its argument that EPA should have added only 2020 import data by failing to raise it in comments.

As a threshold matter, iGas's argument that EPA arbitrarily or capriciously failed to consider adding *only* 2020 import data to its 2024–2028 allocation methodology is forfeited because it was not "raised with reasonable specificity" during the comment period. 42 U.S.C. § 7607(d)(7)(B). In their comments, iGas and others urged EPA to use *both* 2020 and 2021 data. *See also* iGas Brief at 8 (describing comments advocating for the inclusion of 2020–2021 data). But neither iGas, nor any other commenter, urged EPA to include *just* 2020 data, or pointed to any material difference between the 2020 and 2021 data. IGas's argument that EPA "failed to independently consider whether 2020 data should be included" is therefore not properly before the Court. *See Nat. Res. Def. Council v. EPA*, 571 F.3d 1245, 1259 (D.C. Cir. 2009).

This Court enforces the Clean Air Act's reasonable-specificity exhaustion requirement "strictly," *Nat. Res. Def. Council*, 571 F.3d at 1259 (cleaned up), requiring that a comment provide "adequate notification of the general substance of the complaint" to avoid forfeiture, *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 891 (D.C. Cir. 2006); *see also EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 512 (2014) (describing Section 7607(d) as a "mandatory" rule).

Here, neither iGas nor any other commenter made the argument that the 2020 data are qualitatively different from 2021, and thus that EPA should include *only* 2020 data, rather than *both*. iGas's initial comments proposed that "instead of using 2011–2019 as baseline years, the baseline years for 2024 should begin in 2017 and extend to 2022 for allocation purposes."[12] EPA-HQ-OAR-2022-0430-0002 at 4, JA__; *see also id.* (recommending that "2020, 2021 and 2022 manufactures and imports" be included). In other comments, iGas reiterated that the "thrust of iGas's comments" was its objection to EPA's "failure to include 2020 and 2021 in the baseline years[.]" EPA-HQ-OAR-2022-0430-0070, Att. 1 at 1, JA__; *see also id.* at 3–4, JA__–__ (addressing "Why Addition of 2020 and 2021 to the Allocation Baseline is Necessary"); EPA-HQ-OAR-2022-430-0108, Att. 3 at 2, JA__ (suggesting that EPA should add 2020 and 2021 "to the allocation formula"). Other commenters seeking to change the range of years used to determine the allowance allocation likewise advocated for including *both* 2020 and 2021. *See, e.g.*, RTC at 13, JA__ (comments of FluoroFusion Specialty Chemicals); *id.* at 15, JA__ (comments of Amsco Supply Inc. et al.).

---

[12] IGas's comment uses the term "baseline years" to describe the range of years used to calculate the allowance allocation, not to the calculation of a "baseline" per 42 U.S.C. § 7675(e)(1) against which the phasedown is measured.

Concluding that iGas's argument here is waived aligns with this Court's prior decisions. For instance, in *Motor & Equipment Manufacturers Ass'n v. Nichols*, 142 F.3d 449, 462 (D.C. Cir. 1998), the Court concluded that petitioners' comments that California motor vehicle standards had to be "consistent[] with [Clean Air Act] section 202" were insufficiently specific. Because section 202 is capacious, the Court found that a "bare reference to section 202" could not preserve a more specific argument about a subsection of that provision in particular. *Id*. In other words, neglecting to raise the specific objection forfeited that issue. Similarly, in *Maryland v. EPA*, 958 F.3d 1185, 1210 (D.C. Cir. 2020), the Court concluded that Maryland, in asking for a finding that downwind states were contributing to its violations of the 2008 Clean Air Act ozone standards, did not preserve an argument about attainment under the 2015 standards.

