ORAL ARGUMENT NOT YET SCHEDULED

**Nos. 23-1261, 23-1263 (consolidated)**

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

IGAS HOLDINGS, INC., et al.,
*Petitioners,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY,
*Respondent,*

*and*

AIR-CONDITIONING, HEATING, AND REFRIGERATION INSTITUTE AND
ALLIANCE FOR RESPONSIBLE ATMOSPHERIC POLICY,
*Intervenors.*

---

On Petition for Review from the United States
Environmental Protection Agency

---

**Brief of Intervenors in Support of Respondent**

---

Thomas A. Lorenzen
Robert J. Meyers
Elizabeth B. Dawson
Felicia L. Isaac
CROWELL & MORING LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004
Phone: (202) 624-2789
Fax: (202) 628-5116
tlorenzen@crowell.com

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**Parties, intervenors, and amici**

All parties, intervenors, and *amici* appearing in this Court are listed in the Briefs for Petitioners and Respondent.

**Rulings under review**

The agency action under review is EPA's final rule, entitled Phasedown of Hydrofluorocarbons: Allowance Allocation Methodology for 2024 and Later Years, 88 Fed. Reg. 46,836 (July 20, 2023), which this Brief identifies throughout as the "Final Rule" or "2024 Rule."

**Related cases**

Intervenors are unaware of any related cases within the meaning of Circuit Rule 28(a)(1)(C).

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Intervenors state as follows:

The Alliance for Responsible Atmospheric Policy ("Alliance") states that it is a "trade association," as defined by Circuit Rule 26.1, whose members consist of manufacturers and business in a number of industry sectors, including air-conditioning, refrigeration, heating, appliance manufacturing, foam insulation manufacturing, and aerosol manufacturing. The Alliance has no parent companies and no publicly held companies own 10% or more of the intervenor's stock.

The Air-Conditioning, Heating, and Refrigeration Institute ("AHRI") is the trade association representing more than 330 members, including manufacturers of heating, cooling, water heating, and commercial refrigeration equipment; and refrigerant producers. AHRI has no parent companies and no publicly held companies own 10% or more of the intervenor's stock.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ................................................................................. i

CORPORATE DISCLOSURE STATEMENT ..................................... ii

GLOSSARY ............................................................................... viii

INTRODUCTION ........................................................................ 1

STATUTES AND REGULATIONS ................................................. 4

STATEMENT OF THE CASE ........................................................ 4

I.  Statutory Background ...................................................... 4

   A.  Allowance allocation and trading system ........................... 4

   B.  Relationship with Clean Air Act provisions addressing the depletion of the ozone layer ........................................... 7

II.  Regulatory Background and the Rule Under Review .............. 10

SUMMARY OF ARGUMENT ...................................................... 12

ARGUMENT .......................................................................... 14

I.  The AIM Act Constitutionally Delegates Specific, Constrained Regulatory Authority to EPA. .......................... 14

   A.  The AIM Act includes intelligible principles that guide and constrain EPA's discretion in allocating HFC allowances. ................................................................ 14

   B.  Choice's selective quotations from and interpretation of the AIM Act do not advance its nondelegation argument. ............. 18

   C.  Choice's attempt to analogize to the two lone successful nondelegation arguments falls flat. ................................ 21

II.  EPA Appropriately Retained the Original Allowance-Allocation Methodology for the 2024-2028 Time Period. ........ 25

   A.  EPA Reasonably Concluded That 2020 HFC Data was Unrepresentative of Existing Market Conditions. .................. 27

   B.  IGas's remaining arguments lack merit. ............................ 32

CONCLUSION ........................................................................ 36

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935)................................................................22

*Allstates Refractory Contractors, LLC v. Su*,
79 F.4th 755 (6th Cir. 2023) ...........................................18

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946)..................................................15, 18, 20

*Consumers' Rsch., Cause Based Commerce, Inc. v. FCC*,
88 F.4th 917 (11th Cir. 2023) ...........................................16

*CTS Corp. v. EPA*,
759 F.3d 52 (D.C. Cir. 2014)............................................32

*Gundy v. United States*,
139 S. Ct. 2116 (2019)................................................16, 18

*Midwest Ozone Grp. v. EPA*,
61 F.4th 187 (D.C. Cir. 2023)..........................................26

*Mississippi v. EPA*,
744 F.3d 1334 (D.C. Cir. 2013).......................................29

*Mistretta v. United States*,
488 U.S. 361 (1989)................................................15, 16, 17, 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983).....................................................31, 33

*N.Y. Cent. Sec. Corp. v. United States*,
287 U.S. 12 (1932)...........................................................16

*Nat. Res. Def. Council, Inc. v. U.S. EPA*,
822 F.2d 104 (D.C. Cir. 1987).........................................32

*Nat'l Shooting Sports Found., Inc. v. Jones*,
   716 F.3d 200 (D.C. Cir. 2013) ............................................................31

*Panama Refin. Co. v. Ryan*,
   293 U.S. 388 (1935) ...........................................................................22

*U.S. Sugar Corp. v. EPA*,
   830 F.3d 579 (D.C. Cir. 2016) ......................................................27, 32

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ...............................................................15, 16, 21

*Wynnewood Refin. Co. v. EPA*,
   77 F.4th 767 (D.C. Cir. 2023) .............................................................29

