# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 8, 2024          Decided August 1, 2025

No. 23-1261

IGAS HOLDINGS, INC., ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

AIR-CONDITIONING, HEATING, AND REFRIGERATION
INSTITUTE AND ALLIANCE FOR RESPONSIBLE ATMOSPHERIC
POLICY,
INTERVENORS

———

Consolidated with 23-1263

———

On Petitions for Review of a Final Rule
of the Environmental Protection Agency

———

*JoAnn T. Sandifer* argued the cause for petitioners IGas
Holdings, Inc., et al. With her on the briefs were *Jamie
Shookman* and *Daniel G. Solomon*.

2

*Zhonette M. Brown* argued the cause for petitioner RMS of Georgia, LLC. With her on the briefs were *Kaitlyn D. Schiraldi* and *David M. Williamson*.

*Michael Pepson* was on the brief for *amicus curiae* Americans for Prosperity Foundation in support of petitioners.

*Sarah A. Buckley*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief was *Todd Kim*, Assistant Attorney General.

*Elizabeth B. Dawson* argued the cause for intervenors for respondent. With her on the brief were *Thomas A. Lorenzen* and *Robert J. Meyers*.

*Sarah C. Tallman*, *David Doniger*, *Nanding Chen*, and *Ian Fein* were on the brief for *amicus curiae* Natural Resources Defense Council in support of respondent.

Before: PILLARD, PAN, and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PAN.

PAN, *Circuit Judge*: Hydrofluorocarbons (HFCs) are synthetic cooling agents used in a variety of applications, including refrigeration and air conditioning. Despite their utility, HFCs are extremely potent greenhouse gases that increase global warming. To address that problem, Congress passed the American Innovation and Manufacturing (AIM) Act of 2020. The AIM Act requires an 85 percent reduction in U.S. production and consumption of HFCs by 2036. Congress specified that the HFC phasedown would be accomplished with a cap-and-trade program, and it tasked the Environmental Protection Agency (EPA) with administering that program.

3

In 2021, the EPA issued a rule to implement the cap-and-trade program for the years 2022 and 2023 (the Framework Rule). The program required the EPA to calculate and allocate "allowances" that authorized industry members to produce and consume HFCs. The EPA allocated the allowances to market participants according to their historic market share, and determined the market share of each participant based on its production-and-consumption activities in the years 2011 to 2019. Subsequently, the EPA issued a new rule to set the allocation methodology for the years 2024 through 2028 (the 2024 Rule). In the new rule, the EPA again allocated allowances to market participants according to their historic market share, and again used data from the years 2011 to 2019 to calculate that market share.

We now consider two challenges to the 2024 Rule. Petitioner RMS of Georgia, LLC (which goes by its trade name, "Choice") argues that Congress violated the nondelegation doctrine when it granted the EPA authority to allocate use allowances, and that the EPA unconstitutionally exercised legislative power when it promulgated the 2024 Rule. Petitioner IGas Holdings, Inc. (IGas) argues that the EPA's exclusion of 2020 data from its market-share calculations was arbitrary and capricious. We deny both petitions for review.

**I.**

The 2024 Rule is not the first of its kind. Congress has employed cap-and-trade programs to phase out industrial use of other hazardous refrigerants, including chlorofluorocarbons (CFCs) and hydrochlorofluorocarbons (HCFCs). Those predecessor programs are the model for the one at issue in this case.

4

Both CFCs and HCFCs are ozone-depleting substances. In 1986, the United States agreed to regulate such substances when it ratified the 1985 Vienna Convention for the Protection of the Ozone Layer. The subsequent 1987 Montreal Protocol, ratified by the United States in 1988, set specific targets for the global elimination of CFCs and HCFCs. To make good on those treaty obligations, Congress enacted Title VI of the Clean Air Act, 42 U.S.C. § 7671 *et seq.*, which effectuated a phaseout of CFC- and HCFC-emissions in the United States. Title VI created a cap-and-trade program that (1) set limits (caps) on the total level of emissions for CFCs and HCFCs, (2) authorized the EPA to issue emissions allowances to market participants (not to exceed the overall cap), (3) allowed companies to sell (trade) their unused allowances, and (4) made it unlawful for anyone to emit the regulated substances without having a corresponding allowance. *See id.* §§ 7671c(a)–(c), 7671d(a)–(c), 7671f. Today, CFCs have been eliminated, and new production and importation of most HCFCs were phased out as of 2020 (although some HCFCs are still used in existing air conditioners and refrigeration equipment).

HFCs have proven to be an effective replacement for the phased-out refrigerants. With the increased global use of air-conditioning and refrigeration, the demand for HFCs also has surged. Although HFCs do not deplete the ozone layer, they present their own problem: HFCs are potent greenhouse gases with a relative climatic impact "that can be hundreds to thousands of times that of carbon dioxide." J.A. 341. Thus, in 2016, signatories of the Montreal Protocol passed the Kigali Amendment, which mandates reductions in the production and consumption of HFCs. Although the United States did not ratify the Amendment until 2022, Congress passed the AIM Act to address HFCs in 2020.