The same reasoning applies here. iGas only ever advocated for including 2020 *and* 2021 data. Enforcing the statutory exhaustion requirement is important here because the central contention of iGas's petition for review is that the reasons EPA gave for excluding *both* 2020 and 2021 data apply to 2021 but *not* to 2020. *See, e.g.*, iGas Br. at 18, 20–21. Although iGas is incorrect on the merits, *see infra* Part II.B, had iGas made clear that it was, in the alternative, asking EPA to consider including *just* 2020, then EPA would have more directly addressed that argument. Because the iGas Petitioners "failed in their generalities . . . to give the

agency an opportunity to consider their specific concerns," they "cannot raise them for the first time now." *Motor & Equip. Mfrs. Ass'n*, 142 F.3d at 462.

iGas's argument is not properly before the Court. The Court should accordingly deny the petition.

### B. EPA reasonably excluded 2020 data given concerns about market stability, distortions, and data quality.

At any rate, EPA's determination to use 2011–2019 market data in its calculation of 2024–2028 allowance allocations, and to exclude 2020 data, was well-reasoned and well-supported by the record. The question of what range of years best reflects the hydrofluorocarbon market is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376–77 (1989). The Court must be "particularly deferential when reviewing agency actions involving policy decisions based on uncertain technical information." *New York v. Reilly,* 969 F.2d 1147, 1150–51 (D.C. Cir. 1992); *see also Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

Here, EPA "considered the relevant factors, weighed risks and benefits, and articulated a satisfactory explanation for [its] decision." *Dep't of Com. v. New York*, 139 S. Ct. at 2570. Its decision should therefore be upheld.

### 1. EPA reasonably prioritized continuity and minimizing market disruption.

Excluding 2020 (and 2021) from the 2024–2028 allowance allocation methodology reasonably advances EPA's concern for minimizing market disruption. EPA explained that over the first years of the phasedown, "allowance holders and their supply chains have been adjusting" to the program and to entity-specific allocation levels, "including by reoutfitting production lines, undertaking corporate mergers and acquisitions, making importer/exporter arrangements, and transitioning business models including with the introduction of new chemicals." 88 Fed. Reg. at 46,844. "Continuing to use the same set of years reduces the disruption to the market," as allowance holders have become familiar with the allocation calculation. 87 Fed. Reg. at 66,377; *accord* RTC at 25, JA__ (comments of Lennox International Inc.) ("These improved insights from EPA continuing to use a similar allocation methodology should promote overall regulatory predictability regarding EPA's [hydrofluorocarbon] program[.]").

EPA also explained that the predictability of retaining the 2011–2019 range was especially valuable because the number of allowances available decreases from 90% of baseline in 2023 to 60% in 2024 through 2028. 88 Fed. Reg. at 46,844. EPA worried that changes to the allocation formula "directly ahead of this significant phasedown step would contribute to further market pressures leading to price spikes and lack of availability of [hydrofluorocarbons] in sectors that are not

yet prepared to transition into different chemicals." *Id*. Furthermore, because that

significant phasedown step would require "other changes to business practices,

such as the increased use and changes in production or import of substitutes and

reclaimed [hydrofluorocarbons]," EPA put a particularly high premium on

providing "continuity between two stepdown periods." *Id*. Indeed, EPA noted that

"[r]egulated entities have also previously expressed preference for allowances to

be allocated using a consistent approach for as long as possible." *Id*.

Most allowance holders, industry associations, and other commenters

supported EPA's proposal to continue to use the 2011–2019 date range. 88 Fed.

Reg. at 46,842. For example, one commenter, Arkema, Inc., stated that EPA's

approach "enjoys widespread support among market participants" and "promotes

predictability, a critical feature of any market-based system so as to facilitate

planning and avoid price swings." RTC at 28, JA__. In fact, EPA received

comments supporting excluding 2020 and 2021 from "a trade organization whose

members represent 70 percent of the dollar values of the HVAC-Refrigeration

market, 400 whole companies, nearly 300 manufacturing associates and nearly 100

manufacturer representatives[.]" 88 Fed. Reg. at 46,843. *See, e.g.*, RTC at 26, JA__

(comments of Heating, Air-conditioning & Refrigeration Distributors

International); RTC at 48–49, JA__ ("The Alliance [for Responsible Atmospheric

Policy] agrees that continuing to use the 2011–2019 data promotes stability and will minimize market disruptions in 2024.").