**Statutes**

42 U.S.C. §§7671-7671q ...........................................................................8

42 U.S.C. §7671a(b) .................................................................................24

42 U.S.C. §7671c(a) ..................................................................................24

42 U.S.C. §7671d .......................................................................................24

42 U.S.C. §7671d(d) ...................................................................................9

42 U.S.C. §7671f(a) .....................................................................................8

42 U.S.C. §7671f(d) .....................................................................................8

42 U.S.C. §7675 ...........................................................................................4

42 U.S.C. §7675(a)-(k) ................................................................................8

42 U.S.C. §7675(b)(2) .................................................................................5

42 U.S.C. §7675(b)(3) .............................................................................4, 21

42 U.S.C. §7675(b)(6) ...........................................................................20, 21

42 U.S.C. §7675(d) ................................................................................17, 20

42 U.S.C. §7675(d)(1)(A) ..........................................................................17

42 U.S.C. §7675(e)(1)(A)-(C) ................................................5

42 U.S.C. §7675(e)(1)(B) ...............................................10

42 U.S.C. §7675(e)(1)(D) .................................................6

42 U.S.C. §7675(e)(2)(A) ...............................................17

42 U.S.C. §7675(e)(2)(B) .................................................5

42 U.S.C. §7675(e)(2)(C) ............................................6, 17

42 U.S.C. §7675(e)(2)(D) ............................................5, 17

42 U.S.C. §7675(e)(3)......................................6, 7, 17, 18, 22

42 U.S.C. §7675(e)(3)(A) .........................................5, 6, 17

42 U.S.C. §7675(e)(3)(B) ......................... 5, 6, 17, 19, 20, 21, 23

42 U.S.C. §7675(e)(4)(B)(i) ..........................................9, 20

42 U.S.C. §7675(e)(4)(B)(i)-(iii) ........................................6

42 U.S.C. §7675(e)(4)(B)(iv) .........................................5, 20

42 U.S.C. §7675(e)(4)(B)(iv)(I) ..........................................8

42 U.S.C. §7675(e)(4)(B)(v) ..............................................7

42 U.S.C. §7675(g) ...............................................7, 17, 20

42 U.S.C. §7675(j)(2)-(4) ................................................7

42 U.S.C. §7675(k)(1)(C) .................................................8

42 U.S.C. §7676(e)(1)(A)-(C) .............................................6

Pub. L. No. 116-260, 134 Stat. 1182 (Dec. 27, 2020) ..................4, 22

**Regulations**

40 C.F.R. §84.9 .................................................6, 10, 34

40 C.F.R. §84.9(a)(1) ...............................................10, 27

40 C.F.R. §84.9(a)(2) ........................................................................34, 35

40 C.F.R. §84.11(a)(1) ...............................................................................10

40 C.F.R. §84.11(b)(2) ...............................................................................14

40 C.F.R. §84.11a .......................................................................................14

40 C.F.R. §84.15(c) .....................................................................................11

40 C.F.R. §84.15(d) .....................................................................................11

**Other Authorities**

74 Fed. Reg. 56,260 (Oct. 30, 2009).........................................................22

86 Fed. Reg. 55,116 (Oct. 5, 2021)...........................................10, 11, 27

86 Fed. Reg. 55,841 (Oct. 7, 2021)...........................................................11

87 Fed. Reg. 61,314 (Oct. 11, 2022).........................................................12

87 Fed. Reg. 66,372 (Nov. 3, 2022)..........................................................12

88 Fed. Reg. 46,836 (July 20, 2023)........................................ 12, 26, 27, 28, 30, 31

S. Exec. Rep. No. 117-2 (May 26, 2022)...............................................2, 9

S. Treaty Doc. No. 117-1 (Nov. 16, 2021) ...........................................2, 4

## GLOSSARY

| | |
|---|---|
| AIM Act | American Innovation and Manufacturing Act |
| EPA | Environmental Protection Agency |
| HFC | hydrofluorocarbon |
| JA | Joint Appendix |

## INTRODUCTION

Since the mid-1990s, hydrofluorocarbons (HFCs) have played a significant role in helping the United States phase out the use of ozone-depleting substances such as chlorofluorocarbons and hydrochlorofluorocarbons in many manufacturing, industrial, and consumer applications important to our nation's economy—among them, air-conditioning, refrigeration, insulating foams, solvents, and propellants used in thousands of products, including medical devices and asthma inhalers. Because HFCs have little to no effect on the planet's vital ozone layer, HFCs have provided and continue to provide safe alternatives to chlorofluorocarbons and hydrochlorofluorocarbons in many applications.

Even while HFCs have minimal effect on the ozone layer, however, many HFCs possess relatively high global-warming-potential values. Thus, it became widely recognized that HFCs could not serve as complete replacements for chlorofluorocarbons and hydrochlorofluorocarbons. Consequently, from approximately 2009 to 2016, various proposals were considered for amending the Montreal Protocol, the international treaty that seeks to protect the stratospheric ozone layer, to include the phasedown of HFCs within its provisions.[1] These efforts corresponded with substantial investments by producers of HFCs to develop

---

[1] *See* Timeline of Actions on HFCs, https://www.epa.gov/snap/timeline-actions-hfcs (last visited Apr. 9, 2024).

new and alternative HFC blends and other chemicals with lower global warming potential.[2] And manufacturers of equipment and products using HFCs spent considerable resources to redesign their products to utilize these alternatives.

In late 2016, the Parties to the Montreal Protocol adopted the Kigali Amendment, which requires a gradual phasedown of the production and consumption of HFCs. In late 2020, Congress passed the American Innovation and Manufacturing Act (AIM Act), which provides for a phasedown of HFCs in the United States that generally aligns with the timetable and percentage reductions specified by the Kigali Amendment. In September 2022, the U.S. Senate gave its advice and consent to the Kigali Amendment, concurrently recognizing the AIM Act as the domestic law under which the United States would meet its new treaty obligations. S. Treaty Doc. No. 117-1 (Nov. 16, 2021).[3]

To phase down the use of HFCs over time, the AIM Act directed EPA to solicit public comment and promulgate a rule using an allowance allocation and trading program to govern the production and importation of HFCs. EPA

---

[2] *Id.*

[3] The Letter of Transmittal from the White House to the Senate noted that "[t]he United States has sufficient domestic authority to implement obligations under the Kigali Amendment, including through the American Innovation and Manufacturing Act of 2020 (the "AIM Act") and the Clean Air Act." *Id.* at (III). The Senate committee of jurisdiction (Committee on Foreign Relations) affirmed this interpretation. S. Exec. Rep. No. 117-2, at 2-3 (May 26, 2022).

promulgated regulations forming the basic structure of this program in 2021 (the Framework Rule) using data submitted to the Agency detailing prior production and consumption of HFCs over a nine-year period (2011 to 2019). EPA subsequently allocated allowances to producers and importers of HFCs for 2022 and 2023 on the basis of these regulations. EPA then promulgated a second rule— the 2024 Rule under review here—to address the HFC phasedown period running from 2024 to 2028, making a series of small alterations to the underlying program, but retaining its basic structure and methodology, including use of production and import data for the years 2011 through 2019.

Petitioners seek more allowances to import HFCs into the United States than the 2024 Rule gave them. To that end, during the rulemaking process both Petitioners requested that EPA depart from the considerations and formula that EPA had used in the Framework Rule and instead employ a different method for allocating HFC allowances in the 2024 Rule—one that would be more favorable to Petitioners' business interests. EPA declined those requests, determining to retain the methodology it had used in the Framework Rule as the best means to carry out the AIM Act's purposes and maintain the stability of the existing allowance program. Intervenors Air-Conditioning, Heating, and Refrigeration Institute and the Alliance for Responsible Atmospheric Policy (Alliance) submit this brief in support of the 2024 Rule, which the Court should uphold.

## STATUTES AND REGULATIONS

All pertinent statutes and regulations are included in EPA's response brief.

## STATEMENT OF THE CASE

### I.    Statutory Background

### A.    Allowance allocation and trading system

Congress enacted the AIM Act, Section 103(e)(2) of Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (Dec. 27, 2020); 42 U.S.C. §7675[4], in late 2020. The law contains a detailed statutory structure that *requires* a phasedown of the production and consumption of 18 different HFCs in the United States in several steps from 2020 to 2036.[5]

To accomplish this task, Congress first specified formulae for calculating production and consumption[6] baselines for HFCs using historic data (a) from 2011 to 2013, involving prior production and consumption of HFCs; and (b) from 1989, involving prior production and consumption of chlorofluorocarbons and

---

[4] Unless otherwise specified, all statutory references are to Title 42 of the U.S. Code.