5

The AIM Act, 42 U.S.C. § 7675, mandates an 85 percent phasedown of HFC production and consumption by 2036. To accomplish that goal, the Act employs a cap-and-trade program like those that were used to phase out CFCs and HCFCs. Subsection (e) of the AIM Act creates a program that schedules the HFC phasedown and authorizes the allocation of production-and-consumption allowances that are capped and traded. Subsection (e)(1) sets production-and-consumption baselines according to specific formulas,[1] while subsection (e)(2) sets a timeline for gradually reducing HFC use as a "capped" percentage of the baseline. Subsection (e)(3) directs the EPA to allocate the allowances, which then can be traded. The program accomplishes the targeted reductions in HFC production and consumption by lowering the number of available allowances each year.

Specifically, under subsection (e)(2)(C), HFC production and consumption is capped at 90 percent of the baseline for the years 2020 to 2023; at 60 percent of the baseline for the years 2024 to 2028; at 30 percent of the baseline for the years 2029 to 2033; at 20 percent of the baseline for the years 2034 to 2035; and, finally, at 15 percent of the baseline by the year 2036. *See* 42 U.S.C. § 7675(e)(2)(C).

For each year, the EPA must "ensure that the annual quantity of all regulated substances produced or consumed in the United States does not exceed" the targets in subsection (e)(2)(C). 42 U.S.C. § 7675(e)(2)(B). To accomplish that task, the EPA "shall use" the listed targets "to determine the quantity

---

[1]    The statute directs the EPA to set the baselines as the average annual quantity of all regulated substances produced or consumed from 2011 to 2013, plus the sum of 15 percent of the production or consumption level of HCFCs in 1989 and 0.42 percent of the production or consumption level of CFCs in 1989. *See* 42 U.S.C. § 7576(e)(1)(B)–(D).

6

of allowances" for each year. *Id.* § 7675(e)(2)(D)(i). The AIM Act describes an "allowance" as "a limited authorization for the production or consumption of a regulated substance." *Id.* § 7675(e)(2)(D)(ii)(I)(bb). Under subsection (e)(2), "no person shall" produce or consume "a quantity of a regulated substance without a corresponding quantity of [production-and-consumption] allowances." *Id.* § 7675(e)(2)(A).

Subsection (e)(3) of the Act gives the EPA authority to "issue a final rule" that accomplishes the following:

> (A) phasing down the production of regulated substances in the United States through an allowance allocation and trading program in accordance with this section; and
>
> (B) phasing down the consumption of regulated substances in the United States through an allowance allocation and trading program in accordance with the schedule under paragraph (2)(C) . . . .

42 U.S.C. § 7675(e)(3).

Finally, Congress provided for certain exceptions and also mandated that the EPA initially "allocate the full quantity of allowances necessary" for a small class of "essential uses." 42 U.S.C. § 7675(e)(4)(B)(iv).

## A.

In 2021, the EPA promulgated its Framework Rule, which implements subsection (e) of the AIM Act for the years 2022 and 2023. *See* Phasedown of Hydrofluorocarbons: Establishing the Allowance Allocation and Trading Program Under the [AIM] Act (*Framework Rule*), 86 Fed. Reg. 55116

7

(Oct. 5, 2021).  As directed by the statute, the Framework Rule calculated HFC production-and-consumption baselines under subsection (e)(1) and then determined the quantity of allowances that would be available in 2022 and 2023 under subsection (e)(2) — *i.e.*, the quantity that would achieve 90 percent of the baseline level of production and consumption.

The Framework Rule also established an allocation plan for the 2022–2023 allowances.  First, the EPA decided that allowances would be issued to entities that had historical production-and-consumption data and that were still active in 2020, with case-by-case exceptions for companies with pandemic-related disruptions in 2020.  Next, the EPA allocated the available allowances to those entities according to their historical market share.  To calculate an entity's market share, the EPA looked to that entity's three highest years of production or consumption activity between the years 2011 and 2019.  It then averaged the data from those three high years and divided that number by the sum of all entities' high-three averages.  Finally, the EPA multiplied that number by the total number of allowances in the pool (which was 90 percent of the baseline amount).  The EPA said it would reconsider this methodology before the next step of the phasedown, in 2024.