Expanding the range of years for determining entities' allocation would undermine the stability and continuity EPA sought to foster because doing so "could significantly change each entity's market share." 88 Fed. Reg. at 46,844. iGas disputes that adding 2020 data to the calculation would significantly change the allocation, *see* iGas Br. at 37, 38, even while acknowledging that entities (like itself) "would receive more allowances if 2020 were included," *id*. at 44. This argument is easily refuted, as iGas's "win-win" scenario is not mathematically possible.

Because EPA is allocating allowances from a fixed pool, any increase in an individual entity's share necessarily decreases others' shares. To illustrate, the first table in Figure 1 below shows a simplified model of EPA's consumption allocation, where four companies have, on average, imported 25 units in their high-three years. Together, 100 units were imported, and each company's share is the product of its high-three average (25) divided by the total units imported (100). That share would then be multiplied by total allowances available from the consumption general pool: that is, the consumption baseline as calculated consistent with 42 U.S.C. § 7675(e)(1)(C) and multiplied by the applicable phasedown for that calendar year per 42 U.S.C. § 7675(e)(2)(C).

The second table in Figure 1 reflects a change to the allocation methodology to include another year of import activity. Companies A through C did not import more in that new year, but Company D imported 40% more units, increasing its high-three average while other companies' averages stay the same. That change affects the calculation in two ways. First, the denominator—the total of all entities' high-three average—is larger (103.33). Second, each company's proportion of that total is different: Companies A through C now have a 24.2% share, and Company D has a 27.4% share—about a 10% increase in market share for Company D.

**Figure 1**

| Company | High Year 1 | High Year 2 | High Year 3 | High 3 Avg | Share |
|---------|-------------|-------------|-------------|------------|-------|
| A | 25 | 25 | 25 | 25 | 0.25 |
| B | 25 | 25 | 25 | 25 | 0.25 |
| C | 25 | 25 | 25 | 25 | 0.25 |
| D | 25 | 25 | 25 | 25 | 0.25 |
| | | | TOTAL | 100 | |

| Company | High Year 1 | High Year 2 | High Year 3 | High 3 Avg | Share |
|---------|-------------|-------------|-------------|------------|-------|
| A | 25 | 25 | 25 | 25 | 0.242 |
| B | 25 | 25 | 25 | 25 | 0.242 |
| C | 25 | 25 | 25 | 25 | 0.242 |
| D | 25 | 25 | 35 | 28.333 | 0.274 |
| | | | TOTAL | 103.333 | |

The effects of these individual shifts can be great. Because the allowance pool is a fixed pie, increasing any one entity's slice necessarily decreases the others. Although the 10% swing in the above model may seem small, the ultimate

size of an entity's slice depends both on its share and the size of the pie. And for 2024, the pie was 181,522,990 allowances. *Notice of 2024 Allowance Allocations for Production and Consumption of Regulated Substances Under the [AIM Act]*, 88 Fed. Reg. 72,060, 72,063 (Oct. 19, 2023). In the simplified model, 10% amounts to more than 4.3 million additional allowances for Company D, at the expense of Companies A through C.

Taking iGas as a real-world example, from 2011 to 2019, the high-three average imports by iGas Holdings— ███████████████████████ —is ███████ MTEVe. ICF Master List Updated Allocations, DOCUM_0001, JA__. In 2020, iGas Holdings imported ███████ MTEVe of hydrofluorocarbons, nearly ██% more than it imported in 2019 (███████ MTEVe), its next highest importing year.[13] *Id*. Assuming only iGas Holdings' high-three average changes, and that the same number of application-specific allowances were allocated, iGas Holdings could expect to see about a ██% increase in the number of 2024 allowances it would receive if EPA

---

[13] While EPA provided an opportunity for historic producers and importers to submit corrected production and consumption data, including for 2020, the Agency has not conducted the same degree of verification on 2020 and 2021 data given the decision not to expand the years beyond 2011–2019 in the final rule. *See* Part II.B.3, *infra*. For example, it has not completed a thorough comparison against import data reported to U.S. Customs and Border Protection. As a result, the information described in this paragraph may not accurately reflect the 2020 consumption data EPA would have used in determining 2024 allocation levels.

included 2020 in the allocation calculation. Given the zero-sum nature of the allowance pool, in this counterfactual scenario, iGas Holdings' allocation would increase by about ███████ allowances (to more than ███████ allowances) at the expense of other allowance holders.