[5] The timing and extent of required reductions in HFC production and consumption do not represent some arbitrary period of time, but rather generally conform to the same periods and amounts as defined in Article 2.J(1) and (3) of the Kigali Amendment to the Montreal Protocol. S. Treaty Doc. No. 117-1, PDF pp. 34-35.

[6] "Consumption" is defined as the difference between production of HFCs and importation and export of HFCs, essentially representing net imports of HFCs. §7675(b)(3).

hydrochlorofluorocarbons. §7675(e)(1)(A)-(C). Congress then applied percentage reductions to these baselines and required EPA to use them to calculate the number of allowances (defined as a "limited authorization for the production or consumption" of HFCs, §7675(b)(2)), available for use each year during the phasedown periods, §7675(e)(2)(D). Under the express terms of the AIM Act, EPA must "ensure" each year that these statutory quantities are not exceeded. §7675(e)(2)(B). Congress also specifically directed EPA to phase down the yearly production and consumption of HFCs using an "allowance allocation and trading program." §7675(e)(3)(A)-(B). And this program must be embodied in a rule promulgated "in accordance with" the AIM Act. *Id.*

Multiple provisions further direct how the AIM Act mandatory allowance allocation and trading program is to operate. EPA is required to phase down the production and import of HFCs in the United States using three types of allowances and allowance allocations:

- *Mandatory allowances* are to be allocated to six specific categories of end uses. These end uses include a range of consumer products, manufacturing (semiconductor material or wafer), and "mission-critical military end uses." §7675(e)(4)(B)(iv).

- *Essential use allowances* are specified for end uses of HFCs for which there are no available safe or technically achievable substitutes, or for

which there is an insufficient supply of regulated substances.
§7675(e)(4)(B)(i)-(iii).

- *"General pool" production and consumption allowances.*[7] *General pool production allowances* are to be allocated pursuant to an "allowance allocation and trading program in accordance with [the AIM Act]." §7675(e)(3)(A). *"General pool" consumption allowances* are to be allocated through an allocation and trading program in accordance with the schedule for phasing down the quantity of allowances under §7675(e)(2)(C) and are subject to "the same exceptions and other requirements as are applicable to the phase-down of production of [HFCs under the AIM Act]." §7675(e)(3)(B).

Apart from the overall limitation on the total quantity of allowances available in any one year,[8] none of these allowance types is "capped" as to the amount that may be allocated to each end-use category in any one year, although essential use and

---

[7] The AIM Act does not itself use the term "general pool" allowances; rather, this description of the allowances allocated pursuant to Section 7675(e)(3) was adopted in the Framework Rule. *See* 40 C.F.R. §84.9.

[8] The total quantity of allowances available in any one year cannot exceed the historic production and consumption baselines determined in accordance with Section 7676(e)(1)(A)-(C) (previous years in which HFCs, chlorofluorocarbons, and hydrochlorofluorocarbons were produced and consumed), and Section 7675(e)(1)(D) (providing "exchange values" for individual HFCs, chlorofluorocarbons, and hydrochlorofluorocarbons based on global warming potential), multiplied by the "applicable percentages" provided in the AIM Act.

mandatory allowances are subject to review at least every five years. §7675(e)(4)(B)(v). Congress also provided that these allowances may be freely traded, not only by specifying an "allowance allocation *and trading* program," §7675(e)(3), but also by providing explicit direction with regard to *how* transfers of allowances among regulated entities are to occur. §§7675(g), (j)(2)-(4) (emphasis added).

Within this broader statutory scheme, Petitioners focus all of their arguments on the last category of allowances: general pool allowances. And all of Petitioners' arguments that reference specific allowance allocations focus solely on a subset of general pool allowances: those utilized for consumption.

**B.    Relationship with Clean Air Act provisions addressing the depletion of the ozone layer**

Congress passed the AIM Act as stand-alone legislation, not as an amendment to the Clean Air Act. However, Congress clearly drew on its experience with the phase-out of ozone-depleting substances under the Clean Air Act's title VI, which EPA has successfully implemented for well over three decades using an allowance allocation system. The AIM Act and title VI have parallel statutory structure in terms of the general order and organization of the statutory requirements: (a) definitions; (b) listing of regulated substances; (c) monitoring and reporting requirements; (d) phasedown of production and consumption of regulated substances; (e) exceptions and essential uses; (f)

accelerated schedule; (g) exchange authority; (h) management (recycling and reclaim) of regulated substances; (i) safe alternatives/technology transitions; and (j) relationship to other law. *Compare* §§7671-7671q *with* §7675(a)-(k). Congress also provided that certain provisions of the Clean Air Act shall apply to the AIM Act "as though [the AIM Act] were expressly included in title VI [of the Clean Air Act]," including provisions relating to judicial review, rulemaking, and enforcement. §7675(k)(1)(C).

A significant difference between title VI and the AIM Act, however, is that the former did *not* explicitly allocate allowances to any specific end use, or provide specific allowances for essential uses. The Clean Air Act only required EPA to "promulgate rules … for the issuance of allowances for the production of [certain identified chlorofluorocarbons, hydrochlorofluorocarbons and halons, as well as carbon tetrachloride and methyl chloroform]" and for related rules regarding consumption allowances. §7671f(a), (d).[9] By contrast, the AIM Act creates three separate categories of allowances that cover *all* regulated substances (*i.e.*, all 18 listed HFCs) and also contains: (1) specific directives directing EPA to allocate the "full quantity of allowances necessary" for one category of allowances (mandatory allowances, §7675(e)(4)(B)(iv)(I)), and (2) qualifying criteria for another category

---

[9] EPA was also required to provide for the transfer of such allowances, interpollutant transfers of allowances, and trading. §7671f(a)-(d).

(essential use allowances, §7675(e)(4)(B)(i)). In addition, while the AIM Act provides for allocation of essential use allowances (taken from the overall amount of yearly allowances available), *id.*, title VI provides an *exemption* for certain essential uses (meaning that allowances are not required for such uses), §7671d(d). Thus, in these respects, the AIM Act provides considerably more specific direction to EPA regarding the allocation of allowances than does the 34-year old program Congress authorized in title VI of the Clean Air Act.

It is also not without consequence that the AIM Act phasedown generally aligns with the phasedown required by the Kigali Amendment, which the Senate subsequently gave its advice and consent to with the explicit intention that the AIM Act implement its provisions. Specifically, in May 2022 the Senate Committee on Foreign Relations in reporting the Kigali Amendment to the full Senate for consideration stated that the AIM Act "provides the Executive Branch with the necessary authorities to phase-down the production and consumption of HFCs in the United States, consistent with the Kigali Amendment." S. Exec. Rep. No. 117-2, at 2-3. And the Senate committee noted that "[t]he U.S. Government is already implementing the AIM Act." *Id.* at 3. Given that this congressional assessment of the AIM Act occurred approximately a year and a half after the enactment of the AIM Act and over seven months after promulgation of the Framework Rule, at

minimum it demonstrates that Congress believed EPA was acting consistent with its intent in implementing the required phasedown of HFCs.