**B.**

Subsequently, the EPA proposed an allocation methodology for HFC allowances for the years 2024 through 2028, the period for which subsection (e)(2) capped production and consumption at 60 percent of the baseline.  After calculating the quantity of allowances available, the EPA proposed "to continue using historic production and consumption data from 2011 to 2019" to allocate allowances by market share, in part to "minimize disruption to the market in 2024," and in part because the "EPA ha[d] conducted

8

multiple rounds of outreach and review" on that dataset. Phasedown of Hydrofluorocarbons: Allowance Allocation Methodology for 2024 and Later Years (*Proposed Rule*), 87 Fed. Reg. 66372, 66377–78 (Nov. 3, 2022).

The EPA noted, however, that it was "considering whether to include more recent data" to reflect the current state of the HFC production and import market. *Proposed Rule*, 87 Fed. Reg. at 66378. The EPA therefore "request[ed] comment on whether to expand the range of years to use to develop each allowance holder's high three-year average to include 2020 and 2021." *Id.* But the agency previewed its concerns about using the more recent data, stating: "[T]he Agency recognizes that production and importation of HFCs in 2020 and 2021 were likely influenced by external factors such as the COVID–19 pandemic, and supply chain disruptions. In addition, EPA is concerned that data from 2020 and 2021 could be distorted due to an entity's awareness that the AIM Act may be, or had been, passed," leading to stockpiling. *Id.* The EPA further worried that "[e]xpanding the range of years could also significantly change each entity's market share, which could disrupt the market and negatively affect ongoing adjustments to the HFC Allocation Program that have taken place in 2022 and 2023." *Id.* Finally, the EPA said it was "unaware of any environmental benefit associated with changing the years used to determine allowance allocations." *Id.*

Petitioners Choice and IGas each submitted comments on the proposed rule. Choice is a small business that reclaims HFCs and invents HFC blends. Its comments argued that subsection (e) of the AIM Act unconstitutionally delegated legislative power to the EPA. IGas is a participant in refrigerant aftermarkets for existing HFC-containing equipment. IGas's comments urged the EPA to include data from the years 2020 and 2021 in its allocation methodology

9

because, in its view, the EPA's focus on years 2011 to 2019 ignored the aftermarket's growth in more recent years and favored companies that were not involved in the aftermarket.

In its final 2024 Rule setting the allocation methodology for the years 2024 to 2028, the EPA continued to rely on market-share data from 2011 to 2019 and thus excluded data from 2020 and 2021. *See* Phasedown of Hydrofluorocarbons: Allowance Allocation Methodology for 2024 and Later Years (*2024 Rule*), 88 Fed. Reg. 46836, 46842 (July 20, 2023). The EPA explained that the data from 2020 and 2021 were not representative of the typical market due to the pandemic, had not been as thoroughly vetted as the 2011 to 2019 dataset, and could cause market disruptions by drastically changing entities' market share from what had been implemented under the Framework Rule.

## C.

Choice and IGas timely petitioned for review of the 2024 Rule, and their appeals were consolidated. Two trade associations whose members are regulated HFC importers and producers — the Air-Conditioning, Heating, and Refrigeration Institute, and the Alliance for Responsible Atmospheric Policy — intervened as respondents.[2]

---

[2]    Article III standing is a prerequisite to intervention, even as a respondent. *See Deutsche Bank Nat'l Tr. Co. v. FDIC*, 717 F.3d 189, 193 (D.C. Cir. 2013). *But see Inst'l Shareholder Servs. v. SEC*, -- F.4th --, 2025 WL 1802786, at *4 n.3 (D.C. Cir. July 1, 2025) (recognizing tension with cases holding that "intervenors that seek the same relief sought by at least one existing party need not" show standing (citing *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 674 n.6 (2020))). Although no party

10

## II.

Petitioner Choice argues that the AIM Act unconstitutionally delegates legislative power to the EPA by granting the agency "unconstrained authority" to allocate HFC allowances.  Choice Br. 1.  Choice asks us to vacate the EPA's 2024 Rule because it is "contrary to constitutional right, power, privilege, or immunity."  42 U.S.C. § 7607(d)(9)(B) (made applicable to the AIM Act through 42 U.S.C. § 7675(k)(1)(C)).

### A.

Amicus National Resources Defense Council (NRDC) argues that Choice lacks standing to challenge the EPA's 2024 Rule.  We disagree.  Choice imports HFCs that are regulated by the EPA under the AIM Act, and Choice receives allowances for that import activity.  Choice therefore "has standing to challenge an allegedly illegal statute or rule under which it is regulated." *State Nat'l Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015).

NRDC contends, however, that Choice has not established standing because it has not alleged that its injury will be redressed by the court striking down the only section of the AIM Act that Choice challenges: subsection (e)(3), which provides for the allocation of allowances.  According to NRDC, if subsection (e)(3) is vacated and the EPA thereby loses its authority to allocate allowances, then no entity could

---

contests the Intervenors' standing, "we have an independent obligation to assure ourselves that standing exists." *Pub. Emps. for Env't Resp. v. EPA*, 77 F.4th 899, 912 (D.C. Cir. 2023) (cleaned up).  Because the Intervenors are both trade associations whose members are regulated HFC importers and producers, they have associational standing.  *See Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002).