In short, little changes can have big consequences. EPA rationally weighed those consequences heavily, while also considering the potential—though ultimately dubious, *see infra* Part II.B.2—benefits of using more recent hydrofluorocarbon production and import data. *See* 87 Fed. Reg. at 66,378; 88 Fed. Reg. at 46,843. Because there is a rational basis for EPA's decision, the Court should affirm EPA's action and deny the petition for review. *See Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir. 1981).

### 2. EPA reasonably determined that 2020 data did not accurately represent the hydrofluorocarbon market.

Even if the 2020 data were a perfect reflection of the hydrofluorocarbon market, EPA's consideration of continuity and market stability would be an independently sufficient reason for its ultimate decision. *Supra* Part II.B.1. But the 2020 data is not perfect. EPA identified—and the record reflects—two reasons that 2020 data were not an accurate representation of existing market conditions.

*1. The COVID-19 Pandemic*. EPA recognized that hydrofluorocarbon production and import in 2020 were influenced by the supply chain disruptions and market distortions wrought by the global COVID-19 pandemic. 88 Fed. Reg. at

46,843. Public comments from industry corroborate EPA's observation. For example, Koura, a producer and importer of regulated hydrofluorocarbons, stated that "Covid-related business impacts—which disrupted supply chains while unusually benefitting some market participants—made 2020 and 2021 atypical." RTC at 29, JA__ (Koura comments). Likewise, the Heating, Air-conditioning and Refrigeration Distributors International (HARDI), an industry association, noted that "imported HFC refrigerants were impacted by COVID-19, supply chain disruptions, and bad actors attempting to influence data used to provide allocations." RTC at 26, JA__ (HARDI comments); *see also, e.g.*, RTC at 27, JA__(Honeywell comments) (noting that 2020 and 2021 were "'contaminated' by COVID effects"); RTC at 29, JA__ (National Refrigerants, Inc. comments) (noting that entities' market share in 2020 may have been artificially "impeded due to supply chain issues related to the COVID-19 pandemic").

Even iGas conceded in its comments that "2020 and 2021 were anomalous as a result of the COVID-19 pandemic where supply chain difficulties dominated all markets." EPA-HQ-OAR-2022-0430-0002, Att. 3 at 4, JA__; *see also* EPA-HQ-OAR-2022-0430-0070, Att. 1 at 2, JA__ (describing "significant difficulties with supply and transportation caused by the COVID-19 pandemic"). iGas acknowledged that "there was a dip in supply in 2020" as "supply chain disruptions in 2020 caused by the pandemic" caused some companies to "pull[]

back from aggressively increasing supply due to the uncertainties." *Id*. at 9, JA__.

"Overseas suppliers were curtailing supply, space on ships was difficult to find and ships reaching the U.S. were backed up for months before unloading." *Id*. at 8–9, JA__.

In other words, EPA reasonably concluded that "2020 import activity was also atypical." 88 Fed. Reg. at 46,846. That is not "reverse-engineering," as iGas charges (at 20); that is self-evident from EPA's observation of the market and confirmed by industry commenters.[14]

Where EPA and iGas diverge is this: iGas believes that companies, like itself, that managed to import higher amounts of hydrofluorocarbons despite pandemic disruptions should be rewarded by changing the allocation formula, iGas Br. at 21; EPA believes that a pandemic-distorted market does not accurately represent market share, 88 Fed. Reg. at 46,843. In the end, EPA's judgment, informed by its extensive industry outreach, assessment of the data, and experience regulating in this space, *see id.* at 46,858, is rational. *See Ethyl Corp. v. EPA*, 541

---

[14] EPA conducted extensive outreach while developing the rule, including general stakeholder meetings involving approximately 350 participants, individual stakeholder meetings, participating in industry conferences, in addition to a public hearing and written comments on the proposed rule. *See* EPA-HQ-OAR-2022-0430-0003, JA__ (meetings pre-proposal); EPA-HQ-OAR-2022-0430-0002, JA__ (written comments pre-proposal); EPA-HQ-OAR-2022-0430-0109, JA__ (describing written comments and meetings after proposal).