## II.    Regulatory Background and the Rule Under Review

Following enactment of the AIM Act, EPA promulgated the "Framework Rule" to provide for the allocation of allowances for calendar years 2022 and 2023. 86 Fed. Reg. 55,116 (Oct. 5, 2021). This rule utilized a historic baseline corresponding to the beginning of the *statutory* production and consumption baseline for HFCs on January 1, 2011. §7675(e)(1)(B); 86 Fed. Reg. at 55,203; 40 C.F.R. §84.9. From this starting point, EPA then allowed the use of an entity's three highest "exchange value-weighted" production and consumption amounts during the years from 2011 through 2019 to calculate allowances that would be allocated to producers and importers of HFCs. 86 Fed. Reg. at 55,203; 40 C.F.R. §§84.9(a)(1), 84.11(a)(1). EPA explained that using such a three-year period provided a "more accurate, equitable, and inclusive" period from which to determine allowance allocations than using data from any single year. 86 Fed. Reg. at 55,145. Among other considerations, this period of time recognized the market transition to lower HFC alternatives as a result of the Kigali Amendment. *Id.* at 55,145-46. And EPA explained that this methodology would provide as "seamless a transition as possible to a regime where allowances are needed to produce and import HFCs, promoting equity, timeliness of implementation, and availability of

robust data." *Id.* at 55,147. The Framework Rule also addressed the mandatory allocation of allowances for certain "application-specific" end uses identified in the AIM Act, and it created a "set-aside" pool of consumption allowances for new market entrants. 86 Fed. Reg. at 55,171; 40 C.F.R. §84.15(c)-(d).

EPA received numerous comments on the Framework Rule. Intervenor Alliance supported using the 2011-2019 time period, pointing out that "[u]sing an average of the three best years during the 2011-2019 period best represents both industry history and ongoing growth and market change" and would "better address market distortions for entities that had high production or consumption levels based on participation in unfair trade practices[.]" Alliance for Responsible Atmospheric Policy Comments at 2, EPA-HQ-OAR-2021-0044-0187, JA__. Regarding this latter point, the Alliance recommended that "EPA … carefully consider and ensure that the final framework for HFC allowance allocations does not reward companies that have increased their market share by importing HFCs in violation of recognized trade requirements." *Id.* at 4, JA__. EPA received separate comments detailing the extent of prior import violations. American HFC Coalition Comments, EPA-HQ-OAR-2021-0044-0160, JA__. EPA subsequently allocated allowances for 2022 on the basis of the formula using the 2011-2019 time period it established for general pool allowances in the Framework Rule. 86 Fed. Reg.

11

55,841 (Oct. 7, 2021).[10] EPA then essentially repeated the process, using the same 2011-2019 time period, to allocate 2023 allowances. 87 Fed. Reg. 61,314 (Oct. 11, 2022).

For the 2024-2028 time period, EPA largely retained the allowance allocation regulations promulgated in the Framework Rule. EPA specifically proposed "to continue using historic production and consumption data from 2011 to 2019, matching the approach taken for allocating calendar year 2022 and 2023 allowances[.]" 87 Fed. Reg. 66,372, 66,377 (Nov. 3, 2022). And in the final 2024 Rule, EPA explained at length and in detail its reasons for retaining the 2011-2019 time period for calculating allowance allocations. 88 Fed. Reg. 46,836, 46,842-50 (July 20, 2023). Responding to comments that including 2020 and 2021 would provide a more "accurate reflection of the current state of the HFC production and import market," EPA "determined that the data from 2020 and 2021 are less representative due to several important global and market factors[.]" *Id.* at 46,843.

## SUMMARY OF ARGUMENT

Petitioners' self-serving challenges to the 2024 Rule do not withstand scrutiny.

---

[10] This notice also allocated mandatory allowances for specific end uses identified in the AIM Act.

I.      Petitioner RMS of Georgia, d/b/a/ Choice Refrigerants (Choice), rests its claims on overarching constitutional principles—attempting to wield the nondelegation doctrine to void EPA's allowance allocation authority. Congress itself, however, made the policy choice at issue here—to phase down the production and consumption of HFCs in the United States—and to that end it enacted a comprehensive phasedown scheme that EPA is simply implementing per Congress's express instruction. And while Choice asserts that it is not challenging "the merits of EPA's decision in this proceeding," Choice Br. 34 (Doc. 2034676), at core its real objection is to the allocation of allowances "to a company that had arranged for Choice's imports" (rather than to Choice itself). Choice Br. 14. But remedying that objection requires the continued existence of consumption allowances, something wholly at odds with the nondelegation arguments Choice advances, which (if accepted by this Court) would render all such allowances null and void. Regardless, there is no impermissible delegation of legislative authority to EPA here, thus Choice's challenge must fail.

II.     For its part, Petitioner IGas engages in a classic but similarly ill-founded argument—that EPA should have included data from a calendar year (specifically, 2020) that was more favorable to IGas' economic interests when

13

EPA developed its allocation methodology in the Final Rule.[11] But EPA sufficiently explained why it chose to stick with the allocation methodology it developed for the Framework Rule, and why it excluded data from 2020 (and 2021)—the first two years of the coronavirus pandemic, when market conditions were topsy-turvy, and also years in which evidence suggested stockpiling of HFCs in anticipation of the AIM Act-mandated phasedown. EPA's explanations for adhering to its prior allocation methodology and excluding data from 2020 (and 2021) were rational and reasonable, and that is enough to sustain the 2024 Rule.

## ARGUMENT

### I.    The AIM Act Constitutionally Delegates Specific, Constrained Regulatory Authority to EPA.

#### A.    The AIM Act includes intelligible principles that guide and constrain EPA's discretion in allocating HFC allowances.

Choice argues that the AIM Act lacks explicit and unequivocal criteria to govern EPA's allocation of allowances to individual entities, and that the statute therefore unconstitutionally "transfers legislative power to EPA." *See, e.g.*, Choice Br. 22. Not so. So long as the Act provides "an intelligible principle to which [EPA] is directed to conform, [it] is not a forbidden delegation of legislative

---

[11] IGas requests only vacatur of certain provisions affecting the calculation of consumption allowances pursuant to 40 C.F.R. §84.11(b)(2) and a remand for EPA to re-calculate 2024-2028 consumption allowances. IGas Br. 43 (Corrected, Doc. 2036348).

power." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (internal quotation marks and citation omitted).

The AIM Act provides the requisite intelligible principles to guide and constrain EPA's choices and thus readily passes constitutional muster. To effectuate its goal of phasing down the production and consumption of HFCs, Congress in the AIM Act provided EPA a comprehensive framework based on historic HFC production and consumption data as a guide, and then deferred to EPA's expertise as to how to implement this framework. This is all the Constitution requires.