11

produce or consume HFCs at all because subsection (e)(2) prohibits the production and consumption of HFCs without a corresponding allowance. NRDC reasons that the resulting inability to import HFCs would exacerbate, not redress, Choice's injury of having its "market activity limited" and its "market share . . . reduced." Choice Br. 15, 18.

We disagree with NRDC's assumption that subsection (e)(2) would remain operative if we invalidated subsection (e)(3). An unconstitutional provision is "presumed severable" from the statute only "if what remains after severance is fully operative as a law." *INS v. Chadha*, 462 U.S. 919, 934 (1983) (cleaned up). Any presumption of severability is overcome where "it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not." *Buckley v. Valeo*, 424 U.S. 1, 108 (1976) (cleaned up); *see also Regan v. Time, Inc.*, 468 U.S. 641, 653 (1984) ("Whether an unconstitutional provision is severable from the remainder of the statute in which it appears is largely a question of legislative intent[.]").

In our view, the interrelated subparts of subsection (e) are not severable. Subsection (e)(2) prohibits HFC production and consumption without a corresponding allowance. That provision cannot be "fully operative as a law" without subsection (e)(3)'s mechanism for allocating allowances. *Chadha*, 462 U.S. at 934 (cleaned up). Congress plainly would not have enacted the remainder of subsection (e) if there were no way to allocate HFC allowances because the entire cap-and-trade program depends on the availability of allowances.

Accordingly, we are satisfied that Choice has standing to challenge the constitutionality of subsection (e)(3).

12

**B.**

Turning to the merits, we hold that the AIM Act does not unconstitutionally delegate legislative power because it sufficiently constrains the EPA's discretion to allocate HFC allowances.

**1.**

The Constitution vests "[a]ll legislative Powers herein granted . . . in a Congress of the United States." U.S. Const. art. I, § 1. "This text permits no delegation of those powers[.]" *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001). That does not mean, however, that Congress may not seek "assistance from another branch." *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406 (1928). "[I]n particular, [Congress] may confer substantial discretion on executive agencies to implement and enforce the laws." *Gundy v. United States*, 588 U.S. 128, 135 (2019) (plurality opinion). The Constitution is not offended when Congress "vest[s] discretion in" agencies "to make public regulations interpreting a statute and directing the details of its execution," so long as that discretion is "within defined limits." *J.W. Hampton*, 276 U.S. at 406; *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 46 (1825) (Marshall, C.J.) ("[T]he maker of the law may commit something to the discretion of the other departments[.]"); *Am. Trucking*, 531 U.S. at 475 ("A certain degree of discretion . . . inheres in most executive . . . action." (cleaned up)); *cf. Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024) ("In a case involving an agency, of course, the statute's meaning may well be that the agency is authorized to exercise a degree of discretion.").

"Once it is conceded, as it must be," that some discretion — and "even some judgments involving policy considerations" — "must be left to the officers executing the law," the

13

remaining debate is "not over a point of principle but over a question of degree." *Mistretta v. United States*, 488 U.S. 361, 415 (1989) (Scalia, J., dissenting). The Court has said that "the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred." *Am. Trucking*, 531 U.S. at 475. "The guidance needed is greater . . . when an agency action will affect the entire national economy than when it addresses a narrow, technical issue[.]" *FCC v. Consumers' Rsch.*, No. 24-354, slip op. at 11 (June 27, 2025) (cleaned up). Still, "even in sweeping regulatory schemes," the nondelegation doctrine has "never demanded . . . that statutes provide a determinate criterion." *Am. Trucking*, 531 U.S. at 475 (cleaned up).

The nondelegation analysis boils down to this: When "confer[ring] decisionmaking authority upon agencies," Congress "must lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform." *Am. Trucking*, 531 U.S. at 472 (cleaned up). When setting forth an "intelligible principle," Congress is not required to "prescribe detailed rules" but rather to "clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). If a federal law contains such an intelligible principle to guide an agency's actions, then there is no nondelegation problem: The law permissibly grants discretion to an agency rather than unconstitutionally transfers legislative power. *See Consumers' Rsch.*, slip op. at 6 (Kavanaugh, J., concurring) ("[W]hen implementing legislation that contains an intelligible principle, the President is exercising executive power.").

Consistent with the foregoing principles, the Supreme Court has invalidated only two federal laws for violating the nondelegation doctrine, both times in 1935, and "in each case

14

because Congress had failed to articulate *any* policy or standard to confine discretion." *Gundy*, 588 U.S. at 146 (cleaned up) (emphasis in original); *see also A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935). Since then, the Court has "over and over upheld even very broad delegations." *Gundy*, 588 U.S. at 146. To name a few: The Court has upheld laws authorizing agencies to regulate broadcast licensing as "public interest, convenience, or necessity" requires, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–26 (1943); set "just and reasonable" rates for natural gas, *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 600 (1944); and set air-quality standards that are "requisite to protect the public health," *Am. Trucking*, 531 U.S. at 472–76. In so doing, the Court has affirmed and reaffirmed that the governing standards for a permissible delegation are "not demanding." *Gundy*, 588 U.S. at 146.