F.2d 1, 36 (D.C. Cir. 1976) (deferring to agency reliance "on its own developed expertise" (citation omitted)). As such, the Court should "defer to [EPA's] reasonable exercise of its judgment and technical expertise" in this area. *U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1008 (D.C. Cir. 2002) (citations omitted).

Finally, iGas contends that excluding 2020 import data from the 2024–2028 allocation methodology conflicts with EPA's prior decision to require companies to have imported during 2020 to be eligible for 2022 and 2023 allowances. iGas Br. at 21. As explained in the Framework Rule preamble, EPA decided to allocate allowances only to companies that produced or imported in 2020 "to ensure that allowance holders are active in the [hydrofluorocarbon] market," because allocating allowances "to companies no longer producing or importing would be at the expense of companies that are still actively invested in [hydrofluorocarbon] production and import." 86 Fed. Reg. at 55,144. But although EPA stated it would "generally presume" an entity had exited the hydrofluorocarbon import market if it did not import in 2020, EPA provided for "individual consideration of a company's inactivity, for example if it was due to the COVID-19 pandemic." *Id*. EPA's treatment of pandemic circumstances in the Framework Rule was accordingly consistent with its conclusion here: that COVID-19 disrupted the market, warranting special consideration.

*2. Stockpiling in Anticipation of the Phasedown.* EPA likewise reasonably concluded that stockpiling and gamesmanship occurred in anticipation of Congressional legislation. *See* 88 Fed. Reg. at 46,843. EPA explained that the AIM Act was first introduced in 2018, and by 2020 "Congressional activity picked up significantly." *Id*. The level of "Congressional interest and activity as well as the significant industry and environmental organization support for the legislation could reasonably have affected business decisions including decisions to stockpile [hydrofluorocarbons] in advance of a phasedown." *Id*. Additionally, because the AIM Act was modeled on the phaseout of ozone-depleting substances under Title VI of the Clean Air Act, under which EPA allocated allowances based on historic market activity, EPA reasoned that some companies likely "increased their import and production in patterns that did not align with their actual needs or business model." *Id*. Basing allocations on years marred by stockpiling "would be a market distortion" because "an entity that imported at increased levels in order to build up a stockpile would have imported at levels higher than the market demand for that year." RTC at 22, JA__.

Again, public comments support EPA's assessment. Chemours, a major hydrofluorocarbon producer and importer, commented that "during nearly all of 2020, interested companies and entities were aware that Congress could approve legislation to control the production and importation of HFCs using an allowance

allocation and trading system." RTC at 30, JA__. Chemours explained that because both House and Senate bills were "modeled on Title VI of the Clean Air Act" and provided for a hydrofluorocarbon phasedown "consistent with the Kigali Amendment," which "explicitly provid[ed] for use of an 'allowance allocation and trading program,'" producers and importers in 2020 and 2021 would not have been acting "in an informational vacuum." *Id.*; *see also, e.g.*, RTC at 28, JA__ (Arkema comments) (explaining that anticipated legislation led to attempts in 2020 and 2021 to "game the system"); *id.* at 14, 13, JA__ (Supply LLC, et al. comments) ("It is easy to see that during nearly all of 2020, interested companies and entities were aware the Congress could approve legislation to control the production and importation of [hydrofluorocarbons] using an allowance allocation and trading system.").

Indeed, even as iGas disputes anticipatory stockpiling, its own comments to EPA imply that iGas itself did just that. In describing how the phasedown has affected the markets it serves, iGas stated aftermarket suppliers like itself tried "to blunt the impact" of the phasedown "by using existing inventory to supply the demand." iGas Comments, EPA-HQ-OAR-2022-0430-0070 Att. 1, at 3, JA__; *see also id.* at 4 (explaining that aftermarket suppliers like iGas are "depleting their inventories" now that the phasedown is in effect).