Courts have long upheld delegations of decision-making authority in statutes where Congress "clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated authority." *Mistretta*, 488 U.S. at 372-73 (internal quotation marks and citation omitted); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 475 (2001); *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). These factors are rooted in the practical notion that Congress must be able to delegate decision-making power to the expert federal agencies to address the complexities that arise in modern society, *see Mistretta*, 488 U.S. at 372, complexities that are generally beyond Congress's ability to address at such a granular level.

Accordingly, "[t]he standards necessary to satisfy the nondelegation doctrine 'are not demanding.'" *Consumers' Rsch., Cause Based Commerce, Inc. v. FCC*, 88 F.4th 917, 923 (11th Cir. 2023) (quoting *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019)), *petition for cert. filed*. Indeed, the Court "ha[s] over and over upheld even very broad delegations." *Gundy*, 139 S. Ct. at 2129; *see also N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 25 (1932) (upholding a delegation to the Interstate Commerce Commission to regulate in the "public interest"). As the Supreme Court stated in *Whitman*, "[E]ven in sweeping regulatory schemes we have never demanded … that statutes provide a determinate criterion for saying how much of the regulated harm is too much…. A certain degree of discretion, and thus of lawmaking, inheres in most executive or judicial action." 531 U.S. at 475 (cleaned up). Only in instances where "Congress had failed to articulate *any* policy or standard" to constrain executive branch discretion has the Court found the delegation unconstitutional. *Mistretta*, 488 U.S. at 373, n.7 (emphasis added). But these instances are rare, and (as amply evidenced by Choice's brief) all of them lie nearly 90 years in the past.

Congress clearly articulated in the AIM Act that its policy and intent were to ensure that HFCs are phased down in line with the amounts and schedules it prescribed. EPA cannot lawfully vary from that overarching statutory objective, and that limitation is all the Constitution demands.

In fact, Congress puts forth in the AIM Act even more than just an intelligible principle—like the statute under review in *Mistretta*, the AIM Act "outlines the policies which prompted" EPA's task of reducing HFC production and consumption, explains what EPA "should do and how it should do it, and sets out specific directives to govern particular situations." 488 U.S. at 379 (internal quotation marks and citation omitted).

First, the AIM Act outlines, among others, the following policy objective: phasing down the production and consumption of listed HFCs on a strict timeline. *See* §7675(e)(2)(C)-(D), (e)(3)(A)-(B). Second, the AIM Act directs EPA to develop an "allowance allocation and trading program" (effectively a "cap-and-trade" system that allows subsequent reallocation of allowances through private sector transactions) through which to effectuate that policy objective. §7675(e)(3). Importantly, Congress also directs EPA to establish mandatory HFC reporting requirements, upon which the Agency's allowance program can rely to facilitate compliance and trading activity. *See* §7675(d). Finally, the AIM Act specifies: (a) who is subject to the requirement to hold allowances (*i.e.*, those who produce or consume HFCs), *see* §7675(e)(2)(A); (b) how allowances may be transferred among different entities, *see* §7675(g); and (c) who is required to report activities regarding HFCs (including their production, import, export, destruction, transformation, use as a process agent, or reclamation), *see* §7675(d)(1)(A). *See*

17

*also supra* pp.4-7. Together, these requirements maintain the integrity of the

allowance system and ensure compliance with the overarching objective of phasing

down HFCs over time. This hardly represents a legislative program under which,

as Choice alleges, EPA has carte blanche to determine who may or may not remain

in the market.

### B.    Choice's selective quotations from and interpretation of the AIM Act do not advance its nondelegation argument.

Choice myopically focuses on a single paragraph of the AIM Act, Section

103(e)(3), §7675(e)(3)—which sets forth the general requirement that EPA issue a

rule to phase down the production and consumption of HFCs "through an

allowance allocation and trading program"—in an effort to create support for its

nondelegation doctrine argument. Choice Br. 24-27. Choice argues that this single

provision, read in isolation, gives EPA impermissible legislative authority by

allowing the Agency to determine which entities should receive allowances. *Id.* at

26.

But the courts have been clear that reading such provisions in isolation is

improper; instead, the judiciary "must interpret the standard, not in 'isolation,' but

with regards to 'the purpose of the Act, its factual background and the statutory

context in which [it] appear[s].'" *Allstates Refractory Contractors, LLC v. Su*, 79

F.4th 755, 761 (6th Cir. 2023) (quoting *Am. Power & Light*, 329 U.S. at 104),

*petition for cert. filed*; *see also Gundy*, 139 S. Ct. at 2118 (stating that "[t]h[e]

Court has long refused to construe words 'in a vacuum'.... Rather, the Court interprets statutory provisions—including delegations—by reading the text in 'context' and in light of the statutory 'purpose'") (citations omitted).

Choice also omits key statutory language in arguing the AIM Act lacks language setting forth the required "intelligible principle." Notably missing from Choice's selective quotation is *any* reference to the pellucid statutory text expressly limiting EPA's discretion regarding consumption allowances; per the statute, such allowances may only be allocated "in accordance with the schedule under paragraph (2)(C) (*subject to the same exceptions and other requirements* as are applicable to the phase-down of production of regulated substances under this section)." §7675(e)(3)(B) (emphasis added). In allocating consumption allowances, Congress directed EPA to look outside of paragraph 103(e)(3), §7675(e)(3), to the "other requirements" of the AIM Act. Choice completely ignores this limiting language, likely because its real complaint with the 2024 Rule is not that the statute violates the Constitution, but that Choice itself did not receive the quantity of HFC consumption allowances it desired to facilitate its future imports. Choice Br. 14.

Based on its cherry-picking of statutory language, Choice argues that with regard to allocating allowances, "EPA is legislating." Choice Br. 22. Choice complains that the AIM Act contains "nothing to guide EPA in its exercise of governmental power to limit liberty." Choice Br. 26. But this is simply wrong.

19

EPA is not required to view the allowance allocation standard in isolation. *See Am. Power & Light*, 329 U.S. at 104. In fact, EPA is specifically directed by Congress to look to the entire AIM Act (*i.e.*, "this section") for guidance in making its decisions related to the allocation of HFC consumption allowances. §7675(e)(3)(B); *see also Am. Power & Light*, 329 U.S. at 104 (explaining that a statute's standards "need not be tested in isolation"). This broader legislative context—referring to the "same exceptions and other requirements"—provides the very standards and boundaries Choice claims are missing from section 103(e)(3). These "other requirements" are those that Congress specified "under this section"—in other words, the entire AIM Act, including specified allowance allocations for propellants used in metered-dose inhalers, the etching of semiconductor material, mission-critical military end uses, onboard aerospace fire suppression, and other uses, §7675(e)(4)(B)(iv); and essential uses where "no safe or technically achievable substitute[s] are available" or where supply of HFCs is insufficient, §7675(e)(4)(B)(i). These "other requirements" also include provisions to facilitate trading and hence redistribution of allowances, §7675(g), and important compliance and reporting requirements to ensure the integrity of the annual "cap" on allowances, §7675(d), and, by extension, the market value of allowances. And these other requirements include the definition of what it means to "import" a regulated substance, §7675(b)(6), a term also used to define

"consumption," §7675(b)(3), and thereby, what actions are subject to the phasedown of regulated substances under the AIM Act.[12]

In short, Congress comfortably met the permissible-delegation standard by setting forth within the entire AIM Act intelligible principles with appropriate constraints to guide EPA's authority in phasing down the use and consumption of HFCs through allowance allocations and a trading system.