**2.**

Against that backdrop, the AIM Act easily passes muster. Congress enacted a detailed program for capping and trading HFC allowances, in which the EPA has discretion to decide how to allocate the allowances. Congress provided ample direction to guide the EPA's exercise of discretion: The Act's text, structure, and history demonstrate that Congress intended for the EPA to model its cap-and-trade program on similar programs established under the Clean Air Act, and those programs allocated allowances to market participants according to their market share. "Given that statutory meaning," Choice's "constitutional claim must fail" — subsection (e)(3)'s "delegation falls well within permissible bounds." *Gundy*, 588 U.S. at 136.

15

The question of whether Congress has supplied an intelligible principle to guide the agency's use of discretion begins with statutory interpretation. We must "constru[e] the challenged statute to figure out what task it delegates and what instructions it provides." *Gundy*, 588 U.S. at 136. "Only after a court has determined a challenged statute's meaning can it decide whether the law sufficiently guides executive discretion to accord with Article I." *Id.* The established rules of statutory interpretation "hold[] good for delegations, just as for other statutory provisions." *Id.* at 141. And so, when reviewing a statute for an intelligible principle, "we do not confine ourselves to the isolated phrase in question, but utilize all the tools of statutory construction, including the statutory context and, when appropriate, the factual background of the statute to determine whether the statute provides the bounded discretion that the Constitution requires." *Owens v. Republic of Sudan*, 531 F.3d 884, 890 (D.C. Cir. 2008); *see Consumers' Rsch.*, slip op. at 22 (noting that previous nondelegation cases "did not examine . . . statutory phrases in isolation but instead looked to the broader statutory contexts, which informed their interpretation and supplied the content necessary to satisfy the intelligible-principle test").

We thus review the AIM Act's "text, considered alongside its context, purpose, and history." *Gundy*, 588 U.S. at 136. We agree with the EPA that the statute guided the agency "to allocate . . . allowances among persons that have produced or imported hydrofluorocarbons." EPA Br. 27–29. The statutory text commands the EPA to allocate allowances "in accordance with" the Act, 42 U.S.C. § 7675(e)(3); and the Act focuses on reducing HFC "production and consumption." *See id.* § 7675(e)(3)(A)–(B) (directing the EPA to "issue a final rule" "phasing down the production . . . [and] consumption" of HFCs); *see also id.* § 7675(e)(2)(C) (setting schedule for reducing baseline levels of "production and consumption" of

16

HFCs).  To accomplish the statute's goal of phasing down HFCs, the EPA must require the existing players in the HFC market to lower their HFC "production and consumption" to a degree that is commensurate with the capped number of allowances issued by the agency.  A natural way to allocate the allowances to achieve that purpose is to rely on the market participants' historical market share.

Moreover, precedent supports that approach:  The AIM Act follows the lead of two predecessor cap-and-trade programs that virtually eliminated the emissions of CFCs and HCFCs.  Indeed, legislative history demonstrates that the AIM Act was "modeled on" Title VI of the Clean Air Act.  *See Promoting American Innovation and Jobs: Legislation to Phase Down Hydrofluorocarbons: Hearing on H.R. 5544 Before the Subcomm. on Env't & Climate Change of the H. Comm. on Energy & Com.*, 116th Cong. 2, 7 (2020) (statements of Rep. Paul Tonko, Chairman, H. Subcomm. on Env't & Climate Change, and Rep. Frank Pallone, Jr., Chairman, H. Comm. on Energy & Com.) (Title VI "proved an able vehicle to foster an orderly, market-based phasedown of HFCs' predecessors," and the AIM Act "builds upon [Congress's] previous experience in phasing out CFCs and their replacement chemicals, HCFCs.").  Thus, in both statutes, Congress used "baseline" years to set caps and phaseout schedules for the regulated refrigerants.  *Compare* 42 U.S.C. §§ 7671(2)(A)–(C), 7671c(a), 7671d(b), *with id.* § 7675(e)(1).  Congress also directed the EPA to allocate allowances to accomplish the refrigerant phaseouts "in accordance with" each controlling Act.  *Compare* 42 U.S.C. §§ 7671c(c), 7671d(c), *with id.* § 7675(e)(3).  Congress even expressly incorporated certain provisions of Title VI into the AIM Act, such as the penalty, recordkeeping-and-monitoring, citizen-suit, and judicial-review provisions.  *See id.* § 7675(k)(1)(C).