Shifting course in litigation, iGas now concedes there is evidence of stockpiling in 2021, *see* iGas Br. at 17–18, but still contends that the data are not so definitive for 2020. iGas contends that when looked at "holistically," 2020 import activity was not "atypical." *Id*. at 22. But iGas relies entirely on aggregate import information that hides the issue EPA was concerned about: that the distribution of market activity that year does not accurately reflect the market due to the combined effects of the COVID-19 pandemic *and* anticipatory stockpiling. 88 Fed. Reg. at 46,843. Again taking iGas as an example, from 2019 to 2020, iGas Holdings' imports increased ██%, from ████████████ MTEVe to ████████ MTEVe of hydrofluorocarbons. *See* ICF Master List, DOCUM_0001, JA__. Four other allowances holders imported hydrofluorocarbons in quantities more than 20% larger than their previous highest year. *See id*. (████████████████████████).

EPA's assessment that the aggregate import data in 2020 can be explained by the interaction of the COVID-19 pandemic and anticipatory stockpiling is not "conclusory," as iGas contends (at 19). *See* 88 Fed. Reg. at 46,846 (explaining that 2020 import activity was "atypical"). It is a reasonable conclusion drawn from observing both market and individual data, comments from and discussions with industry and other stakeholders, and EPA's experience with the similar ozone-depleting-substances phasedown under Title VI of the Clean Air Act. *See* 88 Fed. Reg. at 46,886 (noting EPA's observation of stockpiling in that context). And, as

EPA noted, the commenters advocating to include later years "provided no evidence, including explanations of their own business plans" or evidence of "growth due to demand" to show that increased imports were anything besides "a response to the AIM Act's pending restrictions." 88 Fed. Reg. at 46,846.

Importantly, even if iGas is correct that 2020 imports were *less* affected by stockpiling than 2021, or that the 2020 data *could* be interpreted differently, it should not affect the outcome here. Ultimately, the question for the Court "is not whether the agency's analysis is impeccable, but whether it is reasonable; not whether most of the evidence supports the agency's position but whether enough of it does; not whether the agency's policy choices are wise but whether they are rational." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 541 (D.C. Cir. 1983); *see also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951) (explaining that a reviewing court may not substitute its own judgment for an agency's "choice between two fairly conflicting views," even if that court "would justifiably have made a different choice had the matter been before it de novo").

Selecting the years on which to base allowance allocations "is a policy choice . . . left [specifically] to the Administrator's judgment." *Lead Industries Ass'n, Inc. v. EPA*, 647 F.2d 1130, 1160 (D.C. Cir. 1980). Having "considered the relevant factors" and articulated a "rational connection between the facts found and

the choice made," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, EPA has satisfied the

arbitrary or capricious standard. The Court should deny the iGas petition.

### 3. The 2011–2019 data was more thoroughly vetted than 2020.

Finally, EPA explained that the 2011–2019 dataset had the marginal

advantage of being "better understood and more thoroughly vetted" than the data

from 2020. 88 Fed. Reg. at 46,845. In preparation for the 2022 Framework Rule,

EPA conducted stakeholder outreach, issued public Notices of Data Availability,

and invited entities to assess and submit corrections to their import and production

data for the 2011–2019 period. *See* Notice of Data Availability, 86 Fed. Reg. 9059

(Feb. 11, 2021); 87 Fed. Reg. at 66,377 (anticipating "some entity-specific

revisions due to corrected historic data"); 88 Fed. Reg. at 46,858 (describing

"extensive public notification" and "numerous opportunities to correct" data).

Many companies submitted corrected data even as EPA was working on the 2024–

2028 Allocation Rule. *See* 87 Fed. Reg. at 66,381 (giving entities until December

19, 2022, to submit corrected data). Although EPA has now been able to solicit

similar corrections and validation for the 2020 dataset, the "sheer number of

iterations of review, updates, and follow-up" on the 2011–2019 dataset cannot be

compared. 88 Fed. Reg. at 46,845; *see also, e.g.*, RTC at 51, JA__.

iGas may disagree (at 35), but many commenters agreed that "due to the

EPA's diligence in data validation and reconciliation," the 2011–2019 dataset is

better understood and more thoroughly vetted than later years. RTC at 27, JA__ (Honeywell comments); *see also, e.g.*, RTC at 29–30, JA__ (Chemours comments). And even if iGas may have made a different call based on the information in the record, EPA's choice here was reasonable. *See Dep't of Com. v. New York*, 139 S. Ct. at 2570 ("the choice between reasonable policy alternatives in the face of uncertainty" is left to the agency).