### C.    Choice's attempt to analogize to the two lone successful nondelegation arguments falls flat.

The courts have "'almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law.'" *Whitman*, 531 U.S. at 474-75 (quoting *Mistretta*, 488 U.S. at 416 (Scalia, J., dissenting)). Indeed, in two centuries of case law, the

---

[12] EPA is to issue a final rule "phasing down the consumption of regulated substances in the United States through an allowance allocation and trading program[.]" §7675(e)(3)(B). Here, it should be noted that Choice complains that its "injury in this case was caused when EPA decided to give allowances to companies that happened to report historic HFC *imports* for years 2011-2019 into EPA's greenhouse gas reporting system, even if a different company actually *received* and *used* the imports in a manufacturing process in the U.S. refrigerant market." Choice Br. 32-33 (emphasis added). But the AIM Act statutory definition of "import" (central to the definition of "consumption") does not mention such third parties. "The term 'import' means to land on, bring into, or introduce into, or attempt to land on, bring into, or introduce into, any place subject to the jurisdiction of the United States, regardless of whether that landing, bringing, or introduction constitutes an importation within the meaning of the customs laws of the United States." §7675(b)(6). Thus, EPA properly allocated allowances to importers of HFCs and not to companies that obtained and used such HFCs only after the act of importation.

Supreme Court has *only twice* found a violation of the nondelegation doctrine, and both instances occurred nearly 90 years ago. *See Panama Refin. Co. v. Ryan*, 293 U.S. 388, 430 (1935); *see also A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 530 (1935). Choice nonetheless insists that these two antiquated cases take precedence over nearly a century of consistent case law upholding delegations to the federal agencies, and their argument suffers accordingly.

As discussed above, a plain reading of the AIM Act, considering all parts and how they work together (as opposed to Choice's myopic focus on Section 7675(e)(3)), belies Choice's argument that EPA has unfettered authority. At its core, the AIM Act is a program designed to determine allowances based on historical production and consumption. Therefore, it is neither unreasonable nor impermissibly unconstrained for EPA to: (1) determine HFC allowance allocations based on historical HFC production and consumption data; (2) use verifiable information derived from the Greenhouse Gas Reporting Program[13] to derive those allocations; (3) weight allowances based on their exchange value (as opposed to some other metric); and (4) create a neutral regulatory formula for calculating

---

[13] Choice complains that EPA "invented" the GHGRP and that this program is not authorized by any congressional legislation. This is incorrect. The Consolidated Appropriations Act, 2008 (Pub. L. No. 110-161) directed EPA to use existing Clean Air Act authority to promulgate greenhouse gas reporting rules. EPA subsequently promulgated regulations relying on Clean Air Act sections 114 and 208. *See* 74 Fed. Reg. 56,260, 56,264-65 (Oct. 30, 2009).

allowances. The explicit language in Section 7675(e)(3)(B) also refutes Choice's contention that the statute does not sufficiently guide and constrain EPA in the exercise of its discretion. Congress directs EPA to subject its phasedown—including allowance allocations—to the "same exceptions and other requirements … under this section," thereby limiting EPA's authority. §7675(e)(3)(B); Choice Br. 5.

Moreover, Choice's suggestion of different allocation criteria—specifically, that EPA should have declined to give allowances to a "company that had arranged for imports", Choice Br. 33, and instead given them to Choice—shows that Choice is not really interested in invalidating EPA's rulemaking on constitutional grounds, but instead simply wishes the allowance allocation methodology EPA adopted had more favored it than its competitors. Choice Br. 31-32. Choice's additional contention that the AIM Act "does not reflect any legislative consideration of factors such as time in business, percentage of business, [or] geographic priorities," Choice Br. 32, is little more than a complaint that Choice wishes that Congress had made different legislative choices than it did. True, Congress did not divvy up allowances based on factors such as the location (domestic vs. foreign) of a business—it was under no obligation to. Congress *did* consider factors it deemed relevant, carving out some allowances for mandatory allocation and providing other allowances for essential uses. That fundamentally is a decision for Congress,

not Choice, and it does not demonstrate an impermissible delegation of authority to EPA.

Finally, Choice asserts that the AIM Act fails to provide an intelligible principle because, unlike title VI of the Clean Air Act, "[t]he AIM Act does not provide, for example, for market share to be maintained but proportionately reduced in volume[.]" Choice Br. 31 (citing §7671c(a)). This inapt analogy reveals the flaws in Choice's logic. First, Choice ignores that the production phase-out in the Clean Air Act it references is just that—a *production* phase-out. It speaks not at all to the market share of importers like Choice, who are concerned with *consumption* allowances. Second, the provision Choice cites says nothing about allowances or allowance allocations to implement title VI; it is fundamentally a cap on actual production of *certain* ozone depleting substances, *i.e.*, class I substances, and not others.[14] Third, Choice claims that Congress would have employed "typical legislative factors such as reliance expectations of market participants, economic effect on the HFC market, or sufficient supply to consumers," Choice Br. 31-32, without citation to any statutory provision referencing such factors, much less the quantity required to make them "typical."

---

[14] Title VI also provides for the phase-out of class II substances which are enumerated hydrochlorofluorocarbons. *See* 42 U.S.C. §§7671a(b), 7671d. Note that the phase-out of hydrochlorofluorocarbons under §7671d makes *no* mention of allowances.

In fact, *not one* of the litany of factors Choice purports would satisfy its conception of an "intelligible principle" is backed up by any reference to a statute.

In sum, the weight of precedent and pragmatism overwhelms Choice's arguments that Congress in the AIM Act impermissibly delegated legislative authority to EPA. The Court should reject Choice's challenges and uphold the AIM Act's allowance allocation framework—as implemented through the 2024 Rule—as a constitutional delegation of decision-making authority guided by intelligible principles that appropriately cabin EPA's authority and discretion.

## II.    EPA Appropriately Retained the Original Allowance-Allocation Methodology for the 2024-2028 Time Period.

Like Choice, Petitioner IGas is unhappy with the specific HFC allowance allocations EPA promulgated in the 2024 Rule. Unlike Choice, IGas does not attempt to take down the statute on constitutional grounds to advance its own commercial interests. Instead, IGas mounts a more pedestrian challenge to the 2024 Rule, complaining that EPA acted arbitrarily and capriciously when it allocated HFC allowances for the years 2024-2028, because the Agency did not include data from 2020 in the methodology for allocating those allowances. But EPA was under no duty to include that 2020 data in its methodology, and its reasons for declining to do so were eminently reasonable.