17

Based on the strong similarity between the programs created by the AIM Act and Title VI, it is evident that Congress expected the EPA to implement the HFC cap-and-trade program in a manner that tracked the successful predecessor programs for CFCs and HCFCs — and those predecessor programs allocated allowances according to market share. *Compare* Protection of Stratospheric Ozone, 57 Fed. Reg. 33754, 33754 (July 30, 1992) ("[The EPA] [a]pportions baseline allowances to produce or import ozone depleting substances to companies that produced or imported certain ozone depleting substances in the baseline years[.]"), *with 2024 Rule*, 88 Fed. Reg. at 46837 ("The Agency is basing these general pool allocations on entities' market shares derived from the average of the three highest years of production and consumption, respectively, of regulated substances between 2011 and 2019."). That interpretation of the AIM Act is consistent with "the familiar principle that Congress legislates with a full understanding of existing law." *Am. Fed'n of Gov't Emps. v. FLRA*, 46 F.3d 73, 78 (D.C. Cir. 1995). Congress intended that the EPA would implement the AIM Act by allocating allowances in an orderly, market-based fashion, as it did when implementing cap-and-trade programs under Title VI. *See Am. Power & Light Co.*, 329 U.S. at 104 (concluding that the relevant delegation "derive[d] much meaningful content from the purpose of the Act, its factual background and the statutory context").[3]

---

[3] We also note that, to the extent the AIM Act is susceptible to more than one plausible construction, we should read the statute to avoid granting discretion that is so broad that it could create a nondelegation problem. *See Consumers' Rsch.*, slip op. at 30 ("Statutes (including regulatory statutes) should be read, if possible, to comport with the Constitution, not to contradict it."); *Gundy*, 588 U.S. at 136 (rejecting the petitioner's preferred reading of the statute, under which the Court "would face a nondelegation question").

18

"Now that we have determined what [the statute] means, we can consider whether it violates the Constitution." *Gundy*, 588 U.S. at 145. The foregoing analysis reveals that our interpretation of the statute all but answers the constitutional question of whether Congress provided an intelligible principle to guide the agency's discretion. *See id.* at 136 ("[I]ndeed, once a court interprets the statute, it may find that the constitutional question all but answers itself.").

Here, the AIM Act directs the EPA's regulatory authority "to a particular subject matter . . . in a particular industry" — *i.e.*, the allocation of a capped number of allowances for the production and consumption of HFCs. *Sanchez v. Off. of State Superintendent of Educ.*, 45 F.4th 388, 401–02 (D.C. Cir. 2022). "Within that narrow sphere," Congress "can delegate considerable discretion." *Id.* at 402. Indeed, how to allocate allowances in a cap-and-trade program is the sort of "technical issue" for which little guidance is necessary. *Consumers' Rsch.*, slip op. at 11; *see Am. Trucking*, 531 U.S. at 475 ("[T]he degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred."). By modeling the AIM Act on Title VI, Congress "imposed ascertainable and meaningful guideposts for" the EPA "to follow when carrying out its delegated function of" allocating HFC allowances: The guideposts are found in Title VI and its implementing regulations, which allocated allowances according to the historical market share of industry participants. *Consumers' Rsch.*, slip op. at 19. The AIM Act's allocation provisions, read in context, are constitutionally sufficient and do not violate the nondelegation doctrine. *See Gundy*, 588 U.S. at 135–36; *see also Sanchez*, 45 F.4th at 401–02 (concluding that the "implication of the Act, read as a whole," clearly guided the Mayor's discretion).

19

The AIM Act plainly does not give the EPA the sort of unbounded discretion that renders a statute unconstitutional. Subsection (e)(3) is very different from the only two precedents, from over ninety years ago, that applied the nondelegation doctrine to strike down a law. *See Panama Refining Co.*, 293 U.S. 388; *A.L.A. Schechter Poultry Corp.*, 295 U.S. 495. The Supreme Court overturned statutes "in each case because Congress had failed to articulate *any* policy or standard to confine discretion." *Gundy*, 588 U.S. at 146 (cleaned up) (emphasis in original). By contrast, as discussed, the history and context of the AIM Act show that Congress provided ample direction to confine the EPA's discretion in implementing the statute's allowance-allocation program.

**3.**

We are unpersuaded by Choice's counterarguments. Choice complains that the AIM Act's language directing the EPA to distribute allowances "in accordance with this section," 42 U.S.C. § 7675(e)(3), is not as specific as the direction provided in other sections of the Act. But the Constitution does not require the degree of specificity demanded by Choice. *See Am. Trucking*, 531 U.S. at 475 (noting that the nondelegation doctrine has "never demanded . . . that statutes provide a determinate criterion" (cleaned up)).