### C. If iGas prevails, remand without vacatur is the appropriate remedy.

If the Court grants iGas's petition, the appropriate remedy is to remand the 2024–2029 Allocation Rule to EPA for further proceedings. iGas requests that the Court vacate 40 C.F.R. § 84.11(b)(2), which establishes the 2024–2028 methodology based on 2011–2019 data, and remand for EPA to revise the methodology to include 2020 data in its calculation. *See* iGas Br. at 13, 43. That requested remedy should be rejected for two reasons.

First, iGas's request for an order specifically directing EPA to include 2020 data in its allocation methodology violates fundamental administrative law principles. The "guiding principle" of administrative law "is that the function of the reviewing court ends when an error of law is laid bare." *Calcutt v. Fed. Deposit Ins. Corp.*, 598 U.S. 623, 629 (2023). A reviewing court cannot dictate the agency's course of action on remand.

Second, the widespread and substantial consequences of vacating the 2024–2028 allocation methodology outweigh the seriousness of the error iGas alleges in its petition. To determine whether to remand without vacatur, this Court weighs "the seriousness of the action's deficiencies" against "the likely disruptive consequences of vacatur." *Am. Great Lakes Ports Ass'n v. Schultz*, 962 F.3d 510, 518 (D.C. Cir. 2020) (cleaned up) (quoting *Allied-Signal, Inc. v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

On the first factor, at its core, iGas's argument is that EPA inadequately explained its rationale for excluding 2020 data from its 2024–2028 methodology. *See* iGas Br. at 11 (arguing EPA inadequately explained whether its rationale for excluding 2020 and 2021 data applied independently to 2020 data). As explained in Part II.A., *supra*, no commenter, including iGas, asked EPA to consider including *only* 2020 data. Thus, if the Court agrees with iGas, that purported need for additional explanation can be "readily [] cure[d]" on remand. *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009).

On the second, vacating the 2024–2028 allocation methodology would have substantial disruptive consequences. A "quintessential disruptive consequence arises when an agency cannot easily unravel a past transaction in order to impose a new outcome," or "when vacatur would disrupt settled transactions." *Am. Great Lakes Ports Ass'n*, 962 F.3d at 519. That is the case here. Entities have already

been allocated their 2024 calendar year allowances based on that methodology and are expending the allowances on calendar-year 2024 production and imports. *See* 2024 Allocation Action, 88 Fed. Reg. 72,060. If vacatur throws that allocation into doubt, the hydrofluorocarbon production and import markets could be significantly disrupted, jeopardizing the Congressionally mandated phasedown. Besides that, the AIM Act requires EPA to issue 2025 calendar-year allowances by October 1, 2024, to be used starting on January 1, 2025. Thus, if the Court's order comes before October 1, 2024, vacatur would throw next year's allowance allocation into chaos. Even after that date, vacatur would cast doubt on the allocated 2025 allowances.

Consequently, if the Court grants iGas's petition, it should remand the rule to EPA without vacatur.

## CONCLUSION

For all these reasons, the Court should deny the petitions for review.

Respectfully submitted,

TODD KIM
*Assistant Attorney General*

Of Counsel:                              /s/ *Sarah A. Buckley*
                                         SARAH A. BUCKLEY
KAREN BIANCO                             *Senior Attorney*
*Attorney*                               Environment and Natural Resources Division
U.S. Environmental Protection Agency     U.S. Department of Justice

March 20, 2024

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of the Court's order of December 18, 2023 because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 13,939 words.

2.      This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

/s/ *Sarah A. Buckley*
SARAH A. BUCKLEY

Counsel for Respondents