EPA received numerous comments supporting its use of a historical 2011-2019 period to calculate allowance allocations and advocating a number of reasons

why EPA should exclude the years 2020 and 2021 from the baseline calculation. Chemours, for instance, urged that "a broad range of years can help to account for market fluctuations…. [T]here is considerable value in not disrupting the market for allowances by altering the basis on which they are calculated." Chemours Comments at 8, EPA-HQ-OAR-2022-0430-0047, JA__. Honeywell made similar arguments, commenting that, "as the proposed rule rightfully states, 'the 2011-2019 dataset is well understood and has received more review than any other set of years.'" Honeywell Comments at 3, EPA-HQ-OAR-2022-0430-0039, JA__. Intervenor Alliance commented that it "agrees that the years 2020 and 2021 should not be included in the general pool allowance allocation formula, as those years are 'contaminated' by COVID effects and stockpiling in anticipation of the phasedown." Alliance Comments at 2, EPA-HQ-OAR-2022-0430-0084, JA__.

In the rulemaking context, EPA is only required to "consider[] the relevant factors and articulate[] a 'rational connection between the facts found and the choice made.'" *Midwest Ozone Grp. v. EPA*, 61 F.4th 187, 192 (D.C. Cir. 2023) (citation omitted). EPA did so here, "determin[ing] that the data from 2020 and 2021 are less representative [than the data for earlier years] due to several important global and market factors, and therefore do not accurately represent companies' market share." 88 Fed. Reg. at 46,843.

Courts have made clear that an agency acts arbitrarily or capriciously only when it (1) has relied on factors which Congress has not intended it to consider, (2) entirely failed to consider an important aspect of the problem, (3) offered an explanation for its decision that runs counter to the evidence before the agency, or (4) is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 606 (D.C. Cir. 2016) (internal quotation marks and citation omitted). None of these circumstances is present here, where EPA simply continued its past practice of relying on the average of each eligible company's three highest exchange value-weighted annual production and consumption amounts from 2011-2019—data that it had previously determined was appropriate to use. 86 Fed. Reg. at 55,147, 55,203; 40 C.F.R. §84.9(a)(1).

## A.    EPA Reasonably Concluded That 2020 HFC Data was Unrepresentative of Existing Market Conditions.

In its Final Rule, EPA noted evidence suggesting that some entities were stockpiling HFCs in 2020 in anticipation of Congress's late-2020 passage of the AIM Act and EPA's implementation of the new law.[15] IGas quibbles with EPA's conclusions, arguing that, while EPA's exclusion *of 2021* was sound based on

---

[15] EPA noted evidence regarding "recent import activity of regulated HFCs, specifically with respect to the stark, unprecedented, and otherwise inexplicable (aside from stockpiling) increase in import activity in 2021 from a limited number of entities." 88 Fed. Reg. at 46,843.

concerns about stockpiling, EPA had no basis for excluding 2020, as imports of HFCs in 2020 were roughly the same as they had been in 2019. IGas contends that this fact rebuts EPA's claims regarding stockpiling of HFCs during 2020. IGas Br. 18. But EPA explained why it concluded that 2020 too showed evidence of stockpiling. As EPA stated (and as IGas itself quotes), "[t]he Agency also maintains that 2020 import activity was also atypical, i.e., import levels were almost equal to 2019 import activity, *even with the various effects of COVID-19*." IGas Br. 19 (quoting 88 Fed. Reg. at 46,846) (emphasis added). Put another way, given how disruptive the pandemic was of global supply of and demand for goods, one would have expected 2020 HFC import activity to be *even lower* than it was. That it was not lower was, in EPA's view, likely indicative of stockpiling for future years.

Comments provided to the Agency supported this analysis and pointed to the incentive for a company to gain *relative* advantage in allowance allocations by including in the baseline a year or years that were more favorable to it:

> Major efforts to encourage Congress to pass the AIM Act were ongoing throughout 2020 and finally successful in December of that year. Arkema's analysis of HFC import data shows that this legislative activity, along with anticipation of a 2021 rulemaking, coincided with a large increase in imports.

Response to Comments 28, EPA-HQ-OAR-2022-0430-0111_Att._1, JA__.

IGas argues that this Court should disregard EPA's reasoned conclusion regarding how unrepresentative 2020 was of historical production and consumption data and instead "perform its own 'searching and careful inquiry into the underlying facts.'" IGas Br. 15 (quoting *Mississippi v. EPA*, 744 F.3d 1334, 1342 (D.C. Cir. 2013)). But its citation to and quotation from *Mississippi* is cherry-picking at its worst. While the *Mississippi* decision does call for the Court to engage in a "searching and careful inquiry into the underlying facts," the Court also made very clear the well-settled administrative law principle that it "do[es] not look at the decision as would a scientist, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality." 744 F.3d at 1342 (internal quotation marks and citation omitted); *see also Wynnewood Refin. Co. v. EPA*, 77 F.4th 767, 782 (D.C. Cir. 2023) ("Under the deferential arbitrary and capricious standard, we evaluate whether the challenged agency action is reasonable and reasonably explained.") (internal quotation marks and citation omitted). EPA's explanation—that it saw in the near-equivalence of the 2019 and 2020 data, despite "the various effects of COVID-19" during 2020, evidence of stockpiling—very plainly satisfies this "highly deferential standard of review[.]" *Mississippi*, 744 F.3d at 1342. As we now show, EPA considered all the relevant statutory factors and adequately explained its

29

decision to exclude 2020 from its baseline calculation, and that is all that was required of it.

In the 2024-2028 Rule, EPA proposed and finalized an approach that "match[ed] the approach taken for allocating calendar year 2022 and 2023 allowances[.]" 88 Fed. Reg. at 46,842. In other words, EPA used data from 2011-2019, but did not use more recent data, from 2020 and 2021, due to the distorting effects of the pandemic and concerns about stockpiling during those years. IGas argues that EPA should have used one additional recent year (2020) in allocating allowances but not another recent year (2021) that EPA also excluded from consideration. IGas Br. 14-43. This is a different position from that taken in its comments, where IGas argued that adding *both* 2020 and 2021 to the "allocation baseline" was necessary. IGas comments at 3-10, EPA-HQ-OAR-2022-0430-0070, JA__-__.

IGas argues that EPA's conclusions that 2020 data are '"unrepresentative' of 'existing market conditions' and 'distorted'" are arbitrary and capricious and that EPA's reliance on GHGRP data to conclude that companies engaged in stockpiling HFCs is misplaced. IGas Br. 16-17. IGas also argues that *producers* of refrigerants, solvents, and propellants need *fewer* allowances than IGas because they are "transitioning away from HFCs and 'actively commercializing alternatives to high-GWP [(global warming potential)] HFCs." IGas Br. 35. But EPA considered a

number of factors when deciding to exclude 2020 (and 2021). Among these, EPA

noted that "production and importation of HFCs in 2020 and 2021 were influenced

by external factors such as the COVID-19 pandemic and supply chain disruptions"

and that "data from 2020 and 2021 are distorted due to entities' awareness in 2020

of Congress's efforts to pass [the AIM Act]." 88 Fed. Reg. at 46,843. EPA

explained that, had it included data from 2020 and 2021 in its baseline calculation,

"EPA could unfairly give additional weight to some entities that imported amounts

*that were not reflective of demand*[.]" *Id.* (emphasis added). EPA noted that "[f]ive

companies are responsible for approximately 97 percent of the net increase in

import activity … between 2020 and 2021[.]" *Id.* Further, EPA explained that

including 2020 and 2021 would "likely disrupt the market and negatively affect

ongoing adjustments to the HFC Allocation Program that have taken place in 2022

and 2023." *Id.* at 46,844.