Choice further disputes Title VI's relevance to the AIM Act and says that Title VI cannot provide limiting principles here because Congress "expressly incorporated certain procedural provisions of the Clean Air Act" while "declin[ing] to refer to any substantive provisions." Choice Reply Br. 14. As already discussed, however, the Act's structure and history clearly show that Congress relied on Title VI for more than the procedural provisions expressly incorporated. *See, e.g.*, *Hearing on H.R. 5544*, 116th Cong. 2 (statement of Rep. Paul

20

Tonko) ("The legislation is modeled on Title VI of the Clean Air Act," which "proved an able vehicle to foster an orderly, market-based phasedown of HFCs' predecessors.").

Finally, Choice accuses the EPA of taking different positions in prior proceedings and argues that the EPA's decision to model its HFC phasedown on Title VI today does not prevent the EPA from "abandon[ing] this system in the future." Choice Reply Br. 14; *see also Am. Trucking*, 531 U.S. at 472 ("[A]n agency [cannot] cure an unlawful delegation of legislative power by adopting in its discretion a limiting construction of the statute."). We decline to consider this possibility because it is not our job to address hypothetical future applications of the AIM Act. *Cf. Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 584 (1998) (We will not "invalidate legislation on the basis of . . . hypothetical . . . situations not before" us. (cleaned up)). If the EPA "abandon[s] this system in the future," Choice Reply Br. 14, that action can be subject to further APA challenge.

For the reasons discussed, we deny Choice's petition.

**III.**

Petitioner IGas challenges the EPA's 2024 Rule as arbitrary and capricious. According to IGas, the EPA's decision to calculate market share by considering an entity's three highest years of production and consumption between 2011 and 2019 was unreasonable because it excluded 2020 data.[4] Because the EPA's methodology was reasonable, we reject IGas's challenge and deny its petition for review.

---

[4]    IGas has standing to challenge the 2024 Rule. IGas imports HFCs regulated by the EPA's Rule and receives allocations for that

21

**A.**

As a threshold matter, we disagree with the EPA's contention that IGas forfeited its argument that the agency "failed to independently consider whether 2020 data should be included" in the allocation methodology. IGas Br. 15. The EPA argues that IGas's comments during the agency-review process urged the agency to adopt data from *both* 2020 and 2021, which did not adequately preserve its argument on appeal that EPA should consider *only* the 2020 data. *See* 42 U.S.C. § 7607(d)(7)(B) (An argument is preserved for appeal if it was made "with reasonable specificity during the period for public comment" before the agency.). But the EPA's assertion that IGas did not previously "point[] to any material difference between the 2020 and 2021 data," EPA Br. 41, is belied by the record. In direct response to the EPA's concern about stockpiling in 2020 and 2021, IGas offered different reasons for disproving the stockpiling theory for each year. *Compare* J.A. 260–61, *with* J.A. 262–63. Because IGas pointed out differences in the 2020 and 2021 data, IGas's "comment to the agency was adequate notification of the general substance" of a claim that the agency should consider each year's data separately. *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 891 (D.C. Cir. 2006); *see also Appalachian Power Co. v. EPA*, 135 F.3d 791, 817–18 (D.C. Cir. 1998) ("[T]he [Clean Air] Act does not require that precisely the same argument that was made before the agency be rehearsed again, word for word, on judicial review.").

---

import activity. It is thus an "object of the action . . . at issue," and there is "little question" that the action has caused it injury and that a judgment preventing the action will redress that injury. *Sierra Club v. EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002) (cleaned up).

22

**B.**

On the merits, we conclude that the EPA reasonably excluded the 2020 data. Under the Clean Air Act, made applicable to the AIM Act through 42 U.S.C. § 7675(k)(1)(C), we "may reverse any [] action found to be arbitrary, capricious, [or] an abuse of discretion." 42 U.S.C. § 7607(d)(9)(A). "To determine whether EPA's rules are arbitrary and capricious, we apply the same standard of review under the Clean Air Act as we do under the Administrative Procedure Act (APA)." *Allied Loc. & Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 68 (D.C. Cir. 2000) (cleaned up). Under that standard, an agency must engage in reasoned decision-making. *See Michigan v. EPA*, 576 U.S. 743, 750 (2015). This means that "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up). Agency action is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem," or "offered an explanation for its decision that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* But our "scope of review under the 'arbitrary and capricious' standard is narrow," and we are not to "substitute [our] judgment for that of the agency." *Id.* Further, "when an agency relies on multiple grounds for its decision," we may "sustain the decision as long as one is valid and the agency would clearly have acted on that ground even if the other were unavailable." *Casino Airlines, Inc. v. NTSB*, 439 F.3d 715, 717 (D.C. Cir. 2006) (cleaned up).

23

Applying that deferential standard of review, the EPA's decision to exclude the 2020 data from its allocation methodology was not arbitrary and capricious because the agency reasonably concluded that (1) the data was unrepresentative of market share, and (2) its inclusion would disrupt the market.