   That IGas is dissatisfied with EPA's ultimate decision regarding whether to

use data from 2011-2019 versus data from 2011-2020 does not undermine the

reasonableness of the Agency's final allocation methodology or the allocations

themselves. The record shows that EPA considered all the "relevant data and

articulate[d] a satisfactory explanation for its action[.]" *Nat'l Shooting Sports

Found., Inc. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) (quoting *Motor Vehicle

31

*Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*MVMA*")). That is all the law requires.

### B.    IGas's remaining arguments lack merit.

In the Final Rule, EPA largely maintained the allowance allocation methodology it promulgated in the 2022 Framework Rule. Thus, EPA was only required to articulate "a rational connection between the facts found and the choice made." *U.S. Sugar Corp.*, 830 F.3d at 606 (internal quotation marks and citation omitted). Contrary to IGas's insinuations, "a final rule which declines to embrace a proposed policy change and stays the course with the agency's original approach"—as EPA decided to do here—"can be positive evidence of careful decisionmaking." *Nat. Res. Def. Council, Inc. v. U.S. EPA*, 822 F.2d 104, 112 (D.C. Cir. 1987) (citation omitted).

IGas alleges fatal error because EPA "lumped" 2020 and 2021 together and did not individually consider each year on its own. IGas Br. 11; *see also id.* at 14. This argument strains credulity since, in its comments, IGas itself advocated for EPA to include both 2020 and 2021. IGas Comments 3-10, EPA-HQ-OAR-2022-0430-0070, JA__-__. And IGas cites no comments that argued that EPA should consider 2020 and 2021 data separately. *See also* EPA Br. 41-44 (Doc. 2045932). Such objections do not support a determination of arbitrary and capricious rulemaking. *CTS Corp. v. EPA*, 759 F.3d 52, 61 (D.C. Cir. 2014) (rejecting a

Petitioner's attempt at "methodological nit-picking" when it asserted that the agency acted arbitrarily because it did not take two additional steps in its method).

Nevertheless, IGas claims that "[t]he Supreme Court's decision rejected a similar approach in *MVMA*[, 463 U.S. at 43]." IGas Br. 14. But while the court in *MVMA* struck down an agency's action, citing the agency's failure to "separately consider the continuous belt option" in the context of a decision to repeal mandates for automatic seat belts and airbags, 463 U.S. at 55-56, two key distinctions exist with regard to the rule under review. First, the agency in *MVMA* was *changing its course* by repealing the mandates. Second, the Court required this unusual vetting of alternative options because the agency ultimately "decided to employ a seatbelt system which *will not meet the [] objectives of [the statute]*." *Id.* at 49 (emphasis added). This logic is inapplicable here. Here, EPA is not changing its course; rather, it is *retaining* the data sets upon which its prior rule relied.

Moreover, the final 2024 Rule fully meets the objectives of the AIM Act: to reduce the production and consumption of HFCs in accordance with the statutory schedule through an allowance allocation and trading program. Unlike the agency's decision in *MVMA*, EPA's decision to promulgate the 2024 Rule in its final form does not impede the AIM Act's primary objective, and this Court should simply refuse to "substitute its judgment for that of the agency." *Id.* at 43. The Court should not allow IGas to advance its own economic interests at the expense

of others who will be harmed by a decision in IGas's favor, under the guise of an arbitrary-and-capricious challenge to an agency action.

With regard to IGas' complaint that producers (which it mistakenly calls OEMs, IGas Br. 36) need fewer allowances because they have invested in the very substitutes that will help the United States reduce its production and consumption of HFCs, the response is obvious: Entities that are actively investing and developing HFC substitutes are acting in accordance with the overall purpose of the Kigali Amendment and the AIM Act, to reduce the use of high global warming potential HFCs over time in a safe and effective manner. That is by no means a basis for discriminating against them by awarding them fewer allowances.

At the core of IGas' arguments regarding arbitrary and capricious rulemaking is pure economic self-interest. IGas indicates that aftermarket suppliers had "their best import years" in 2020-2021. IGas Br. 8. Using 2020 in the baseline calculation for allocation of allowances in 2024 through 2028, then, would disproportionately benefit these entities (presumably importers) over other entities that benefited from 2020's exclusion.

Under EPA's allowance allocation rules, allowances are allocated on the basis of "high 3" imports over nine years. 40 C.F.R. §84.9. Specifically, an annual average of entity's "three highest" years form the numerator for calculating an entity's relative percentage of total allowances. *Id.* §84.9(a)(2). The denominator

consists of the "average high year" values for all eligible entities. *Id.* Thus, one or two similar years to the nine years already in the baseline makes little difference to the overall calculation of the "denominator." But adding one or two years to a numerator consisting of three years would have greater impact, particularly if such years were an entity's "best years." This math is what appears to be at stake in the current litigation on the Final Rule, not any broader principle enshrined in the AIM Act.

In sum, IGas complains that it was not among the "winners" in the allocation methodology chosen by EPA for the 2024 Rule. But EPA adequately and rationally explained both why it chose to rely on the data from 2011 to 2019 in calculating that the baseline for the 2024 Rule and why it chose to exclude 2020 (and 2021) from that baseline. Such technical judgments fall into the area in which the expert agencies are granted the greatest degree of deference—that of weighing facts and making technical and scientific judgments—and IGas has not shown any reason why the Court should decline to grant such deference to EPA here.

## CONCLUSION

For the reasons set forth in this brief and in those filed by EPA and *amicus curiae* Natural Resources Defense Council, the Court should deny the petitions for review and uphold EPA's 2024 Rule.

/s/ *Thomas A. Lorenzen*
Thomas A. Lorenzen
Robert J. Meyers
Elizabeth B. Dawson
Felicia L. Isaac
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C. 20004-2595
Phone: (202) 624-2789
Fax: (202) 628-5116
tlorenzen@crowell.com

*Counsel for Intervenors for Respondent*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation contained in Fed. R. App. P. 32(a)(7) and this Court's December 18, 2023 Order (Doc. 2031956) because, excluding the portions exempted by Rule 32(f), this brief contains 8,016 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in 14-point Times New Roman.

/s/ Thomas A. Lorenzen
Thomas A. Lorenzen

**CERTIFICATE OF SERVICE**

I certify that on April 10, 2024, I electronically filed the foregoing brief with the Clerk of Court for the U.S. Court of Appeals for the District of Columbia Circuit through the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Thomas A. Lorenzen*
Thomas A. Lorenzen