First, the EPA reasonably determined that the 2020 data was "less representative due to several important global and market factors," "such as the COVID–19 pandemic and supply chain disruptions," "and therefore [did] not accurately represent companies' market share." *2024 Rule*, 88 Fed. Reg. at 46843. The EPA conducted extensive stakeholder outreach and received comments agreeing with its concern that the "production and importation of HFCs in 2020 [] were influenced by external factors such as the COVID–19 pandemic and supply chain disruptions." *Id.* Indeed, IGas's own comments conceded that 2020 was "anomalous as a result of the COVID–19 pandemic where supply chain difficulties dominated all markets." J.A. 60; *see also* J.A. 256 (continuing to represent that there were "significant difficulties with supply and transportation caused by the COVID–19 pandemic"). The EPA's final rule further noted that the agency "received comments from a trade organization whose members represent 70 percent of the dollar value of the HVAC-Refrigeration market, 400 whole companies, nearly 300 manufacturing associates and nearly 100 manufacturer representatives, who supported the Agency's proposal to exclude 2020 and 2021 from evaluation." *2024 Rule*, 88 Fed. Reg. at 46843. It was plainly reasonable for the EPA to rely on the comments of a "breadth of stakeholders," *id.* at 46844, as well as IGas's own comments about the 2020 data.

We also reject IGas's argument that the 2020 data should be included even if it is atypical, to avoid punishing companies

24

that managed to do well in atypical years. The EPA's decision that allocations should reflect typical market share is a policy judgment entitled to deference. *See Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir. 2004) (We do not "substitute our policy judgment for that of the Agency."). Our job is limited to "ensuring that EPA has examined the relevant data and articulated a satisfactory explanation for its action." *Id.* (cleaned up). Here, the EPA has done that. The EPA acknowledged the issue raised by IGas, but disagreed "that it would be appropriate to incorporate data influenced by the pandemic because some entities did well during those years." *2024 Rule*, 88 Fed. Reg. at 46845. The EPA reasonably declined to "provid[e] a company with additional future allowances based on activity in years that are so unusual." *Id.*[5]

Second, the EPA's decision to exclude the 2020 data because of its potential to disrupt the market independently supports upholding the 2024 Rule. In the 2024 Rule, the EPA chose to maintain existing market-share calculations — which did not include 2020 data — because "[r]egulated entities have . . . previously expressed a preference for allowances to be allocated using a consistent approach for as long as possible." *2024 Rule*, 88 Fed. Reg. at 46844. The agency determined that "[a]pplying a similar approach as the one taken" previously

---

[5]   And contrary to IGas's assertions, the EPA was not inconsistent in its treatment of 2020 data. IGas argues that the EPA's decision to exclude 2020 data as unrepresentative is undermined by the Framework Rule, which required entities to be an active market participant in 2020 to be eligible for allowances. But the Framework Rule recognized the atypicality of 2020 by providing exceptions for entities that were inactive in 2020 due to the COVID–19 pandemic. *See Framework Rule*, 86 Fed. Reg. at 55144 (stating that the EPA will "give individualized consideration to circumstances of historical importers that were not active in 2020," "for example if [inactivity] was due to the COVID–19 pandemic").

25

"will provide a longer-term planning horizon for HFC producers and entities importing, which will enable entities to make decisions about which HFCs, and HFC substitutes, to produce and import as the market transitions[.]" *Id.* For those reasons, the EPA concluded, retaining the Framework Rule's dataset to set allowances was the "best means for reducing (though not eliminating) disruption to the market." *Id.* The EPA thus "justif[ied] its rule with a reasoned explanation." *Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009).

We disagree with IGas's claim that excluding 2020 data does not advance the EPA's stated goal of continuity and that the EPA's conclusion was "left completely unexplained." IGas Br. 42 (quoting *West Virginia v. EPA*, 362 F.3d 861, 866 (D.C. Cir. 2004)). And although IGas argues otherwise, the EPA was not required to conduct studies to conclusively show that the 2020 data would have significantly changed individual allocations. The APA "imposes no general obligation on agencies to produce empirical evidence." *Stilwell*, 569 F.3d at 519.

For the foregoing reasons, we deny IGas's petition.[6]

*So ordered.*

---

[6] We need not examine the additional reasons that the EPA provided for excluding the 2020 data, including its statements that 2020 was not a representative year due to stockpiling ahead of the AIM Act's passage, and that 2020 data was not as reliable or well-vetted as data from 2011 to 2019. That analysis would be superfluous. *See Casino Airlines*, 439 F.3d at 717 ("We have consistently held that when an agency relies on multiple grounds for its decision, some of which are invalid, we may nonetheless sustain

---

the decision as long as one is valid and the agency would clearly have acted on that ground even if the other were unavailable." (cleaned up)).